UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

UNITED STATES OF AMERICA,

     -against-

CHEVELLE NESBETH,

          Defendant.

-------------------------------------------------x

**OPINION**
15-CR-18 (FB)



**Appearances:**
*For the United States:*
ROBERT L. CAPERS
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

*For the Defendant:*
AMANDA L. DAVID
HEIDI C. CESARE
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, New York 11201

By:   PAUL G. SCOTTI
       Assistant United States Attorney

**BLOCK, Senior District Judge:**

      Chevelle Nesbeth was convicted by a jury of importation of cocaine and possession of cocaine with intent to distribute. Her advisory guidelines sentencing range was 33-41 months. Nonetheless, I rendered a non-incarceratory sentence today in part because of a number of statutory and regulatory collateral consequences she will face as a convicted felon. I have incorporated those consequences in the balancing of the 18 U.S.C. § 3553(a) factors in imposing a one-year probationary sentence.

      I am writing this opinion because from my research and experience over two

decades as a district judge, sufficient attention has not been paid at sentencing by me and lawyers—both prosecutors and defense counsel—as well as by the Probation Department in rendering its pre-sentence reports, to the collateral consequences facing a convicted defendant.[1] And I believe that judges should consider such consequences in rendering a lawful sentence.

There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction.

The effects of these collateral consequences can be devastating. As Professor Michelle Alexander has explained, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'"[2]

Preparatory to sentencing Ms. Nesbeth, I afforded counsel the opportunity to opine as to whether collateral consequences should indeed be part of the § 3553(a)

---

[1] This opinion has been attached to the Judgment of Conviction as the requisite Statement of Reasons. *See* 18 U.S.C. § 3553(c)(2); *United States v. Santiago*, 384 F.3d 31, 35-37 (2d Cir. 2004) (discussing the district court's obligation to provide a written statement of reasons).

[2] MICHELLE ALEXANDER, THE NEW JIM CROW 142 (2010).

mix, and requested written submissions. The Government was essentially non-committal. Not surprisingly, the Office of the Federal Defender—which represented Ms. Nesbeth—gave a positive response. Commendably, both parties' submissions detailed the collateral consequences she faces.

Because of the significance which I attach to the need of the criminal justice system to embrace collateral consequences as a sentencing issue, I write extensively, addressing in turn: (I) The History of Collateral Consequences; (II) The Depth and Breadth of Post-Conviction Statutory and Regulatory Collateral Consequences; (III) The Governing Caselaw; (IV) Ms. Nesbeth's Collateral Consequences and the Balancing of all § 3553(a) Factors; (V) The Shaping of the Sentence; and (VI) The Responsibilities of Counsel and the Probation Department.

## I. The History of Collateral Consequences

### A. From Past to Present

The notion of "civil death"—or "the loss of rights . . . by a person who has been outlawed or convicted of a serious crime"[3]—appeared in American penal systems in the colonial era, derived from the heritage of English common law.[4] As explained by

---

[3] *Civil Death*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[4] *The Collateral Consequences of a Criminal Conviction*, 23 VAND. L. REV. 929, 942-949 (1970); MARGARET COLGATE LOVE, JENNY ROBERTS & CECELIA KLINGELE, COLLATERAL CONSEQUENCES OF CRIMINAL CONVICTIONS: LAW, POLICY AND PRACTICE 8 (2013 ed.).

the New York Court of Appeals in 1888, a convicted felon in old England was

> placed in a state of attainder.  There were three principal incidents consequent upon an attainder for treason or felony, forfeiture, corruption of blood, and an extinction of civil rights, more or less complete, which was denominated civil death.  Forfeiture was a part of the punishment of the crime . . . by which the goods and chattels, lands and tenements of the attainted felon were forfeited to the king . . . .  The blood of the attainted person was deemed to be corrupt, so that neither could he transmit his estate to his heirs, nor could they take by descent from the ancestor . . . .  The incident of civil death attended every attainder of treason or felony, whereby, in the language of Lord Coke, the attainted person "is disabled to bring any action, for he is *extra legem positus*, and is accounted in law *civiliter mortuus*," or, as stated by Chitty, "he is disqualified from being a witness, can bring no action, nor perform any legal function; he is in short regarded as dead in law."[5]

In the United States, civil death has never been imposed by common law; it has always been a creature of statute.[6]

The concept of civil death persisted into the twentieth century as an "integral part of criminal punishment."[7]  Some commentators express that the continuation of civil death, "[e]ven watered down and euphemistically denominated 'civil disabilities,' . . . functioned after the Civil War to perpetuate the social exclusion and

---

[5] Gabriel J. Chin, *The New Civil Death: Rethinking Punishment in the Era of Mass Conviction*, 160 U. PA. L. REV. 1789, 1794 (2012) (omissions in original) (quoting *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888)).

[6] *Id.*

[7] LOVE, ET AL., *supra* note 4, at 8.

political disenfranchisement of African-Americans."[8] These compelling critiques are not limited to traditional civil death and persist with great force to the modern imposition of collateral consequences to convicted felons.

The mid- to late-twentieth century saw the rise and fall of efforts at reforming the harshness of collateral consequences. In 1950, Congress passed the Federal Youth Corrections Act,[9] which was designed to "give youthful criminals 'an incentive to reform' by 'removing the infamy of [their] social standing.'"[10] Specifically, the Act made federal offenders between the ages of eighteen and twenty-six eligible "to have their convictions 'set aside' if the court released them early from probation."[11] The Model Penal Code disseminated by the American Law Institute in 1962 adopted a section under which a "sentencing court would be empowered, after an offender had fully satisfied the sentence, to enter an order relieving 'any disqualification or

---

[8] *Id.* (citing DOUGLAS BLACKMON, SLAVERY BY ANOTHER NAME: THE RE-ENSLAVEMENT OF BLACK PEOPLE IN AMERICA FROM THE CIVIL WAR TO WORLD WAR II (2008) and WILLIAM COHEN, AT FREEDOM'S EDGE: BLACK MOBILITY AND THE SOUTHERN WHITE QUEST FOR RACIAL CONTROL (1991)).

[9] Federal Youth Corrections Act, ch. 1115, 64 Stat. 1085 (1950) (codified at 18 U.S.C. §§ 5005-5056 (1976) (repealed in 1984)).

[10] Margaret Colgate Love, *Starting Over with a Clean Slate: In Praise of a Forgotten Section of the Model Penal Code*, 30 FORDHAM URB. L.J. 1705, 1709 (2003) (alteration in original) (quoting Aidan R. Gough, *The Expungement of Adjudication Records of Juvenile and Adult Offenders: A Problem of Status*, 1966 Wash. U. L. Q. 147, 162 (1966)).

[11] *Id.*

disability imposed by law because of the conviction.'"[12] In the years following, several states enacted measures "to dismantle the statutory apparatus of 'civil death.'"[13]

This reform movement reached its peak in 1984, when the House Committee on the Judiciary reported "a sentencing reform bill that contained a chapter titled 'Restriction on Imposition of Civil Disabilities,'" which "prohibited unreasonable restrictions on eligibility for federal benefits and programs, and state or federal employment, based on a federal conviction."[14] But that bill was never passed, and the movement fell from the peak over a cliff. In lieu of the bill reported out of the House committee, Congress passed the Sentencing Reform Act of 1984, which "emphasized deterrence and incapacitation," and repealed the Youth Corrections Act.[15]

Today, the collateral consequences of a felony conviction form a new civil death.[16] Convicted felons now suffer restrictions in broad ranging aspects of life that

---

[12] *Id.* at 1711.

[13] LOVE, ET AL., *supra* note 4, at 11.

[14] *Id.* at 12; *see* H.R. Rep. No. 98-1017; H.R. 6012, 98th Cong. §§ 4391-92.

[15] LOVE, ET AL., *supra* note 4, at 13; *see also* Pub.L. 98-473, Title II, § 218(a)(8), Oct. 12, 1984, 98 Stat. 2027.

[16] LOVE, ET AL., *supra* note 4, at 15-16 ("The term 'collateral consequences' is of fairly recent origin in the academic literature and case law, and until recently was used interchangeably with terms such as 'civil disabilities,' 'adverse legal consequences,' and 'indirect consequences.' A settled legal definition remains elusive, and the term itself has become somewhat controversial . . . . ['Collateral consequences' has become a part of the lexicon, and we use it in this book to

6

touch upon economic, political, and social rights.[17]  In some ways, "modern civil death is harsher and more severe" than traditional civil death because there are now more public benefits to lose, and more professions in which a license or permit or ability to obtain a government contract is a necessity.[18]  Professor Alexander paints a chilling image of the modern civil death:

> Today a criminal freed from prison has scarcely more rights, and arguably less respect, than a freed slave or a black person living "free" in Mississippi at the height of Jim Crow.  Those released from prison on parole can be stopped and searched by the police for any reason . . . and returned to prison for the most minor of infractions, such as failing to attend a meeting with a parole officer. . . . The "whites only" signs may be gone, but new signs have gone up—notices placed in job applications, rental agreements, loan applications, forms for welfare benefits, school applications, and petitions for licenses, informing the general public that "felons" are not wanted here.  A criminal record today authorizes precisely the forms of discrimination we supposedly left behind—discrimination in employment, housing, education, public benefits, and jury service. Those labeled criminals can even be denied the right to vote.[19]

---

describe the wide range of status-related penalties that are permitted or required by law because of a conviction even if not included in the court's judgment.").

[17] *See* Nora V. Demleitner, *Preventing Internal Exile: The Need for Restrictions on Collateral Sentencing Consequences*, 11 Stan L. & Pol'y Rev. 153, 154 (1999); *see also Labels Like 'Felon' Are an Unfair Life Sentence*, N.Y. TIMES, at SR 10 (May 8, 2016) (discussing the stigmatizing effect of labels such as "felon," "ex-convict," and "ex-offender").

[18] Chin, *supra* note 5, at 1802.

[19] ALEXANDER, *supra* note 2, at 141.

7

## B. Modern Reform Efforts

The ebb and flow of efforts at reform are tiding back towards dismantlement of collateral consequences and civil death. President Barack Obama, for one, has taken steps by executive order to help felons rehabilitate and reintegrate into society. For example, he has ordered federal agencies to "ban the box," i.e., not ask prospective employees about their criminal histories early in the application process.[20] Additionally, the President has voiced his support for the Sentencing Reform and Corrections Act of 2015, which has received bipartisan support in the Senate.[21] If passed, this bill would, among other things, require the Bureau of Prisons to implement recidivism-reduction programming, expand safety-valve eligibility, and permit a sentencing judge to avoid mandatory minimums in certain circumstances.[22]

Other examples include the Department of Justice's National Institute of Justice's funding of a comprehensive study on the collateral consequences of criminal convictions. The study—which was conducted by the American Bar Association's Criminal Justice Section—has catalogued tens of thousands of statutes and regulations

---

[20] Peter Baker, *Obama Moves to Ease Path for Ex-Prisoners Seeking Jobs at Federal Agencies*, N.Y. TIMES, Nov. 3, 2015, at A20.

[21] *See* S.2123 - Sentencing Reform and Corrections Act of 2015, CONGRESS.GOV, https://www.congress.gov/bill/114th-congress/senate-bill/2123 (last accessed May 17, 2016) (listing bipartisan cosponsors).

[22] *See id.* (bill summary prepared by the Congressional Research Service).

that impose collateral consequences at both the federal and state levels.[23]  Based on the results of this study, former Attorney General Eric Holder implored the states to "determine whether [the collateral consequences] that impose burdens on individuals convicted of crimes without increasing public safety should be eliminated."[24]

My former colleague in the Eastern District of New York, Judge John Gleeson, recognized the devastating effects the collateral consequences of conviction had on a defendant who was unable to procure employment due to an offense she had committed seventeen years prior.  He explained that he had sentenced the defendant "to five years of probation supervision, not to a lifetime of unemployment."[25]  Judge Gleeson determined that district courts in the Second Circuit "have ancillary jurisdiction over applications for orders expunging convictions," and expunged the defendant's conviction.[26]  If Judge Gleeson's opinion is affirmed on appeal,

---

[23] American Bar Association, Nat'l Inventory of the Collateral Consequences of Conviction, abacollateralconsequences.org.

[24] Letter from Attorney General Eric Holder to State Attorneys General (Apr. 18, 2011), *available at* http://csgjusticecenter.org/wp-content/uploads/2014/02/Reentry_Council_AG_Letter.pdf.

[25] *Doe v. United States*, 110 F. Supp. 3d 448, 457 (E.D.N.Y. 2015) (Gleeson, J.), *appeal docketed*, No. 15-1967 (2d. Cir. June 19, 2015).

[26] *Id.* at 454 & n.16 (citing *United States v. Schnitzer*, 567 F.2d 536, 539 (2d Cir. 1977)).  On appeal, the Government argues that the Second Circuit should reconsider *Schnitzer*—which grants district court's ancillary jurisdiction to expunge convictions on equitable grounds—in light of the Supreme Court's decision in *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), in which the Supreme Court limited district courts' ancillary jurisdiction to two

Ms. Nesbeth might—if she could show the "extreme circumstances" necessary for expungement—be a candidate for this form of relief at some future time.[27]

In recent years, the organized bar has again made substantial efforts to alleviate the detrimental effects of collateral consequences.[28] In 2003, the ABA House of Delegates approved Standards on Collateral Sanctions and Discretionary Disqualification of Convicted Persons, which, among other things, prohibited the imposition of a collateral sanction unless "the legislature cannot reasonably contemplate any circumstances in which imposing the sanction would not be justified," and prohibiting "discretionary disqualification" from "benefits or opportunities, including housing, employment, insurance," etc.[29] The Uniform Law Commission

---

circumstances, "(I) to permit a single court to dispose of 'factually interdependent' claims and (ii) to enable a court to function successfully by 'manag[ing] its proceedings, vindicat[ing] its authority, and effectuat[ing] its decrees.'" Brief for Appellant at 19-21, *Doe v. United States*, No. 15-1967 (2d Cir. Sept. 18, 2015) (quoting *Kokkonen*, 511 U.S. at 379-80).

[27] In the event Ms. Nesbeth cannot show such extreme circumstances, other future relief may also be possible. In March 2016, Judge Gleeson again exercised ancillary jurisdiction to consider an application for expungement. While he found that the defendant's "situation d[id] not amount to the 'extreme circumstances' that merit expungement," he "reviewed her case in painstaking detail" and certified that she had been rehabilitated. *Doe v. United States*, —F. Supp. 3d—, 2016 WL 929316, at *1 (E.D.N.Y. Mar. 7, 2016) (Gleeson, J.). He accordingly issued a "federal certificate of rehabilitation" to "memorialize[] [his] conclusion so that future employers may benefit from it." *Id.* at *13.

[28] *See generally*, LOVE, ET AL., *supra* note 4, at 33-34.

[29] *See* ABA STANDARDS FOR CRIMINAL JUSTICE, COLLATERAL SANCTIONS AND DISCRETIONARY DISQUALIFICATION OF CONVICTED PERSONS, §§ 19-2.2, 3.1.

10

released the 2010 Uniform Collateral Consequences of Conviction Act ("UCCCA"), which includes certain procedural protections, such as notifying a defendant who pleads guilty of the various consequences he or she will suffer by so pleading.[30] Vermont has enacted the UCCCA, and bills proposing its adoption are currently pending in New York, Pennsylvania, and Wisconsin.[31]

Notwithstanding these various efforts at reform, felony convictions continue to expose individuals to a wide range of collateral consequences imposed by law that affect virtually every aspect of their lives.

## II. The Depth and Breadth of Post-Conviction Statutory and Regulatory Collateral Consequences

Remarkably, there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons.[32]

---

[30] *See* UNIFORM COLLATERAL CONSEQUENCES OF CONVICTION ACT § 5 (2010).

[31] *Legislative Enactment Status: Collateral Consequences of Conviction Act*, UNIFORM LAW COMMISSION, http://www.uniformlaws.org/LegislativeMap.aspx?title=Collateral%20Consequences%20of%20Conviction%20Act.

[32] *See generally* American Bar Association, Nat'l Inventory of the Collateral Consequences of Conviction, abacollateralconsequences.org.  The sheer number of citizens subject to these collateral consequences is staggering. *See How to Get Around A Criminal Conviction*, N.Y. TIMES, at A22 (Oct. 19, 2015) ("Some 70 million to 100 million people in the United States—more than a quarter of all adults—have a criminal record, and as a result they are subject to tens of thousands of federal and state laws and rules that restrict or prohibit their access to the most basic rights and privileges—from voting, employment and housing to business licensing and parental rights.").

Of those, federal law imposes nearly 1,200 collateral consequences for convictions generally, and nearly 300 for controlled-substances offenses.[33] District courts have no discretion to decide whether many of these collateral consequences should apply to particular offenders. The result is a status-based regulatory scheme; by the very fact of an individual's conviction, he or she is subject to a vast array of restrictions.[34]

The range of subject matter that collateral consequences cover can be particularly disruptive to an ex-convict's efforts at rehabilitation and reintegration into society. As examples, under federal law alone, a felony conviction may render an individual ineligible for public housing,[35] section 8 vouchers,[36] Social Security Act benefits,[37] supplemental nutritional benefits,[38] student loans,[39] the Hope Scholarship

---

[33] *See* Nat'l Inventory of the Collateral Consequences of Conviction, *supra* note 32 (narrow database search to federal law and then to controlled-substances offenses).

[34] *See, e.g.*, 21 U.S.C. § 862a(a) ("An individual convicted (under Federal or State law) of any offense which is classified as a felony by the law of the jurisdiction involved and which has as an element the possession, use, or distribution of a controlled substance . . . *shall not be eligible* for (1) assistance under any State program funded under part A of the title IV of the Social Security Act, or (2) benefits under the supplemental nutrition assistance program . . . or any state program carried out under that Act." (emphasis added)).

[35] *See* 24 C.F.R. §§ 966.4(l)(3)(i)(B)(3), (5)

[36] *See* 24 C.F.R. § 982.553(a).

[37] 21 U.S.C. § 862a(a)(1).

[38] 21 U.S.C. § 862a(a)(2).

[39] 20 U.S.C. § 1091(r)(1).

tax credit,[40] and Legal Services Corporation representation in public-housing eviction proceedings.[41] Moreover, in addition to the general reluctance of private employers to hire ex-convicts,[42] felony convictions disqualify individuals from holding various positions.[43]

Oftentimes, the inability to obtain housing and procure employment results in further disastrous consequences, such as losing child custody or going homeless.[44] In this way, the statutory and regulatory scheme contributes heavily to many ex-convicts becoming recidivists[45] and restarting the criminal cycle.[46]

---

[40] 26 C.F.R. § 1.25A-3(d)(iv).

[41] 45 C.F.R. § 1633.3.

[42] *See* Harry J. Holzer, Steven Raphael & Michael A. Stoll, *Will Employers Hire Ex-Offenders? Employer Preferences, Background Checks, and Their Determinants*, at 7-18, *available at* http://www.irp.wisc.edu/publications/dps/pdfs/dp124302.pdf (using empirical data to conclude private "employers reveal considerable reluctance to hiring workers with criminal histories").

[43] *See, e.g.*, 42 U.S.C. § 13041 (listing felony conviction as a "ground for denying employment" in any child-care services position which receives federal funds); 10 U.S.C. § 504 ("No person who is insane, intoxicated, or a deserter from an armed force, or who has been convicted of a felony, may be enlisted in any armed force. However, the Secretary concerned may authorize exceptions in meritorious cases, for the enlistment of deserters and persons convicted of felonies.").

[44]*See* ALEXANDER, *supra* note 2, at 97, 142-58.

[45] A 2014 study conducted by the Department of Justice's Bureau of Justice Statistics revealed that 67.8% of state prisoners released in 2005 were re-arrested within three years of release and 76.6% were re-arrested within 5 years of release. Matthew R. Durose, Alexia D. Cooper, Ph.D., & Howard N. Snyder, Ph.D., *Special Report: Recidivism of Prisoners Released in 30 States in 2005: Patterns*

Denials of social benefits and the difficulty of obtaining employment are only two aspects of post-conviction life. States impose other restrictions that exclude convicted felons from fully rejoining society. Except for Maine and Vermont, which allow convicts to vote absentee while serving an incarceratory sentence, every state disenfranchises convicted felons to some extent.[47] Ten states, depending on the crime committed, impose permanent bans on a felons' right to vote.[48]

Felons are also often excluded from the important civic duty of sitting on a jury. As of 2003, thirty-one states imposed a lifetime ban on ex-convicts serving jury duty,

---

*from 2005 to 2010*, at 1 (April 2014), *available at* http://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf.

[46] Gwen Rubinstein & Debbie Mukamal, *Welfare and Housing—Denial of Benefits to Drug Offenders*, *in* INVISIBLE PUNISHMENT: THE COLLATERAL CONSEQUENCES OF MASS IMPRISONMENT, 49 (Marc Mauer & Meda Chesney-Lind eds. 2002).

[47] *State Felon Voting Laws*, PROCON.ORG, http://felonvoting.procon.org/view.resource.php?resourceID=286. Terry McAuliffe, the Governor of Virginia, recently issued an executive order restoring the rights of convicted felons to vote. However, unlike in Maine and Vermont, but similar to nineteen other states, *see id.*, Virginia convicts are allowed to vote only after completing their incarceratory terms and any period of supervision. *See* Order for the Restoration of Rights, VA. EXEC. ORDER (Apr. 22, 2016), *available at* https://commonwealth.virginia.gov/media/5848/order_restoring_rights_4-22-16.pdf.

[48] *State Felon Voting Laws*, PROCON.ORG, http://felonvoting.procon.org/view.resource.php?resourceID=286.

14

while the vast majority of the remaining nineteen imposed at least some restrictions.[49] While many citizens may not lament the loss of the privilege, these exclusions disproportionately prohibit blacks from serving on juries.[50]

With this framework in mind, the Court turns to the issue of whether the collateral consequences of conviction can legally be considered as § 3553(a) factors when fashioning a sentence.

### III. The Governing Caselaw

There is a circuit split, and as the Tenth Circuit recently stated, "the Supreme Court has [not] addressed the issue." *United States v. Morgan*, 2015 WL 6773933, at *20 (10th Cir. Nov. 6, 2015) (unpublished).[51] In *Morgan*, the Tenth Circuit aligned itself with the "reasoning of the Sixth, Seventh, and Eleventh Circuits" in holding that "[b]y considering publicity, loss of law license, and deterioration of physical and

---

[49] Brian C. Kalt, *The Exclusion of Felons From Jury Service*, 53 Am. U. L. Rev. 65, 67, 150 (2003).

[50] *Id.* at 88-89; *see* ALEXANDER, *supra* note 2, at 1-2 ("An extraordinary percentage of black men in the United States are legally barred from voting today, just as they have been throughout most of American history. They are also subject to legalized discrimination in employment, housing, education, public benefits, and jury service, just as their parents, grandparents, and great-grandparents once were.").

[51] Although *Morgan* is an unpublished decision, it still maintains persuasive value under the Tenth Circuit rules. 10th Cir. R. 32.1(A). The *Morgan* panel considered thoughtfully and wrote extensively on the collateral-consequences issue. Moreover, the Court is presently using *Morgan* more for informational—rather than precedential—purposes.

financial health as punishment, the [district] court impermissibly focused on the collateral consequences of Morgan's prosecution and conviction," because these factors did not "reflect upon the seriousness of his offense" under § 3553(a)(2)(A). *Id.* at *19. Its rationale was that those factors "impermissibly favor criminals, like Morgan, with privileged backgrounds." *Id.*

This rationale seemingly underlined the other three circuit-court decisions. For example, in *United States. v. Musgrave*, 761 F.3d 602 (6th Cir. 2014), the Sixth Circuit held that consideration of "four years of legal proceedings, legal fees, the likely loss of [defendant's] CPA license, and [his] felony convictions that would follow him for the rest of his life," were impermissible considerations because "these sorts of consequences—particularly ones related to a defendant's humiliation before his community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines." *Id.* at 608; *see also United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (rejecting "middle class" sentencing discounts," reasoning that "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime"); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.").

16

But in *Musgrave*, the Sixth Circuit squarely held that in fashioning a sentence that "must reflect the seriousness of the offense, promote respect for the law, and provide just punishment," as required under § 3553(a)(2), "[t]he collateral consequences of the defendant's prosecution and conviction are 'impermissible factors.'" 761 F.3d at 608.

On the other side of the ledger, the Fourth Circuit has viewed the loss of a defendant's "teaching certificate and his state pension as a result of his conduct" as appropriate sentencing considerations, "consistent with § 3553(a)'s directive that the sentence reflect the need for 'just punishment and 'adequate deterrence.'" *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (citation omitted).

Where, then, does the Second Circuit stand?

In *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), the district court—despite a guidelines range of 78 to 97 months—sentenced the defendant to 20 months' imprisonment in part because the "conviction made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant." *Id.* at 141 (internal quotation marks omitted). The circuit court affirmed, reasoning that the district court's analysis was "required by section 3553(a)," and commented: "It is difficult to see how a court can properly calibrate a 'just punishment' if it does not

consider the collateral effects of a particular sentence." *Id.* at 141-142.[52]

The Second Circuit's embrace of collateral consequences as bearing upon the concept of "just punishment," has more recently been underscored in *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014), where the circuit court recognized that deportation is a permissible § 3553(a) factor. *See id.* at 262-63.

There, the defendant, who was convicted of conspiracy to provide material support to a foreign terrorist organization and conspiracy to bribe public officials, faced a guidelines sentence of 240 months.[53]   *Id.* at 255, 257.  The district court imposed a below-guidelines sentence of 108 months in light of several factors, among them that the defendant faced likely deportation upon the completion of his sentence. *Id.* at 256.  The Government argued that immigration consequences of a conviction should not be considered by a sentencing judge, but the Second Circuit disagreed.  It explained: "In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have

---

[52]In *Morgan*, the Tenth Circuit expressly noted its disagreement with *Stewart*, commenting that "[c]onsidering collateral effects is one thing, myopically dwelling upon them is quite another." 2015 WL 6773933, at *18 n.32. Whether or not inadvertent, the comment confusingly seems to recognize that consideration of collateral consequences may indeed be appropriate in a different case.

[53] The guidelines range would have been 360 months to life, but the two counts combined carried a maximum sentence of 240 months. *Id.* at 257.

on the defendant and his family."[54] *Id.* at 262-63.

Happily, I am a creature of the Second Circuit, and its embrace of the impact and significance of the collateral consequences facing a convicted felon as bearing upon a just punishment is the enlightened view—especially where it impacts a poor, underprivileged defendant, in contrast to the "middle-class discounts" that apparently animated those circuit courts that have taken a different view.

What, then, are the collateral consequences now facing Chevelle Nesbeth?

## IV. Ms. Nesbeth's Collateral Consequences and the Balancing of All § 3553(a) Factors

The Pre-Sentence Report (PSR) was issued on August 17, 2015; it contained no reference to collateral consequences. On September 11, 2015, I instructed counsel to submit in writing which collateral consequences would likely be applicable in Ms. Nesbeth's case. They did so on January 26, 2016. Separately, I instructed the Probation Department to prepare an addendum to the PSR addressing the collateral consequences that it believed were implicated. It submitted a five-page addendum on April 14, 2016.[55]

---

[54] The other circuits to have weighed in on whether a sentencing judge may consider a defendant's impending deportation have invariably held that it is not *required* to do so, but some have agreed with the Second Circuit—without contradiction—that the consideration is permissible. *See United States v. Sanchez-Leon*, 74 F.3d 1248, 1264 n.12 (10th Cir. 2014) (collecting cases); *see also United States v. Gomez-Jimenez*, 750 F.3d 370, 384 n.8 (4th Cir. 2014) (same).

[55] Inadvertently dated April 14, 2015.

Neither party has raised any objections to the information contained in the underlying PSR or the Addendum. Accordingly, I have relied on their accuracy in culling from them the circumstances that I believe are worthy of § 3553(a) consideration, including the collateral consequences flowing from the defendant's conviction. Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court may accept any undisputed portion of the presentence report as a finding of fact.").

## A. The Nature and Circumstances of the Offense and Ms. Nesbeth's Personal Characteristics

Initially, under § 3553(a)(1), "the nature and circumstances of the offense" must be considered.[56] There is no question that Ms. Nesbeth has been convicted of serious crimes. The PSR reports that the net weight of the cocaine she brought into the country

---

[56] 18 U.S.C. § 3553(a) provides in part:
The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph of (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2) the need for the sentence imposed--

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B) to afford adequate deterrence to criminal conduct;

      (C) to protect the public from further crimes of the defendant; and

      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

was 602 grams. PSR ¶5. Her criminal conduct is inexcusable.

While visiting Jamaica at the behest of a boyfriend, she was given two suitcases by friends, who had purchased her return airline ticket, and was asked to bring them to an individual upon her arrival to the United States. *Id.* ¶6. As disclosed during the trial, the drugs were in the suitcases' handles. Ms. Nesbeth "m[et] the profile of a courier," *id.*, and there was a clear basis for the jury to reject her claim that she did not know she was bringing drugs into the country, and to render its guilty verdict.

The Probation Department recommended a below-guidelines sentence of 24 months, followed by three years of supervised release, because Ms. Nesbeth was "a first-time offender, is enrolled in college," is employed, and "has otherwise lived a law-abiding life and is at a low risk of recidivism." U.S. Probation Department Sentence Recommendation, at 2.

As recounted in the Recommendation, Ms. Nesbeth, who was 20 years old when convicted, was born in Kingston, Jamaica, has always been single, has no children, and lives with her mother in New Haven, Connecticut. In 2008, when she was 13, she joined her mother in the United States, who had previously left her with her father to be raised by him in Jamaica. Ms. Nesbeth is a U.S. citizen. She has been enrolled in college since 2013, and has helped to support herself as a nail technician at a children's spa. Between September 2012 and June 2013, she worked as a counselor at a facility that provides services to children in lower-income areas, and during the summers of

21

2010 through 2012, she held seasonal employment as a parks maintenance worker.

The PSR adds some relevant context to the Recommendation. Not surprisingly, Ms. Nesbeth's mother, who is a home-care attendant, was "shocked" by her daughter's arrest and conviction because it was "completely out of character." PSR ¶28. She described her daughter as an "'excellent' person, who is quiet, nice, caring, and who is both very loving and very loved." *Id.* The mother also related "that the defendant worries about her future, as she had planned to be a school principal." *Id.*

In the United States, Ms. Nesbeth was raised under lower-income circumstances, and her family had for a time "required Food Stamp benefits." *Id.* at ¶30. As for her employment, the name of the facility where she assisted children from lower-income areas was Leap, in New Haven, and she worked as a "counselor" to the children. *Id.* at ¶41. And her work as a parks maintenance worker was for the Youth at Work agency, where she was "a youth initiative worker." *Id.* at ¶42.

As for her education, Ms. Nesbeth anticipates graduating from Southern Connecticut State University in 2017. "She was originally studying education," but "due to the instant conviction is now studying sociology." *Id* at ¶37. She owes either $9,000 or $19,000 in student loans. *Compare id.* ¶45 *with* ¶46.

"The defendant reported no illegal drug use," and to her mother's knowledge, her daughter "has never used illegal drugs, consumed alcohol, or required substance abuse treatment." *Id.* at ¶36.

22

Ms. Nesbeth was released on January 7, 2015, a day after her arrest, on a $50,000 unsecured bond and has been at liberty ever since. She has been fully compliant with her conditions of release.

## B. The Collateral Consequences

The Addendum to the PSR has advised me of the federal collateral consequences Ms. Nesbeth will or may face as a result of her felony drug convictions.

First, the Probation Department has cited 20 U.S.C. §1091®, and has commented:

> Notably, the defendant is a college student and she has held internships working with young children as it was her original intent to become a teacher and eventually a principal. The defendant will be ineligible for grants, loans, and work assistance for a period of two years, the duration of her college career.

Addendum, at 1.

The Addendum then sets forth a host of other federal statutory and regulatory proscriptions for drug-related felony convictions:

Under 21 U.S.C. § 862, for a period of up to one year for drug possession and up to five years for drug distribution, Ms. Nesbeth will be ineligible "for the issuance of any grant, contract, loan, professional license, or commercial license provided by an agency of or appropriated by funds of the United States." *Id.*

Under 42 U.S.C. § 13661 and 24 C.F.R. §5.855, Ms. Nesbeth and her

23

household may be denied admission to federally assisted housing for a "reasonable time." *Id.*

Under 21 U.S.C. § 862(a), Ms. Nesbeth "shall not be eligible for assistance under any state program funded under Part A of Title IV of the Social Security Act, or for Food Stamp benefits." *Id.* at 2. And this disability is "permanent," although individual states can grant an exemption, "or can enact a law limiting the period during which the restriction applies." *Id.* The Addendum reports that the State of Connecticut, where Ms. Nesbeth resides, "continues to bar felons from receiving Food Stamp benefits." *Id.*

Under 22 U.S.C. § 2714, Ms. Nesbeth cannot be issued a passport during any period of supervised release. "According to Defense Counsel's submission, this provision is particularly relevant for the defendant, whose father, grandmother and extended family reside abroad," and "[t]he inability to do so will undoubtedly impact these important familial relationships." Addendum, at 2. But the Addendum notes that "for trips to visit them, the defendant has not seen them with any regularity." *Id.*

Under 23 U.S.C. § 159 and 23 C.F.R. § 192.4, states are required "to enact a law requiring that any individual convicted of a drug offense have their [driver's] licenses suspended or revoked" for a period of "at least six months." *Id.*

In addition, "[w]hile a felony conviction does not automatically disqualify a person from federal employment, it can be a factor in determining suitability for a

24

position" on a "case-by-case basis by the specific agency." *Id.* The Addendum references a number of them:

### Child Care

"As to employment in child care services, including teaching, employment is generally subject to a background check for criminal convictions. It also affects employment in child protective services, social services, health care services, residential care, recreational or rehabilitative programs, or correctional or treatment programs." *Id.* Furthermore, pursuant to 48 C.F.R. §352.237-72, "all individuals seeking employment in child care services to children under 18, including education, must undergo a criminal background check, and the statute provides that a felony drug conviction may be grounds for denying employment." *Id.* The Addendum references a host of other restrictions for such things as the mentoring of children of prisoners, a permanent bar from employment with AmeriCorps, and working in a foreign student-exchange program sponsored by the Department of State.

### Pharmaceutical

Pursuant to 21 C.F.R. §1301.71, "a felony conviction permanently bars an individual from working for a manufacturer, distributor, dispenser, or reverse dispenser of controlled substances." *Id.* at 3.

### Transportation

Pursuant to 28 C.F.R. §97.11 and 49 C.F.R. §1544.229, a felony conviction

bars employment with private transportation companies transporting prisoners or hazardous materials, and as an airport security screener or baggage handler, a flight crew member, and a customs broker. *Id.*

### Hospice Work

"An individual convicted of a felony offense can be barred from working for a hospice if the conviction was within three years and the applicant would have contact with patient records." *Id.*

### Bank or Financial Industry

"An individual convicted of a felony offense can be barred from working in an FDIC-insured depository institution within ten years of conviction." *Id.*

### Armed Forces Enlistment

"An individual convicted of a felony offense can also be barred from enlisting in the Armed Forces of this country." *Id.*

### Labor Union

"An individual convicted of a felony offense can be ineligible from working in a labor organization or employee benefits plan." *Id.*

### Disaster Assistance

"Any felony conviction bars an individual from relief for disaster relief, and is permanent." *Id.* at 4.

### Firearm Possession (18 U.S.C. §922)

"Any felony convictions bars an individual from possession, sale, shipment, transportation, or receipt of a firearm in interstate and foreign commerce, and is permanent." *Id.*

### Adoption/Foster Care (42 U.S.C. §671)

"Any felony conviction bars an individual from adopting a child or serving as a foster parent for five years. Some states, including New York, disqualify prospective adoptive parents or anyone they live with who has been convicted of a drug related offense." *Id.*

### Jury Service and Voting

"A felony conviction in federal and state courts bars an individual from serving as either a grand juror or a petit juror unless the person's civil rights have been restored, which can only be achieved through a pardon." *Id.*

Ms. Nesbeth has never resided in New York. Any period of supervised release or probation will be administered in Connecticut, where she has always resided.[57] Thus, in addition to whatever federal collateral consequences she will suffer, she will also be subject to collateral consequences under that state's laws.[58] The Addendum

---

[57] The Court will, with the permission of the District of Connecticut, transfer jurisdiction of Ms. Nesbeth's supervision to that district. *See* 18 U.S.C. § 3605 ("A court, after imposing a sentence, may transfer jurisdiction over a probationer or person on supervised release to the district court for any other district . . . with the concurrence of such court.").

[58] Certain collateral consequences imposed under Connecticut law will certainly apply to Ms. Nesbeth. For example, Connecticut law disqualifies an

27

did not address them, but I have identified some which are either currently applicable

or—given Ms. Nesbeth's history of working with and counseling under-privileged

children—may have future relevance:

- She will not be allowed to vote until any probationary or supervised release term has expired. Conn. Gen. Stat. § 9-172.

- She cannot serve on a jury for seven years. Conn. Gen. Stat, § 51-217.

- She is disqualified from receiving a teaching certificate for five years. Conn. Gen. Stat. §10-145i. Afterwards, the Connecticut State Board of Education maintains discretion to deny her a teaching certificate. Conn. Gen. Stat. § 10-145b.

- She will be ineligible for five years to adopt a child or serve as a foster parent. Conn. Agencies Regs. § 17a-145-152.

- She can be denied a license by the Connecticut Commissioner of Early

---

individual from sitting on a jury who "has been convicted of a felony within the past seven years" without differentiating between Connecticut and Federal felonies. Conn. Gen. Stat, §51-217. However, others are more ambiguous. For example, Conn. Gen. Stat. § 10-145i imposes a five-year moratorium on the issuance of a teaching certificate to an individual convicted of, among other state provisions, Conn. Gen. Stat. § 21a-277, which prohibits "possess[ing] with the intent to sell . . . any controlled substance." Whether Ms. Nesbeth's federal conviction for possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1) triggers § 10-145i is an unanswered question of Connecticut law, but either way, Ms. Nesbeth's ability to obtain a teaching certificate would remain subject to the Connecticut State Board of Education's discretion. Conn. Gen. Stat. § 10-145b(i)(3)(B) ("The State Board of Education may deny an application for a certificate, authorization or permit for any of the following reasons: . . . (B) the applicant has been convicted in a court of law of a crime involving moral turpitude or of any other crime of such nature that in the opinion of the board issuance of a certificate, authorization or permit would impair the standing of certificates, authorizations or permits issued by the board; or (C) other due and sufficient cause.").

Childhood to operate or maintain a daycare center or a group childcare home, Conn. Gen. Stat. § 19a-87a; will be ineligible for employment or to volunteer with an adoptive or foster child placing agency, Conn. Agencies Regs. §17a-150-71; and may be ineligible to reside in a home that provides family day care services. Conn. Gen. Stat. § 19a-87b.

- She may be ineligible for Connecticut public housing. Conn. Gen. Stat. § 8-45a.

In response to my instructions to counsel to opine on the collateral consequences that Ms. Nesbeth will or is likely to suffer, they have admirably submitted useful information which I have considered. Defense counsel has tracked most of the collateral consequences contained in the Probation Department's Addendum, with the focus on Ms. Nesbeth's limitations on her ability to obtain employment as an educator or a school administrator. Counsel's submission concludes that "the serious consequences that result from her federal drug conviction cannot be overstated. Compacting these consequences with a period of incarceration or even a lengthy period of supervision would be a severe and an unnecessary punishment." Letter from Defense Counsel, at 11 (Jan. 26, 2016).

The Government, on the other hand, argues that of the many federal collateral consequences, only a "handful" apply to Ms. Nesbeth and sets forth "a brief list of those that are potentially relevant to the defendant." Letter from the Government, at 2 (Jan. 26, 2016). They are "Suspension of Eligibility for Student Assistance Programs, Including Grants, Loans or Work Assistance Programs;" "Denial of Federal Benefits;" "Ineligible for Federally-Assisted Housing;" "Ineligible for Social

29

Security Act/Food Stamp Benefit Programs;" "Ineligible for Passport;" "Revocation or Suspension of Driver's License." *Id.* at 2-3. The Government candidly acknowledges that future employment, especially in teaching and in child-care services, "is subject to a background check for criminal convictions," *id.* at 3, and that "based on her conduct, the defendant now has a felony record that will undoubtedly create challenges for her in the future, particularly with respect to her stated goal of becoming a teacher." *Id.* at 4.

Nonetheless, the Government asserts that "[t]he obstacles resulting from her crime are by no means insurmountable," and that "[w]hile she may end up choosing a different career path or taking longer to become a teacher than she previously anticipated, if she goes on to prove the instant offense was an isolated and solitary blemish on her record, the defendant can achieve the same level of success in life regardless of her criminal conviction," *id.*; thus, it believes that a guidelines sentence is appropriate.

## C. Additional § 3553(a) Factors

Arguably, Ms. Nesbeth might qualify for an aberrant behavior departure under §5K2.20 of the Sentencing Guidelines. Under Second Circuit law, Ms. Nesbeth's crimes need not have been committed "spontaneous[ly] and seemingly thoughtless[ly]." *United States v. Gonzales*, 281 F.3d 38, 47 (2d Cir. 2002). It would suffice if they were a "single criminal occurrence or single criminal transaction,"

30

were committed "without significant planning," were of a "limited duration," and constituted "a marked deviation from an otherwise law-abiding life." *United States v. Castellanos*, 355 F.3d 56, 58 (2d Cir. 2003) (citing U.S.S.G. § 5K2.20). And under the Guidelines Application Notes, the sentencing court can consider the following characteristics of a defendant: "(A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense."[59] U.S.S.G. § 5K2.20, n. 3.

Ms. Nesbeth would seem to fit. Her crimes were certainly a marked deviation from an exemplary law-abiding life; she has worked in meaningful jobs; she has a record of prior good works counseling and tending to young children; she apparently was under the influence of her boyfriend, and there is no evidence that she was even to be paid for her crime or was motivated by financial gain. Finally, her status as a mere courier belies the notion that her crimes were anything but of a limited duration and without significant planning on her part.

In any event, even if, *arguendo*, Ms. Nesbeth would not have qualified for an aberrant-behavior departure under the strictures of Guideline § 5K2.20, she certainly

---

[59]Section 5K2.20(c)(3) bars aberrant behavior departure for "serious drug trafficking" offenses. This would not apply to Ms. Nesbeth because the Commentary defines that preclusive term as "any substance offense . . . that provides a mandatory minimum term of imprisonment of five years or greater." U.S.S.G. § 5K2.20, n. 1. The drug crimes for which Ms. Nesbeth has been convicted do not carry any mandatory minimums.

qualifies for a significant post-*Booker* variance. *See United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) ("With the entire Guidelines scheme rendered advisory by the Supreme Court's decision in *Booker*, the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves.").

I have also added to the variance mix Ms. Nesbeth's efforts at rehabilitation while she has been at liberty for approximately the past year and a half. Faced with the prospect of never achieving her goal as a school principal, she has persevered with her education by changing her major to sociology, and is on target to graduate next year. This is consistent with her personal characteristics of a strong work ethic, her desire to be of service to young children, and her ability to rise above the low-income community in which she was raised. *Cf. United States v. Munoz-Nava*, 524 F.3d 1137, 1149 (10th Cir. 2008) (affirming a significant downward variance because the district court considered, among other things, the defendant's "behavior while on a year-and-a-half pretrial release," which was "found to be exemplary"); *see also United States v. K*, 160 F. Supp. 2d 421, 442 (E.D.N.Y. 2001) (Weinstein, J.) ("[The Second C]ircuit has recognized repeatedly that in deciding whether to depart downward a sentencing court may consider any pre-sentence rehabilitation that a defendant has demonstrated as well as the likelihood that probation rather than prison will facilitate a defendant's future rehabilitation." (citing *United States v. Maier*, 975

F.2d 944, 948 (2d Cir. 1992))).

## V. The Shaping of the Sentence

Even if I were not to consider collateral consequences, the conventional balancing of the § 3553(a) factors might warrant a non-incarceratory sentence. But I need not make that decision because the collateral consequences Ms. Nesbeth will suffer, and is likely to suffer—principally her likely inability to pursue a teaching career and her goal of becoming a principal, Conn. Gen. Stat. §§10-145b, 145i—has compelled me to conclude that she has been sufficiently punished, and that jail is not necessary to render a punishment that is sufficient but not greater than necessary to meet the ends of sentencing.[60]

This surely is not meant to suggest that a convicted defendant's collateral consequences are always likely to result in a non-incarceratory sentence. Each case must, of course, be separately considered, and the balancing of all the § 3553(a) factors may certainly warrant prison—and even significant prison time—for someone else under different circumstances.

---

[60] 18 U.S.C. § 3553(a)(2) sets forth the goals of sentencing: the sentence should (1) "reflect the seriousness of the offense" "promote respect for the law," and "provide just punishment for the offense," (2) "afford adequate deterrence to criminal conduct," (3) "protect the public from further crimes of the defendant," and (4) "provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner."

33

I have imposed a one-year term of probation.[61] In fixing this term, I have also considered the collateral consequences Ms. Nesbeth would have faced with a longer term of probation, such as the curtailment of her right to vote and the inability to visit her father and grandmother in Jamaica because of the loss of her passport during her probationary term.

Moreover, in addition to the requisite conditions of probation,[62] I have imposed

_____

[61] Although Ms. Nesbeth spent one day in custody after her arrest, probation—not supervised release—is the appropriate word for the year of supervision the Court is imposing. "One inherent difference between supervised release and probation is that in the former a defendant will have served time in prison for his offense, while in the latter he will not have served time." *United States v. Jacques*, 321 F.3d 255, 265 (2d Cir. 2003). Because pre-trial detention served by a defendant is purely administrative, and not punishment for the offense, *see United States v. El-Hage*, 213 F.3d 74, 79 (2d Cir. 2000), a defendant has not served time for the offense—of course, time in pre-trial detention may result in credit toward the eventual sentence, 18 U.S.C. § 3585(b)—until the Court imposes its sentence. Thus, whether probation or supervised release applies depends on whether the Court, at the time of sentencing, imposes an incarceratory sentence with supervision to follow (supervised release), or supervision in lieu of incarceration (probation). *Cf. United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002) ("[F]ederal supervised release, . . . in contrast to probation, is meted out in addition to, not in lieu of, incarceration." (internal quotation marks omitted)).

[62] The following conditions encompass both the mandatory conditions set forth in 18 U.S.C. 3563(a) (except for the few that apply only in certain circumstances not relevant here) in addition to the standard conditions of probation in the EDNY:

(1) The defendant shall not commit another federal, state, or local crime.

(2) The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

(3) The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of

34

release from imprisonment or placement on probation and at least two periodic drug tests thereafter.

(4) The defendant shall not leave the judicial district without the permission of the court or probation officer;

(5) The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer.

(6) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.

(7) The defendant shall support his or her dependents and meet other family responsibilities.

(8) The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons.

(9) The defendant shall notify the probation officer at least ten days prior to any change in residence or employment or if such prior notification is not possible, then within forty-eight hours after such change.

(10) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer, any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician.

(11) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

(12) The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer.

(13) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.

(14) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

(15) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of

35

two special conditions: (1) a period of six months' home confinement—when Ms. Nesbeth is not working or going to school—to drive home the point that even though I have not put her in prison, I consider her crimes to be serious; (2) 100 hours of community service in the hope that the Probation Department will find a vehicle for Ms. Nesbeth, as an object lesson, to counsel young people as to how their lives can be destroyed if they succumb to the temptation to commit a crime, regardless of their circumstances.[63]

### VI. The Responsibilities of Counsel and the Probation Department

In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Supreme Court held that the failure of defense counsel to advise his client "that a conviction may have immigration consequences" violates the defendant's Sixth Amendment right to the effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). *Padilla*, 559 U.S. at 388. In so doing, it recognized that it had "never applied a distinction between direct and collateral consequences to define the scope of

the court.

(16) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

*See* Eastern District of New York Probation, Conditions of Probation, http://www.nyep.uscourts.gov/html/conditions_of_probation.html.

[63] No fine will be imposed, but a $100 mandatory statutory assessment must forthwith be paid. I have also advised Ms. Nesbeth of her right to appeal.

constitutionally 'reasonable professional assistance' required under *Strickland.*" *Id.* at 365 (quoting *Strickland*, 466 U.S. at 689). However, it did not have to decide "[w]hether that distinction is appropriate," since it ruled that "[d]eportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence." *Id.* at 365-66. Consequently, "[t]he collateral versus direct distinction" was "ill suited to evaluating a *Strickland* claim concerning the specific risk of deportation." *Id.* at 366.

It is an open question, therefore, under what circumstances, if any, the failure of counsel to advise a defendant prior to a plea of at least the critical non-deportaton collateral consequences he or she faces, might rise to the level of an ineffective-assistance claim. But arguably the Supreme Court in *Padilla* has left the door open. Moreover, once again, as the Tenth Circuit noted in *Morgan*, the high court has also yet to rule whether, regardless of Sixth Amendment concerns, collateral consequences may be part of the § 3553(a) mix. 2015 WL 6773933, at *20.

Thus, it is undecided whether counsel's failure to advise his client of any significant collateral consequences at the pleading stage or to address the issue at the sentencing phase, could ever rise to the level of ineffective assistance under the constitutional standard articulated in *Strickland.*

What is established, however, is defense counsel's "overarching duty to

37

advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688. Thus, counsel has at least a professional responsibility to timely inform both the court, as well as his client, of the significant collateral consequences facing the defendant as a result of a conviction.

Prosecutors also have responsibilities. Pursuant to 28 U.S.C. §530B(a), "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."

Rule 3.8 of New York's Rules of Professional Conduct provide for "Special Responsibilities of Prosecutors," which mostly detail the rules for disclosing relevant information and evidence and dealing with defendants who lack counsel. But comment 1 to the rule provides a broad general statement that, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate." To the extent collateral consequences are part of the § 3553(a) mix, prosecutors have an obligation to be candid with the court at sentencing about the applicable collateral consequences and how much weight they should be accorded.

The Probation Department also has obligations. Commendably, the addendum

38

it provided at the Court's behest advising of the federal collateral consequences Ms. Nesbeth faces proved very useful. The Probation Department should include a collateral-consequences section in all future pre-sentence reports. The Federal Rules of Criminal Procedure authorize the Court to make such a request: Rule 32(d)(1) provides that "the presentence report must . . . (D) identify any factor relevant to: (I) the appropriate kind of sentence, or (ii) the appropriate sentence within the applicable sentencing range; and (E) identify any basis for departing from the applicable sentencing range," and Rule 32(d)(2) requires that the pre-sentence report also include "the defendant's history and characteristics" and "any other information that the court requires, including information relevant to the factors under 18 U.S.C. § 3553(a)."

Thus, it is the obligation of both the defense lawyer and the prosecutor, as well as the Probation Department in the preparation of its PSR, to assess and apprise the court, prior to sentencing, of the likely collateral consequences facing a convicted defendant.

Publicly available resources make this obligation reasonably easy to satisfy. The ABA's collateral consequences database, accessible at abacollateralconsequences.org, is useful due to both its breadth—it contains information on 47,589 statutes and regulations—and the user's ability to narrow the search to collateral consequences relevant to particular cases. One can select

39

narrowing filters based on the categories of the collateral consequences (e.g., employment, education, housing, etc.), whether the consequences are mandatory, and the nature of the defendant's offense (e.g., controlled-substances offenses, weapons offenses, etc.).

The National Association of Criminal Defense Lawyers has published Collateral Consequences of Criminal Convictions: Law, Policy, and Practice, a comprehensive treatise—cited multiple times in this opinion—on the issues surrounding collateral consequences.[64] Additionally, a Department of Justice monograph provides details on various federal collateral consequences.[65]

In the event counsel in a future case disagree as to the applicability or relevance of certain collateral consequences to a defendant's situation, a hearing may be appropriate to make a factual determination on the issue. Fed. R. Crim. P. 32(i)(2)

---

[64] MARGARET COLGATE LOVE, JENNY ROBERTS & CECELIA KLINGELE, COLLATERAL CONSEQUENCES OF CRIMINAL CONVICTIONS: LAW, POLICY AND PRACTICE (2013 ed.). The NACDL provides valuable resources to the bar to support various aspects of representing criminal defendants. With respect to collateral consequences, it recommends that "Defense counsel should interview clients for detailed background information so that the effect of particular collateral consequences can be fully explained to and considered by the client before any final disposition." NACDL, Collateral Damage: America's Failure to Forgive or Forget in the War on Crime, at 62 (May 2014), *available at* https://www.nacdl.org/restoration/roadmapreport/.

[65] Department of Justice, Federal Statutes Imposing Collateral Consequences Upon Conviction, *available at* https://www.justice.gov/sites/default/files/pardon/legacy/2006/11/13/collateral_consequences.pdf.

("The court may permit the parties to introduce evidence on the objections [to the PSR].").

While consideration of the collateral consequences a convicted felon must face should be part of a sentencing judge's calculus in arriving at a just punishment, it does nothing, of course, to mitigate the fact that those consequences will still attach. It is for Congress and the states' legislatures to determine whether the plethora of post-sentence punishments imposed upon felons is truly warranted, and to take a hard look at whether they do the country more harm than good.

Hopefully, this opinion will be of value to the bench and bar, and to all those who are committed to serving the ends of justice.

## VII. Conclusion

After considering the various 3553(a) factors and the need for the sentence to be sufficient but not greater than necessary to meet the ends of sentencing under § 3553(a)(2), Ms. Nesbeth is sentenced to one year of probation, with two special

41

conditions: (1) six months' home confinement, and (2) 100 hours of community service.

**SO ORDERED.**

s/Frederic Block

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
May 24, 2016

42