```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------------x
     UNITED STATES OF AMERICA,
 3
                         Plaintiff,          Docket No.:
 4                                           15 CR 18(FB)
              versus
 5
     CHEVELLE NESBETH,                        U.S. Courthouse
 6                                           225 Cadman Plaza East
                         Defendant.          Brooklyn, NY 11201
 7   -------------------------------------x
                                             June 16, 2015
 8                                           10:00 a.m.

 9              Transcript of Criminal Cause for Trial

10   Before:   HONORABLE FREDERIC BLOCK,
                               District Court Senior Judge
11              (and a jury.)

12                        APPEARANCES

13   For the Government:       KELLY T. CURRIE, ESQ.
                               Acting United States Attorney
14                             Eastern District of New York
                               271 Cadman Plaza East
15                             Brooklyn, New York 11201
                               BY:  PAUL G. SCOTTI, ESQ.,
16                                  ELIZABETH GEDDES, ESQ.
                                    Assistant U.S. Attorneys
17
     For the Defendant:        FEDERAL DEFENDERS OF NEW YORK, INC.
18                             1 Pierrepont Plaza
                               Brooklyn, New York 11201
19                             BY:  AMANDA L. DAVID, ESQ.
                                    MICHAEL WEIL, ESQ.
20
     Also Present:             SHANNON McFADDEN
21                             MELANIE MORALES
                               RANIT PATEL
22                             MAGDALENA ST. SURIN

23   Official Court Reporter:  MICHELE NARDONE, CSR, RPR, CRR
                               Phone:  718-613-2601
24                             Email:  Mishrpr@aol.com
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1           (In open court.)

2           (Defendant present.)

3           THE COURT:  Good morning, everybody.

4           I understand the jurors are all here, Mr. Innelli.

5           THE CLERK:  Yes.  I will call the case.  Criminal

6    cause on trial, United States of America versus Nesbeth.  All

7    counsel and the parties are present.

8           THE COURT:  All right.  Everyone ready to get started?

9    Let's bring the jurors in.

10          THE CLERK:  Okay.

11          (Pause.)

12          THE CLERK:  All rise.

13          (Jury enters.)

14          THE CLERK:  You all may be seated.

15          THE COURT:  Good morning, everybody.  Good to see you

16   all again.

17          Just a few things I may have forgot to tell you

18   yesterday.  I'm going to take a mid-morning break at about

19   11:30-ish or thereabout and a mid-afternoon break.  I think

20   it's probably a good thing to do after we go for an hour, hour

21   and a half to do that, for a chance to use the facilities.  If

22   anybody is uncomfortable and needs to use the facilities, don't

23   hesitate.  Make believe we are in kindergarten class.  I just

24   want to be sure you are comfortable.  So if you need to take a

25   break, just raise your hand.

USA v. Nesbeth

1          Then I forgot inadvertently to give the lawyers an

2     opportunity to reintroduce themselves.  I think you met

3     everybody at the defense table, but you may not have had the

4     opportunity to know who is sitting at the government's table.

5     So we can do that right now.

6          Mr. Scotti, before you start your opening statements

7     maybe you would like to tell the folks who is with you.

8          MR. SCOTTI:  Sure.  Good morning, ladies and

9     gentlemen.

10          As you know from yesterday, my name is Assistant

11     United States Attorney Paul Scotti.  With me yesterday was

12     Special Agent Shannon McFadden.  Two new faces at the table

13     today are Assistant United States Attorney Elizabeth Geddes and

14     Magdalena St. Surin, also from the U.S. Attorney's Office.

15          THE COURT:  I see, Ms. David, you have the same group

16     here that you had yesterday; and, if you want to say hello to

17     the jurors again you can do that, if you would like to.

18     Otherwise, we can get started.

19          MS. DAVID:  Yes, your Honor.  My name is Amanda David.

20     I represent Ms. Chevelle Nesbeth along with Attorney Michael

21     Weil.  Sitting at the table with us is also Intern Ranit Patel

22     and Paralegal Melanie Morales.

23          THE COURT:  Mr. Scotti, are you ready to give your

24     opening statement?

25          MR. SCOTTI:  I am, your Honor.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1      THE COURT:  All right.  Go ahead.

2      MR. SCOTTI:  On January 6, 2015, the defendant,

3  Chevelle Nesbeth, smuggled more than $16,000 of cocaine into

4  the United States.  She was caught, ladies and gentlemen, and

5  that's why we are here today.

6      The evidence will show that last January, just after

7  New Years, the defendant boarded a flight in Montego, Bay

8  Jamaica, headed for John F. Kennedy Airport.  With her she had

9  two matching suitcases.  They were light gray roller bags with

10  the extendible pull handles; and what you will learn is that

11  the pull handles of both those suitcases were filled with

12  cocaine.

13      Now, after landing in New York, the defendant was

14  selected to go to a baggage examination area, and there a

15  customs and border protection officer asked her a series of

16  questions.  The defendant confirmed that the bags and their

17  contents were hers and that she had packed the bags herself.

18      The customs officer then searched the two suitcases.

19  Right away, the customs officer noticed something strange about

20  the larger suitcase.  When he pulled on the extendible handle

21  of the suitcase, it barely extended from the bag, only maybe

22  four to five inches.  He pulled a few times on it, but it

23  didn't budge.

24      He unzipped the lining at the bottom of the suitcase

25  after he emptied out all the belongings, and he used a metal

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1   tool to punch a small hole in the rail of that bag, and it

2   revealed a white, powdery substance.  He also probed the rail

3   of the smaller bag, revealing the same white, powdery

4   substance.

5        That powdery substance inside the rails of both the

6   defendant's bags was cocaine.  Between the two suitcases,

7   ladies and gentlemen, 1.3 pounds of powdered cocaine was

8   recovered.

9        For smuggling cocaine into the United States the

10  defendant is charged with two crimes:  With importation of

11  cocaine and possession of cocaine with intent to distribute it.

12       So how will we prove this case to you?  First, with

13  physical evidence.  You will see the defendant's suitcases, the

14  baggage tags with her name on them, the metal rails, and the

15  cocaine that was found inside.  Second, you are going to hear

16  witness testimony.  You will hear from the customs officer.  He

17  will be on that witness stand right over there, and he will

18  tell you how he found the cocaine and he will tell you about

19  the obvious defect in the pull handle of the larger bag and how

20  that immediately raised his suspicion, leading him to

21  ultimately discover the cocaine.

22       You are also going to hear from a forensic chemist,

23  who is going to confirm for you that that powdery substance was

24  cocaine.  And you are going to hear from a special agent with

25  Homeland Security Investigations, who is an expert in narcotics

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1    pricing and distribution.  He will tell you that the cocaine

2    the defendant smuggled into the United States was worth more

3    than $16,000.  For this much -- and he is also going to tell

4    you that this much cocaine worth that amount of money has only

5    one purpose, and that is distribution on the street and not for

6    personal use.

7            Finally, you will see it on video, ladies and

8    gentlemen, the defendant's large suitcase with the extendible

9    pull handle that didn't extend.  You will see the moment the

10   officer found the cocaine in the rails of that pull handle.

11   You will see it all.

12           Once you have seen and heard all of the evidence in

13   this case, I'm going to come back up to you and I'm going to

14   ask you to return the only verdict that is compelled by that

15   evidence, ladies and gentlemen.  That is a verdict of guilty.

16           Thank you.

17           THE COURT:  Thank you.  All right.  Mr. Scotti.

18           Ms. David, do you wish to make an opening statement?

19           MS. DAVID:  Yes, your Honor.

20           Good morning, ladies and gentlemen.  It's early

21   January, a few days after New Year's, a week or so after

22   Christmas.  Imagine that you are lucky enough to have escaped

23   the frigid temperatures here in New York, the slush, the snow,

24   and be able to still enjoy all the trappings of the holiday

25   season.  You are able to get out of New York, head to the sun,

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1   to the beach, to the Caribbean.  It sounds fantastic, right?

2   It certainly would sound fantastic to a college student on

3   winter break.

4        For 19-year-old Chevelle Nesbeth, it seemed like a

5   dream vacation.  She got to get away from her academic work,

6   get away from her part-time job, and go visit her father in

7   Jamaica for the holidays.

8        But this dream vacation would come to an abrupt end

9   when she landed back into the United States at JFK on January 6

10  of 2015, and that would begin an ongoing nightmare.  On that

11  day, when Chevelle Nesbeth came back to the United States, she

12  knew she was going to have a long commute home.  Chevelle is

13  from and lives in New Haven, Connecticut.

14       She got off the plane -- it was around 10:00 p.m. --

15  tired and eager to get going.  She goes through customs,

16  nothing unusual happens there.  She goes to pick up her bag in

17  baggage claim.  Nothing unusual happens there.  She is in a

18  line when she gets pulled off that line for a secondary

19  inspection.  Still not that unusual to Chevelle, who has been

20  on international flights before.

21       But when the agent is checking her bag that's when

22  something unusual happens.  She notices that the agent is

23  (indicating) banging, banging on the inside of her bag.  Now,

24  that felt strange.  It looked strange, and that's when Chevelle

25  becomes confused.  Confused because she didn't know, she

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    couldn't know, and she wouldn't have known that inside the

2    handrails of the suitcases that she had were bags of cocaine.

3            You will hear during the course of this case -- and

4    you have already heard from the prosecutor and I have just

5    mentioned -- where in the bags the cocaine were found and how

6    those bags were found.  The bags of cocaine were not in some

7    side pocket in her suitcase.  They weren't missioned in with

8    the contents of her suitcase, not in her clothes, not in her

9    purse, not in anything that Chevelle would have touched,

10   packed, or seen that day.

11           And you will hear what was actually in the two

12   suitcases, the things that Chevelle did touch, pack, and see,

13   things you would expect a 19-year-old on vacation to have:

14   Clothes, a lot of shoes, souvenirs, but not drugs.

15           And, ladies and gentlemen, you heard how the drugs

16   were found.  They were found because the agent used an

17   instrument that he used to bang, puncture, and eventually break

18   open the handles.  That is how they are discovered.

19           And why is that important?  Because the key issue,

20   really the ultimate issue in this case for you to decide, is

21   knowledge:  Whether or not Chevelle actually knew that there

22   were bags of cocaine in the handrails of her suitcase; and,

23   ladies and gentlemen, after you hear the evidence in this case,

24   you will learn that she in fact did not.

25           You will hear evidence that the actual bags of cocaine

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1    were vacuum sealed, wrapped up in package tape, and jammed into

2    those handrails.  There was no smell coming from the handrails.

3    There were no punctured holes in the handrails when Chevelle

4    had possession of those bags.  There was nothing that you could

5    see about the handrails that showed that they had been altered

6    in any way.  The drugs were hidden from law enforcement, but

7    they were also hidden from Chevelle herself.

8            That Chevelle possessed those bags, that she packed

9    those bags, that is not where this story ends.  That is not

10   enough to find her guilty, because the question is whether or

11   not she knew that those drugs were in the handrails.

12           Ladies and gentlemen, you will see that when Chevelle

13   is stopped by the agents, she acts in the same manner that you

14   would expect someone who didn't know to behave.  She doesn't

15   refuse to answer their questions.  She doesn't hesitate to

16   answer their questions.  She is not evasive because she has

17   nothing to hide, because Chevelle doesn't believe that she is

18   doing anything illegal.

19           Now, the agents arrested Chevelle Nesbeth.  That's why

20   we are here today, but, as Judge Block told you yesterday, the

21   fact that she was arrested does not mean that she is guilty.

22   And the fact that she possessed the suitcase with those drugs

23   in the handrails also doesn't mean that she is guilty.  You

24   will have to find that she knowingly did so.

25           After you hear all the evidence in the case -- and in

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1   a case like this, you ask yourself, what evidence is lacking --

2   I am confident that you will come back with the only verdict

3   that makes sense; and that is one of not guilty.

4          THE COURT:  All right.  So, folks, you have a sense

5   now of what this case is all about.

6          As I told you before, the lawyers are advocating.

7   What they say is not factually established.  They are just

8   advocating for their clients, which they are supposed to do;

9   and now the bell rings, and you will hear the actual testimony

10  from the lips of those people who will be called to testify

11  under oath and from the documents which I will allow into

12  evidence.

13         So at this time, Mr. Scotti, is the government

14  prepared to call its first witness?

15         MR. SCOTTI:  The government is prepared, your Honor.

16         THE COURT:  Who do we have?

17         MR. SCOTTI:  Officer Giuseppe D'Andrea from the

18  Customs and Border Protection.

19         THE COURT:  Is he outside?

20         MR. SCOTTI:  He is outside, judge.

21         THE COURT:  While we are waiting for the witness to

22  come in, it's the rule of the court that people are not allowed

23  who are going to testify, to be in the courtroom, to listen to

24  the trial testimony.  They wait outside.  It takes a moment to

25  get them into the courtroom; and that's the way it goes in all

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1   trials.  So the idea, of course, is that you don't want the

2   witness to possibly be influenced by what they hear in the

3   courtroom.  So we have to just be a little patient while we

4   bring the witnesses in.  Presumably it won't take too long.

5        We administer an oath to everybody who testifies.  The

6   oath that I instruct Mr. Innelli to give is just to ask them

7   whether they affirm to tell the truth.  I don't use "under God"

8   and all of that.  Why?  Because in Brooklyn especially we have

9   people of different religious beliefs, and some people are more

10  comfortable just affirming to tell the truth.  So that's the

11  way we do it.  It means the same thing.  Once they do that,

12  they have said that they are going to testify truthfully, as if

13  an oath were given to them.

14       Go ahead.

15       THE CLERK:  Good morning, Officer D'Andrea.  Remain

16  standing and raise your right hand.

17  GIUSEPPE D'ANDREA, called as a witness, having been

18       first duly sworn/affirmed, was examined and

19       proceeded to testify as follows:

20       THE CLERK:  Thank you.  Please have a seat.

21       THE COURT:  Mr. Scotti, your witness.

22       THE CLERK:  If you could please state and spell your

23  name, please.

24       THE WITNESS:  Giuseppe D'Andrea G-I-U-S-E --

25       THE COURT:  So the machine doesn't seem as if it's on.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1    Does it?

2            THE CLERK:  There you go.

3            THE WITNESS:  Giuseppe D'Andrea, G-I-U-S-E-P-P-E

4    D-apostrophe-A-N-D-R-E-A.

5            THE COURT:  So we can hear you fine.

6            The courtroom wasn't constructed -- we ran out of

7    money so we couldn't put in a proper auditory system here.  So

8    sometimes people with a loud voice sound too loud, and

9    sometimes with a soft voice have to move a little closer to the

10   mic.  Just check it out by saying, "Good morning, Judge Block,"

11   and see how you sound.

12           THE WITNESS:  Good morning, Judge Block.

13           THE COURT:  All right.  I think we can all hear you

14   okay.  Go ahead.

15           MR. SCOTTI:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MR. SCOTTI:

18   Q    Good morning, Officer D'Andrea.

19   A    Good morning.

20   Q    Officer D'Andrea, who do you work for?

21   A    Customs and Border Protection.

22   Q    Is that also known as CBP?

23   A    Yes.

24   Q    How long have you worked for CBP?

25   A    Six years.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

33

D'Andrea – Direct/Scotti

1    Q    I'm sorry?

2    A    Six years.

3         THE COURT:  Keep your voice up.

4    Q    What is your title?

5    A    CBP officer.

6    Q    Did you have to attend a training academy when you were

7    hired by Customs and Border Protection?

8    A    Yes.

9    Q    What academy did you attend?

10   A    FLETC, the Federal Law Enforcement Training Center.

11   Q    How long did this training last?

12   A    Four months.

13   Q    Could you just tell the members of the jury what that

14   training consisted of?

15   A    It basically consisted of customs and immigration law.

16   Q    What, if any, law enforcement tactical training did you

17   receive?

18   A    We did arrest techniques, and that's basically it.

19   Q    Okay.  As a CBP officer is there any particular airport

20   you are assigned to patrol?

21   A    John F. Kennedy International Airport.

22   Q    Is that in Queens County?

23   A    Yes.

24   Q    What are your duties and responsibilities as a CBP officer

25   working at JFK?

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

34

D'Andrea – Direct/Scotti

1   A    Enforce customs and immigrations laws.

2   Q    Exactly can you just tell the members of the jury how you

3   enforce customs and immigration laws at John F. Kennedy

4   Airport.

5   A    We basically inspect passengers, we verify their

6   documents, we inspect their luggage, their belongings, whatever

7   they bring into the United States.

8   Q    As part of these responsibilities that you have in your

9   daily job, approximately how many suitcases have you inspected

10  as a CBP officer in your career?

11  A    Thousands.

12  Q    And approximately how many suitcases do you inspect in a

13  day?

14  A    Fifteen to twenty a day.

15         THE COURT:  How does that work?  You know, the jurors

16  probably are curious, I guess.  All of us travel.  We have gone

17  through airport security.

18         Is it just a random selection process?  Maybe you can

19  explain to the jurors so they can see how the process unfolds.

20         THE WITNESS:  Yeah.  Basically anybody who comes from

21  overseas is subject to inspection.  So anybody can get chosen

22  for inspection.

23         THE COURT:  How do you get chosen?  Is it just you

24  look down the line and you say every fourth person is going to

25  be inspected?

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

D'Andrea — Direct/Scotti

1          I guess I'm personally interested because when I

2   travel I like to know how I get picked out.

3          THE WITNESS:  Yeah, pretty much, depending where you

4   are coming from.

5          THE COURT:  So it's a random type of thing?

6          THE WITNESS:  Yeah.

7          THE COURT:  So I shouldn't personalize it when I'm

8   picked out for inspection.

9          THE WITNESS:  No.

10          THE COURT:  Okay.

11  BY MR. SCOTTI:

12  Q    Officer D'Andrea, let me direct your attention to

13  January 6 of 2015.  Were you working on that day?

14  A    Yes.

15  Q    What shift were you working?

16  A    I was working a 4:00-to-midnight shift.

17  Q    Which terminal were you assigned to patrol that day?

18  A    The JetBlue terminal, which is terminal five.

19  Q    And is that an international or a domestic?

20  A    It's an international terminal.

21  Q    And were you in the arrivals or departures section?

22  A    The arrivals.

23  Q    Were you in uniform or plainclothes that evening?

24  A    I was in uniform.

25  Q    What area of terminal five were you stationed?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1  A     Basically in the arrivals area, everywhere in the arrivals

2  area.

3  Q     What were your responsibilities working at terminal five

4  that evening?

5  A     To inspect travelers and check their suitcases, make sure

6  they are not carrying anything they shouldn't be.

7        THE COURT:  Keep your voice up a little bit.  You have

8  a tendency to swallow it.

9        Have you ever testified before in court?

10       THE WITNESS:  No.

11       THE COURT:  Ah, no wonder you are speaking so quietly.

12 Just relax and keep your voice up.

13       THE WITNESS:  Thank you.

14 BY MR. SCOTTI:

15 Q     On January 6 did you interact with a passenger named

16 Chevelle Nesbeth?

17 A     Yes.

18 Q     Do you see her in court here today?

19 A     Yes.

20 Q     Could you please point to her, indicating an article of

21 clothing.

22 A     She is wearing a black blazer and glasses, a pink shirt.

23       THE COURT:  So the record reflects that the witness

24 has identified the defendant.

25 Q     Where was she when you first interacted with her?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1  A    The control point exit in the baggage claims area.

2  Q    And did she have any customs or travel documents with her

3  at the time?

4  A    Yes.  She had her passport and her customs receipt.

5          MR. SCOTTI:  Your Honor, if I could just approach?

6          THE COURT:  Go ahead.

7  Q    I would like to show you what's been marked for

8  identification as Government's Exhibit 9.  Just take a look at

9  that.  What is Government's Exhibit 9?

10  A    This is a customs receipt.

11  Q    When you say "a customs receipt," can you just explain

12  what that is, for the members of the jury?

13  A    It's a receipt that comes out of a kiosk when you go

14  through primary control.

15  Q    In that kiosk what type of information does a passenger

16  have to put into that kiosk to get that receipt?

17  A    Basically they put their passport into the kiosk, and they

18  answer customs-related questions.

19  Q    And is that, what's been marked for identification as

20  Government's Exhibit 9, in the same or substantially the same

21  condition as it was on January 6, 2015?

22  A    Yes.

23  Q    If you can, just looking at the back of it, there are some

24  handwritten notes.  Are those notes that you wrote?

25  A    Yes.

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

D'Andrea – Direct/Scotti

1    Q    Those notes, is it fair to say those are notes you wrote

2    after the defendant was arrested?

3    A    Yes.

4    Q    And those notes weren't there when you first saw it, when

5    you first took that receipt from the defendant?

6    A    No.

7          MR. SCOTTI:  Okay.  Your Honor, I would just ask that

8    Government's Exhibit 9 be moved into evidence.

9          THE COURT:  Any objections?

10         MS. DAVID:  No objection.

11         THE COURT:  All right.  So that's the first document

12   that is going to be allowed into evidence.  You see how the

13   process works.  The questions are asked to lay a foundation,

14   and then it's offered into evidence.  If there is an objection

15   by opposing counsel, then I will have to make a ruling of law.

16   So you see how the process unfolds.

17         So that's the first document that's in evidence,

18   Exhibit 9.  Go ahead.

19         (Government's Exhibit 9  so marked.)

20         MR. SCOTTI:  Thank you, your Honor.

21   BY MR. SCOTTI:

22   Q    Officer D'Andrea, just taking a look now at Government's

23   Exhibit 9, does this declaration indicate what date and time

24   that it was issued, or that it was completed?  I'm sorry.

25   A    Yes.

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

D'Andrea – Direct/Scotti

1   Q    What date and time was this completed?

2   A    January 6, 2015 at 9:22.

3   Q    What else of significance is present on Government's

4   Exhibit 9?

5   A    The defendant's photo and a customs stamp.

6   Q    When you say "a customs stamp," where are you referring

7   to?  Is that the stamp that you see that has January 6, 2015 on

8   it?

9   A    Yes.

10  Q    What does that stamp indicate?

11  A    It indicates that the defendant went through immigration

12  and was admitted into the United States.

13  Q    Is there any information about her flight on this form?

14  A    Yes.

15  Q    And what information on this form is there, with respect

16  to her flight?

17  A    It's on the bottom right-hand corner, flight number B6780.

18  Q    What's flight B6780?

19  A    It's a JetBlue flight from Montego Bay, Jamaica.

20  Q    Thank you.  Officer D'Andrea, getting back to your

21  interaction with the defendant, how many bags did she have with

22  her?

23  A    She had two roller suitcases with extendible handles and a

24  satchel.

25  Q    And where did you and the defendant go next, after you

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

D'Andrea – Direct/Scotti

1  first approached her?

2  A    We went to the secondary processing area.

3           MR. SCOTTI:  Mike, I'm just going to -- I have some

4  photographs I want to show him on the ELMO that I don't want

5  published yet.

6           THE CLERK:  Go ahead.

7           MR. SCOTTI:  Thank you.

8  Q    Officer D'Andrea, you mentioned you worked in terminal

9  five JetBlue international arrivals that evening, right?

10 A    Yes.

11 Q    I want you to take a look at -- I'm going to show you

12 Government's Exhibits 5A through F.  I want you to take a look

13 at each of them on your screen.  That's 5B.  I just showed you

14 5A.  This is 5C.  Out of focus.  Hold on one second.  Okay.  So

15 5C, 5D, 5E, and 5F.

16          Looking at each of these pictures, what generally do

17 they depict?

18 A    This is the JetBlue terminal arrivals area.

19 Q    Do each of the photographs marked Government's Exhibit 7A

20 (sic) through F fairly and accurately depict the way terminal

21 five appeared on January 6, 2015?

22 A    Yes.

23          MR. SCOTTI:  Your Honor, at this time I would ask that

24 Government's Exhibits 5A through F be moved into evidence.

25          THE COURT:  A through F, 5A, in evidence, hearing no

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

 1  objection.

 2          (Government Exhibits 5A through 5F so marked.)

 3          MR. SCOTTI:  Thank you, your Honor.

 4          Now, beginning with 5A, if I can have 5A published.

 5          THE CLERK:  Do you want me to dim the lights a little

 6  bit?

 7          MR. SCOTTI:  Just a little.  I know the jurors have

 8  the screens, which might be a little clearer.

 9          THE CLERK:  This might help.

10          MR. SCOTTI:  Yeah.

11  BY MR. SCOTTI:

12  Q    Officer D'Andrea, first looking at 5A, what does 5A

13  depict?

14  A    This is the hallway leading to the primary inspection

15  area.

16  Q    When a passenger is walking down this hallway, where have

17  they just come from?

18  A    The airplane.

19  Q    Now looking at 5B, what is depicted in 5B?

20  A    These are lines leading to the primary inspection.

21  Q    This room, this room that we are looking at now, what

22  would you call this room?

23  A    Primary control.

24  Q    Now, you have mentioned before that the Exhibit 9, this

25  receipt, was generated at a kiosk.  Correct?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

42

D'Andrea – Direct/Scotti

1   A    Yes.

2   Q    Do you see the kiosks that generate this exhibit,

3   Government's Exhibit 9, the declaration form?

4   A    Yeah.  They are in the far back, right corner.

5   Q    Are you referring to these right here (indicating)?

6   A    Yes.

7   Q    Now, just looking at 5C, is that fair to say it's a closer

8   picture of the kiosk?

9   A    Yes.

10  Q    Now, after a passenger will receive this receipt, after

11  they put their passport in and they receive this receipt, where

12  do they go after here?

13  A    They go see an officer.

14  Q    Where?  What is that called?

15  A    It's called primary control.

16  Q    The primary control officers, are they stationed in

17  booths?

18  A    Yes.

19  Q    Is each booth numbered?

20  A    Yes.

21  Q    Do you see those numbered booths on this photograph 5C?

22  A    Yes.

23  Q    Where exactly do you see them?

24  A    They are right kind the kiosk.

25  Q    Are you referring to these numbers over here, behind the

D'Andrea – Direct/Scotti

1   kiosk?

2   A    Yes.

3   Q    Now, looking at 5D, what is 5D a picture of?

4   A    This is a hallway leading to baggage claim.

5   Q    What's on the left, over here, of this hallway?

6   A    Those are the primary inspection booths.

7   Q    Is this the hallway that after they pass through the

8   primary inspection they walk down?

9   A    Yes.

10  Q    Where does this hallway lead to again?

11  A    Baggage claim.

12  Q    And now 5E, this is a picture of what?

13  A    The baggage claim area.

14  Q    Okay.  And obviously these are the baggage carousels where

15  passengers would pick up their luggage, correct?

16  A    Yes.

17  Q    What else is found in that area, that baggage claim area?

18  A    Secondary baggage control.

19  Q    And are there any other check points there that are

20  customs-related check points before a passenger would leave the

21  airport?

22  A    Yes.

23  Q    What is that called?

24  A    It's called a control point.

25  Q    After a passenger picks up their luggage from these

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

D'Andrea – Direct/Scotti

1   carousels where they check the bags, where would they be

2   directed to?

3   A    Baggage control.

4   Q    Okay.  That's the control point you referred to?

5   A    Yes.

6   Q    Then at that point, what happens with the passenger?  What

7   are the options then at that point?

8   A    They either get chosen for a baggage exam or they exit.

9   Q    Now, looking at 5F, is 5F the same room or area that 5E

10  was taken of?

11  A    Yes.

12  Q    Obviously, this is a different angle.  What does 5F

13  depict?

14  A    This is the control board.

15  Q    And if you look in the middle, focusing in there, do you

16  see some yellow signs on the ceiling?

17  A    Yes.

18  Q    There is a desk underneath them with an officer?

19  A    Yes.

20  Q    What is that area right there?

21  A    That's actually the control board.

22  Q    Also, you will notice, looking at 5F, behind those yellow

23  signs, it appears to be the entrance to another room.  What is

24  that?

25  A    That is secondary processing.

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

1    Q    What happens in secondary processing?

2    A    Baggage exams.

3    Q    Now, just looking at -- I have to apologize.  I didn't

4    show you this picture before.  Can I just have this switched

5    off.  I left it in my binder and didn't show you this picture.

6              I want to show you what's marked for identification as

7    5G.  Do you recognize 5G?

8    A    Yes.

9    Q    What do you recognize 5G as?

10   A    Secondary processing.

11   Q    Does this picture fairly and accurately depict the way the

12   secondary processing room looked on January 6, 2015?

13   A    Yes.

14             MR. SCOTTI:  Okay.  Your Honor, I would ask to move 5G

15   into evidence.

16             THE COURT:  Any objection?

17             MS. DAVID:  No objection.

18             THE COURT:  Hearing none, in evidence at this time.

19             (Government Exhibit 5G so marked.)

20             MR. SCOTTI:  Thank you.  Here we go.  Sorry about

21   that.

22   Q    Looking at 5G, what is 5G a picture of?

23   A    Secondary processing.

24   Q    You testified this is the room where baggage examinations

25   occur?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea - Direct/Scotti

1   A    Yes.

2   Q    Looking at these pictures in 5G, where exactly do the

3   examinations occur?

4   A    On top of the tables that you see there.

5   Q    You are referring to these tables here (indicating)?

6   A    Yes.

7   Q    Okay.  Okay.  Now, getting back to your encounter with the

8   defendant, what happened when you and the defendant entered the

9   secondary processing area?

10        MR. SCOTTI:  Thank you.

11        THE CLERK:  You are welcome.

12  Q    What happened when you and defendant entered the secondary

13  processing room that you just testified you went into?

14  A    I verified her belongings.

15  Q    Just tell the jury -- tell the jury what that means

16  exactly, what specifically you do to verify belongings.

17  A    If the bags she was carrying were hers, if she packed them

18  herself, and if everything in the bags were hers.

19  Q    Those were all questions that you asked the defendant?

20  A    Yes.

21  Q    How did she respond to those questions?

22  A    Yes.

23  Q    And did there come a point where you examined her

24  suitcases?

25  A    Yes.

D'Andrea – Direct/Scotti

1    Q    And where were the suitcases placed to be inspected?

2    A    On top of the table.

3    Q    That's the table we just saw that was depicted in 5G?

4    A    Yes.

5    Q    Which suitcase -- you said she had two roller bags with

6    her.  Is that correct?

7    A    Yes.

8    Q    Was there anything that distinguished one from the other?

9    A    One was larger.

10   Q    Which of the two suitcases did you inspect first?

11   A    The larger one.

12   Q    Where was the defendant when you examined the -- her

13   suitcase?

14   A    In front of me, across the table.

15   Q    Now, just tell the members of the jury how you examined

16   the larger suitcases you were starting to check.

17   A    Well, I opened it, and I check every pocket and I take out

18   all the contents onto the table, and I inspect the whole bag.

19   Q    As you were inspecting the larger suitcase what, if

20   anything, unusual was there about that bag that immediately

21   caught your attention?

22   A    The handle.

23   Q    Please explain what handle you are referring to.

24   A    The pull handle on the suitcase.

25   Q    What about that pull handle drew your attention?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1   A    It didn't extend fully.

2   Q    When you say, "It didn't extend fully," could you describe

3   what you mean by that?

4   A    Well, the handle is supposed to extend out.

5   Q    How far did it extend?

6   A    About four to five inches.

7   Q    Why was this strange to you?

8   A    Because it's supposed to extend maybe three times the

9   length.

10  Q    And after noticing that the handle didn't extend, what did

11  you do?

12  A    I got to the bottom of the bag, I unzipped the lining, and

13  went to the handrails.

14  Q    When you say you "went to the handrails," so you unzipped

15  the lining that exposed the handrails underneath?

16  A    Yes.

17  Q    Then what did you do at that point?

18  A    I grabbed the handle again and I pulled on it, and it

19  didn't extend.  So I took out my probe and I tapped on the

20  handrail to see if there was anything inside of it.

21  Q    When you say you tapped it, what would you -- how would

22  that tell you whether there was something inside it?

23  A    When you tap on it, it's supposed to be a hollow sound,

24  like a pinging sound.

25  Q    What was the sound that you heard when you tapped on it?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1   A    It was more of a clunk.

2   Q    What did that tell you?

3   A    That there would be probably something inside of it.

4   Q    Now, after you heard that sound, what did you do next?

5   A    I took my probe and I took -- put the tip of the probe on

6   top of the handrail, and I punched a hole in it.

7   Q    You say you took your probe.

8   A    Yes.

9   Q    I would just like to -- can you just -- I would like to

10  show the witness what's been marked as Government's Exhibit 7.

11  Do you recognize Government's Exhibit 7?

12  A    Yes.

13  Q    What do you recognize it to be?

14  A    My probe.

15  Q    Is that a picture of the same probe you used to probe the

16  defendant's suitcase back on January 6 of 2015?

17  A    Yes.

18  Q    Does this picture fairly and accurately depict the way it

19  looked on that date?

20  A    Yes.

21       MR. SCOTTI:  I just ask that this be moved into

22  evidence and published to the jury.

23       THE COURT:  What exhibit number is that?

24       MR. SCOTTI:  It's Exhibit number 7, your Honor.

25       THE COURT:  No objection.  Into evidence.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1    (Government Exhibit 7 so marked.)

2  Q    Was this the probe that you first used to tap the rails?

3  A    Yes.

4  Q    What is this probe made of?

5  A    It's metal.

6  Q    Is this then a probe that you used to check the inside of

7  the rail?

8  A    Yes.

9  Q    Now, could you just describe to the jury how you used that

10  probe to check the rail.

11  A    I just took it and put the tip right onto the metal

12  railing, and I just punched a hole in it.

13  Q    And where was the defendant when you probed the rail?

14  A    Across from me.

15  Q    After you punched that hole into the rail, afterwards,

16  what, if anything, did the defendant say to you?

17  A    Nothing.

18  Q    I'm sorry?

19  A    Nothing.  She didn't say anything.

20  Q    Did she ask why you just punched a hole in your bag?

21  A    No.

22  Q    What observations did you make after you punched this hole

23  in the railing?

24  A    There was a white, powdery substance.

25  Q    What did you suspect that that substance was?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea - Direct/Scotti

1  A   Cocaine.

2  Q   Did you tell the defendant at that point what you had

3  found?

4  A   No.

5  Q   Why not?

6  A   It's because there was another inspection going on on the

7  other table.

8  Q   Where was that in relation to you?

9  A   Behind me.

10 Q   What did that -- what significance did that have for you?

11 A   I don't know who she is traveling with or who the person

12 was.  I just would rather go into a controlled environment.

13 Q   After you discovered this in the rails of the larger

14 suitcase, what did you do next?

15 A   I packed her belongings and I proceeded to check the other

16 suitcase.

17 Q   Did the smaller suitcase also have an extendible pull

18 handle?

19 A   Yes.

20 Q   Did you check that pull handle, to pull on it?

21 A   Yes.

22 Q   How would you describe the length of the pull handle on

23 the smaller bag?

24 A   It was three times the size.

25 Q   Would you describe it as normal?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1   A     Yes.

2   Q     After you finished examining both bags, what action did

3   you take with respect to the defendant?

4   A     Can you repeat the question, please?

5   Q     Sure.  After you finished examining both of the bags what

6   did you do with the defendant?

7   A     Took her to a private room.

8   Q     Did there come a time when you probed the extendible rail

9   of the smaller bag?

10  A     Yes.

11  Q     Where did you do that?

12  A     In the room.

13  Q     What part of the smaller bag did you probe?

14  A     The top handle.

15  Q     When you say "handle," are you referring to the handle or

16  the rails?

17  A     The rails, the top handle part of the rails.

18  Q     What did you find in the rail, the top rail of the smaller

19  bag?

20  A     A white, powdery substance.

21  Q     Officer D'Andrea --

22        MR. SCOTTI:  May I approach the witness, your Honor?

23        THE COURT:  You may.

24  Q     Mr. D'Andrea, I want to show you what's been marked for

25  identification as Government's Exhibit 17A through C.  Do you

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1    recognize that CD?

2    A    Yes.

3    Q    What's on that CD?

4    A    My initials and the date.

5    Q    I mean what's actually –– if you played the CD what would

6    be on it?

7    A    It's the encounter.

8    Q    Okay.  17A, is that –– does that depict your search of

9    defendant's bag?

10   A    Yes.

11   Q    Does that 17A have sound with it?

12   A    Yes.

13   Q    17B, is that a different angle of your search?

14   A    Yes.

15   Q    Does that have sound with it?

16   A    No.

17   Q    And 17C, is that an video of the baggage carousel area?

18   A    Yes.

19   Q    17A, B, and C, do they fairly and accurately depict the

20   defendant in terminal five JFK Airport on the evening of

21   January 6, 2015?

22   A    Yes.

23        MR. SCOTTI:  Your Honor, I would just ask that

24   Government's 17A through C be moved into evidence?

25        THE COURT:  17A through G?

54

D'Andrea – Direct/Scotti

1        MR. SCOTTI:  C, your Honor.

2        THE COURT:  A through C.  All right.  No objection.  A

3   through C in evidence.

4        (Government Exhibits 17A through C so marked.)

5        MR. SCOTTI:  Your Honor, at this time I would like to

6   publish to the jury, starting with Exhibit 17A.

7        THE COURT:  Go ahead.

8        (Recording played.)

9   Q    I'm going to pause it for a second, Officer D'Andrea.  I

10  will back it up to where it starts.  First, looking at it in

11  freeze frame right now, where is this?

12  A    This is secondary processing.

13  Q    Are those the tables you were referring to where you do

14  the searches?

15  A    Yes.

16       (Recording played.)

17  Q    Now, right there, it sounds as if you asked several

18  questions.  What questions did you ask right there?

19  A    If these bags were hers, if she packed them herself.

20  Q    How did she respond to those?

21  A    Yes.

22  Q    Then you asked another question?

23  A    How much money she was carrying.

24  Q    Is that a routine question you ask any passenger when you

25  are doing these searches?

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

D'Andrea – Direct/Scotti

1    A    Yes.

2            MR. SCOTTI:  Continuing on.

3            (Recording played.)

4    Q    Are you just confirming with her?

5    A    Yes.

6            (Recording played.)

7    Q    Now, at this point there was some discussion going on

8    between you and the defendant.  What was that discussion about

9    that we just heard?

10   A    The purpose of her trip.

11   Q    What did she tell you the purpose of her trip was?

12   A    She said she went to Montego Bay and then Kingston, to

13   visit her father.

14   Q    This video is fairly long, and from this point in the

15   video what do you do with the larger bag?

16   A    I open it and I inspect it.

17   Q    By inspecting it you emptied the belongings?

18   A    Yes.

19           MR. SCOTTI:  Now I just want to skip ahead to two

20   minutes and 36 seconds in, and looking there.

21           (Recording played.)

22   Q    Now, at this point, what are you doing?

23   A    I'm unzipping the lining of the suitcase.

24   Q    Why are you unzipping the lining at that point?

25   A    Because there is a tendency to hide stuff underneath the

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

                        D'Andrea – Direct/Scotti

1   lining of the suitcase.

2              (Recording played.)

3   Q   Just there, what did we just see you do there?

4   A   I pulled on the handle.

5   Q   What happened when you pulled on the handle?

6   A   It only extended a few inches.

7              (Recording played.)

8   Q   That sound we heard, what was that?

9   A   That was the handrail.

10  Q   That was you tapping on it with your tool?

11  A   Yes.

12             (Recording played.)

13  Q   Now, just then, you could hear the defendant say something

14  to you at that point.  What did she say to you?

15  A   "Is there something wrong?"

16  Q   What did you say?

17  A   "Nope."

18             (Recording played.)

19  Q   Now, at this point what did you notice?

20  A   A white, powdery substance.

21  Q   Could you just describe -- you just saw it on video --

22  could you describe how much force you used to punch a hole in

23  that rail?

24  A   It's pretty, pretty hard.

25  Q   And after you punched the hole in the rail what, if

D'Andrea – Direct/Scotti

1   anything, did the defendant say to you?

2   A    Nothing.

3   Q    Prior to that, had you and the defendant been talking?

4   A    Yes.

5           (Recording played.)

6           MR. SCOTTI:  Can you just look -- that's okay.

7   Withdrawn.

8           (Recording played.)

9           MR. SCOTTI:  At this point --

10          THE COURT REPORTER:  I can't hear you.

11          MR. SCOTTI:  I apologize.  I just ask -- I'm stating

12  the obvious at this point.  He is looking at the small bag.

13          (Recording played.)

14  Q    You are also seen looking around here.  At this point what

15  are you looking around for?

16  A    I'm looking for members of my team.

17  Q    Why?

18  A    To let them know something was going on.

19  Q    The person behind you, if you can just explain to the jury

20  what's happening behind you on this video.

21  A    Well, there is another officer behind me, inspecting

22  another traveler.

23  Q    Is that officer on your team?

24  A    No.

25  Q    Do you know if the person, the bag, the passenger behind

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1    you whose bag is being searched by that officer, is that person

2    also just off the flight from Montego Bay?

3    A    Yes.

4         (Recording played.)

5    Q    Just then, what did you do with the small bag?

6    A    I extended the handrail.

7    Q    How would you describe the way it extended?

8    A    Pretty far, normal.

9         (Recording played.)

10   Q    Now, after you finished searching the small bag, at that

11   point what did you do?

12   A    I tried to get my team members' attention.

13        MR. SCOTTI:  Once you did -- I'm going to start it up.

14   I'm going to skip towards the end at this point.

15        (Recording played.)

16   Q    Where is she being brought to at this point?

17   A    A private search room.

18   Q    I would like to go back to one other clip that I skipped,

19   about five minutes and 13 seconds.  Was this after you had

20   finished searching both bags?

21   A    Yes.

22   Q    What is that that you are standing next to?

23   A    It's the larger suitcase.

24        MR. SCOTTI:  Okay.  I will play it from here.

25        (Recording played.)

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1   Q    There, how did you pick the suitcase up?

2   A    I grabbed it by the pull handle.

3   Q    Is that the farthest it extended?

4   A    Yes.

5   Q    Now, looking at -- this should be Government's Exhibit

6   17B.  Is this that second angle of the inspection that you told

7   us about?

8   A    Yes.

9   Q    Obviously this is a closer and clearer view of the

10  inspection.  Would you agree?

11  A    Yes.

12          MR. SCOTTI:  I just want to show a brief clip from

13  this.

14          (Recording played.)

15  Q    Now, after you did that where -- just looking at it, where

16  are the defendant's hands now?

17  A    In her pockets.

18  Q    Prior to that where were her hands?

19  A    On the suitcase.

20  Q    Again, after you punched it what, if anything, did she say

21  to you?

22          MS. DAVID:  Objection, your Honor.

23          THE COURT:  Overruled.  You can answer.

24  A    Nothing.

25          MR. SCOTTI:  Now, I want to go to 17C.  I'm going to

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1   move ahead to about 33 minutes, 32 minutes and 30 seconds.

2            (Recording played.)

3   Q    Now looking at 17C, do you see the defendant in this

4   video?

5   A    Yes.

6   Q    Where is she in this video?

7   A    She is standing by the carousel, in front of the balding

8   man, on the right.

9   Q    Is this her right there?

10  A    Yes.

11           MR. SCOTTI:  And I just want to play this here.

12           (Recording played.)

13  Q    Are those the two bags that you would search a short time

14  later?

15  A    Yes.

16           MR. SCOTTI:  Now, I just want to show you –- if I

17  could switch to the ELMO.

18           THE CLERK:  Is it for identification, or is it in

19  evidence?

20           MR. SCOTTI:  For identification, yeah.

21           THE CLERK:  Okay.

22  Q    Just taking a look at Government's Exhibit 20, do you

23  recognize that?

24  A    Yes.

25  Q    What is Exhibit 20?

MICHELE NARDONE, CSR, RPR, CRR –- Official Court Reporter

61

D'Andrea – Direct/Scotti

1   A     It's the defendant walking with her suitcases.

2   Q     Is this a still clip of the video that you just observed

3   in 17C?

4   A     Yes.

5   Q     Does it fairly and accurately depict the video, the

6   portion of the video that it's a clip of, on 17C?

7   A     Yes.

8         MR. SCOTTI:  Your Honor, I ask that this be moved into

9   evidence.

10        THE COURT:  All right, at this time in evidence.

11        (Government Exhibit 17C so marked.)

12        MR. SCOTTI:  And published to the jury.

13        (Published.)

14        MR. SCOTTI:  We can bring the lights up.  Thank you

15  very much.

16        THE CLERK:  You are welcome.

17  Q     Officer D'Andrea, did there come a time when you conducted

18  a field test of the powdery substance that you found in the

19  rails of the larger suitcase?

20  A     Yes.

21  Q     When was that?  Where did you conduct that test?

22  A     In the private search room.

23  Q     Was that the room that you -- we saw you as you were

24  leading the defendant to in the videos that we watched?

25  A     Yes.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1    Q    And what were the results of the field test that you

2    conducted?

3    A    Positive.

4    Q    For what?

5    A    Cocaine.

6    Q    Did there come a time when agents from the Department of

7    Homeland Security Investigations, or HSI, were notified about

8    this arrest?

9    A    Yes.

10   Q    Did you come in contact with HSI agents that evening?

11   A    Yes.

12   Q    Where did you first come into contact with them?

13   A    Outside of the search room.

14   Q    When they arrived where did they go?

15   A    Inside of the search room.

16   Q    Where did you go?

17   A    Outside of the search room.

18   Q    Did there come a time where they came out of the search

19   room?

20   A    Yes.

21   Q    Who was with them?

22   A    The defendant.

23   Q    Where did they bring the defendant?

24   A    To HSI processing center.

25   Q    Where is that?

D'Andrea – Direct/Scotti

1  A    It's in terminal four at JFK.

2  Q    Where did you go after they left the defendant?

3  A    I followed them.

4  Q    Did you go with them, or separately?

5  A    Separately.

6  Q    What did you bring with you to the HSI facility?

7  A    Her suitcases, the evidence.

8  Q    Once she got to that facility, what did you do with the

9  defendant's belongings when you got to the HSI processing

10  facility?

11  A    I inventoried them.

12  Q    When you say inventoried, can you explain to the jury what

13  you mean by that?

14  A    Basically all her articles, her clothing, everything that

15  she had, was written down and inventoried.

16  Q    And when you removed her belongings, what did you put them

17  in?

18  A    In boxes.

19  Q    Did there come a time where you completely removed the

20  rails from the defendant's suitcase?

21  A    Yes.

22  Q    Where was that done?

23  A    In the -- there is a room in the processing center for

24  HSI, where that stuff is completed.

25  Q    What did you do with the rails when you removed them from

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1    the suitcase?

2    A    They were weighed.

3    Q    What was the purpose of weighing them?

4    A    So they can be -- it can be accounted for, see how much

5    weight it had, and for evidence purposes.

6    Q    After they were weighed, what -- were they weighed -- I'm

7    sorry.

8         Were they weighed together or separately?

9    A    They were separate.

10   Q    So the rails from the large bag were weighed, correct?

11   A    Yes.

12   Q    And then the rails from the small bag?

13   A    Yes.

14   Q    After the rails from the large bag were weighed, what

15   happened with them?

16   A    They were put in evidence bags and sealed.

17   Q    How was the bag sealed?

18   A    With a heat seal.

19   Q    I'm sorry what?

20   A    Heat sealed.

21   Q    After the rails from the small bag were weighed what

22   happened with them?

23   A    They were also bagged and heat sealed.

24        MR. SCOTTI:  I would like to show you, just for

25   identification, what's been marked Government's Exhibit 19.

D'Andrea - Direct/Scotti

1        THE CLERK:  A or B?

2        MR. SCOTTI:  I'm sorry, 19A.

3   Q    Do you recognize Government's 19A?

4   A    Yes.

5   Q    What do you recognize that to be?

6   A    Those are handrails from the bigger suitcase.

7   Q    Does what's depicted in 19A fairly and accurately depict

8   the rails from the larger suitcase after they were removed from

9   the suitcase and placed in an evidence bag and sealed?

10  A    Yes.

11       MR. SCOTTI:  Your Honor, at this time I ask that 19A

12  be moved into evidence.

13       THE COURT:  Hearing no objection, it's in evidence.

14       (Government's Exhibit 19A so marked.)

15       MR. SCOTTI:  Now -- I'm sorry.  I'm going to show him

16  another picture and then publish them.

17  Q    Now looking at 19B that's been marked for identification,

18  do you recognize 19B?

19  A    Yes.

20  Q    What do you recognize 19B as?

21  A    The handrails from the smaller suitcase.

22  Q    And are the handrails from the smaller suitcases in that

23  bag, does that picture fairly and accurately depict the way the

24  handrails looked on January 6, 2015, after the rails from the

25  smaller bag were placed in an evidence bag and sealed?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1    A    Yes.

2        MR. SCOTTI:  I now ask that 19B be moved into evidence

3    and that it be published to the jury.

4        THE COURT:  All right.  In evidence.

5        (Government Exhibit 19B so marked.)

6        (Published.)

7    Q    Now, Officer D'Andrea, you are looking at 19A, the rails

8    from the larger suitcase first, and then 19B, the rails from

9    the smaller suitcase.  Can you just explain to the jury how you

10   are able to distinguish or how you are able to tell that 19A is

11   a picture of the rails from the larger suitcase?

12   A    They were less handrails.

13   Q    Why does -- and why does that tell you they are from the

14   larger bag?

15   A    Because the handle did not extend fully.

16   Q    There were fewer rails when you removed the rails from the

17   larger bag?

18   A    Yes.

19   Q    Here are the rails that you removed from the smaller bag?

20   A    Yes.

21   Q    Now, once the rails from each of the suitcases were

22   bagged, who did you give them to?

23   A    They are turned over to HSI.

24   Q    After HSI gets them where did they go?

25   A    They are turned over to the DEA.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1   Q    The DEA lab, for analysis?

2   A    Yes.

3        MR. SCOTTI:  Now -- I'm sorry.  Judge, I'm not

4   leaving.  I just need to get the evidence in here.

5        (Pause.)

6   Q    Sir, I'm going to show you what's been marked for

7   identification as Government's Exhibit 1.

8        MR. SCOTTI:  Your Honor, may I approach?

9        THE COURT:  Go ahead.

10        MR. SCOTTI:  Thank you.

11   Q    I want you to take a look at Government's Exhibit 1 and

12   tell the jury what it is.

13   A    These are the handrails from the larger suitcase.

14   Q    And how were you able to tell that that bag contains the

15   handrails from the larger suitcase?

16   A    Well, the custody receipt has my name on it.

17   Q    Well, looking at what's inside now of Government's

18   Exhibit 1, is that in the same or substantially the same

19   condition as it was back on January 6?

20   A    No.

21   Q    What's different about it?

22   A    The handrails are cut open.

23   Q    What else is inside the bag?

24   A    Cocaine.

25   Q    And other than the fact that the rails have been opened

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1    and the cocaine is now exposed, is Government's Exhibit 1,

2    other than that, in substantially the same condition?

3    A    Yes.

4         MR. SCOTTI:  Your Honor, at this time we would ask

5    that Government's Exhibit 1 be moved into evidence.

6         THE COURT:  All right.  There is no objection it's in

7    evidence at this time.

8         (Government Exhibit 1 so marked.)

9    Q    Now, looking at Government's Exhibit 2 for identification,

10   what do you recognize that to be?

11   A    These are the handrails from the smaller suitcase.

12   Q    How do you know that?

13   A    Because the custody receipt has my name on it.

14   Q    Is what's inside of Government's Exhibit 2 now in the same

15   or substantially the same condition as it was when you

16   recovered the rails from the small bag on January 6, 2015?

17   A    No.

18   Q    How is it different?

19   A    The cocaine was removed from the handrails.

20   Q    Other than that, is it in -- do you recognize it as in

21   substantially the same condition?

22   A    Yes.

23        MR. SCOTTI:  Your Honor, I would ask that Government's

24   Exhibit 2 be now moved into evidence.

25        THE COURT:  It's in evidence.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1          (Government Exhibit 2 so marked.)

2          MR. SCOTTI:  Your Honor, at this time I would just

3   like to publish for the jury Government's Exhibits 1 and 2.

4          THE COURT:  All right.  You can show it to them.

5          Members of the jury, during your deliberations you can

6   have access to all the exhibits.  We allow counsel to show them

7   to you at this time as they are being offered into evidence,

8   but if you wish to see them during your deliberations they will

9   be available to you.

10         MR. SCOTTI:  This is Exhibit 2, and this is Exhibit 1

11  from the larger bag.

12         (Published.)

13  BY MR. SCOTTI:

14  Q    Now, after the rails were removed, what happened with the

15  suitcases?

16  A    I handed it over to HSI.

17         MR. SCOTTI:  I'm going to show you first what's been

18  marked Government's Exhibit 4.

19         THE COURT:  I take it that's the small suitcase.

20  Right?

21  Q    Do you recognize this as the small suitcase?

22  A    Yes.

23  Q    Is this the same or substantially the same as when you

24  removed the rails on January 6, 2015?

25  A    Yes.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea - Direct/Scotti

```
 1          THE COURT:  I suspect it's not going to be any
 2   objection.  We will move it into evidence as the small
 3   suitcase.
 4          (Government Exhibit 4 so marked.)
 5          MR. SCOTTI:  Now, the same for the larger suitcase,
 6   Government's Exhibit 3.
 7          THE COURT:  Is that what's known as the larger
 8   suitcase?  It's a little larger than the other one, I guess.
 9   Is that the one?
10          MR. SCOTTI:  Yes, your Honor.
11          THE COURT:  Officer, do you recognize that?
12          MR. SCOTTI:  Yes.
13          THE COURT:  Moved into evidence.
14          MR. SCOTTI:  Thank you, your Honor.
15          (Government Exhibit 3 so marked.)
16   Q    Looking at the larger suitcase here, if you can just take
17   a look, what, if any, identifying tags are there on the handle?
18   Not the extendible handle but the handle of the suitcase.
19   A    There is actually an airline bag tag.
20   Q    On the airline bag tag is there a name indicated on it?
21   A    Yes.
22   Q    What's the name?
23   A    Chevelle Nesbeth.
24   Q    Is there any personal identification tag on the handle of
25   Government's Exhibit 3?
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1    A    Yes.

2    Q    What is that tag?

3    A    It has the defendant's name, Chevelle Nesbeth.

4    Q    Does it have any other personal identification information

5    on there?

6    A    Her address, her phone number, and her email.

7    Q    Thank you.  Are those tags, both of those, in the same or

8    substantially the same condition as they were on January 6,

9    2015 when you secured that evidence?

10   A    Yes.

11            THE COURT:  Maybe we should take our mid-morning break

12   now, for about 15 minutes, before you complete his direct

13   examination, which I imagine will take another 10 or 15

14   minutes, I guess.

15            MR. SCOTTI:  I'm almost finished, your Honor.

16            THE COURT:  All right.  If you think you can do it in

17   the next minute or so, I will let you go ahead.

18            MR. SCOTTI:  Yeah.  I'm almost finished.  Thank you.

19   Q    Officer D'Andrea, you said that when you got back to the

20   HSI facility you inventoried all of the defendant's belongings.

21   A    Yes.

22   Q    Did that include her boarding pass from the flight from

23   Montego Bay, Jamaica to JFK?

24   A    Yes.

25            MR. SCOTTI:  I'm going to show you what's been marked

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

D'Andrea – Direct/Scotti

1   as Government's Exhibit 13.

2           THE CLERK:  For identification?

3           MR. SCOTTI:  For identification.

4   Q    Could you just take a look at that and tell me if you

5   recognize that.

6   A    Yes.

7   Q    What do you recognize that to be?

8   A    It's a boarding pass.

9   Q    There is also a sticker attached to the side here.  What

10  does that sticker indicate to you?

11  A    That is a baggage tag.

12  Q    Is Government's Exhibit 13 in the same or substantially

13  condition now as it was back on January 6, 2015?

14  A    Yes.

15          MR. SCOTTI:  I just now ask that this be moved into

16  evidence and published it to the jury.

17          THE COURT:  13?

18          MR. SCOTTI:  13.

19          THE COURT:  It's in evidence at this time.  Go ahead.

20          (Government Exhibit 13 so marked.)

21          (Published.)

22  Q    And looking at Government's 13, it indicates the flight

23  date here; is that correct?

24  A    Yes.

25  Q    The boarding time right, here?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

                        D'Andrea - Direct/Scotti

1    A     Yes.

2    Q     And the defendant's name, of course?

3    A     Yes.

4    Q     This is that baggage sticker you are referring to here?

5    A     Yes.

6               MR. SCOTTI:  Thank you.

7               Your Honor, if I could just have one moment.

8               (Pause.)

9               MR. SCOTTI:  Your Honor, I have no further questions

10   at this time.

11              THE COURT:  All right.  So this will be a good time to

12   take our morning break, about 15 minutes.

13              Don't talk about the case.  You can speak to each

14   other about anything you want, except about the case.  You

15   won't do that until all of you are together at the end of

16   trial, after I tell you to start your deliberations.  Then you

17   can all talk to each other.

18              In the meantime, just enjoy your 15 minutes.  We will

19   see you then.

20              THE CLERK:  All rise.

21              (Jury exits.)

22              (Recess.)

23                            o O o
     Certified to be a true and accurate transcript.
24   /s/ Michele Nardone_____
     MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter
25

D'Andrea - Direct/Scotti

1    (In open court.)

2    (Jury in at 11:55 a.m.)

3    THE COURT:  Cross-examination now, Ms. David.

4    MS. DAVID:  Yes, your Honor.

5    THE COURT:  Go ahead.

6    CROSS-EXAMINATION

7    BY MS. DAVID:

8    Q    Good morning, Officer D'Andrea.

9    A    Good morning.

10   Q    You mentioned on direct that you've been a Customs and

11   Board Patrol officer for six years?

12   A    Yes.

13   Q    During that time, you said that you would estimate that

14   you conducted about a thousand cases, correct?

15   A    Yes.

16   Q    You mentioned on direct also that you received some

17   training for this position?

18   A    Yes.

19   Q    And I believe you said you trained at the federal law

20   enforcement training center?

21   A    Yes.

22   Q    And that was for a set period of time?

23   A    Yes.

24   Q    Apart from that, you have also received some I guess you

25   can call it on-the-job training?

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

D'Andrea – Cross/David

1    A    Yes.

2    Q    In terms of other colleagues talking to you about their

3    work as well?

4    A    Yes.

5    Q    And part of that training includes basically how to detect

6    contraband in luggage, right?

7    A    Yes.

8    Q    Looking for anything that you would find suspicious in

9    someone's luggage?

10   A    Yes.

11   Q    And you were trained on what types of places to look in,

12   right?

13   A    Yes.

14   Q    And there are also these sort of like intelligence

15   bulletins that tell you about different cases that people might

16   have contraband in?

17   A    Yes.

18   Q    And when some of your colleagues find contraband, they

19   often call you or other folks over to show you where it was

20   found?

21   A    Yes.

22   Q    There are some instances where someone comes in with a

23   suitcase and they have what would be referred to as a false

24   bottom, right?

25   A    Yes.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

D'Andrea – Cross/David

1    Q    What is a false bottom?

2    A    Basically the bottom of the suitcase is altered and they

3    load it with contraband.

4    Q    And sometimes people have contraband in food containers

5    that they come into the country with?

6    A    Yes.

7    Q    For instance, in a container of flour, there might be

8    drugs in there?

9    A    Yes.

10   Q    And some people are even caught swallowing pellets of

11   drugs, correct?

12   A    Yes.

13   Q    Now, as part of your job, you also look at -- sometimes

14   you look at flight patterns of the passengers when they come

15   in?

16   A    Yes.

17   Q    To see whether or not there is anything suspicious about

18   their flight patterns?

19   A    Yes.

20   Q    And if they traveled back and forth numerous times from

21   the same country?

22   A    Yes.

23   Q    In this case you looked at Miss Nesbeth's travel

24   documents, right?

25   A    Yes.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

D'Andrea – Cross/David

1    Q    And from her travel documents -- one of the travel

2    documents was obviously her passport, right?

3    A    Yes.

4    Q    And in those travel documents you learned that she was

5    actually born in Jamaica?

6         THE COURT:  It might just be my ears but it sounds a

7    little bit on the loud side.  Maybe you can move the microphone

8    away.  I'm sorry we have these problems but it's just the way

9    it is.

10   Q    So from these travel documents, you actually learned that

11   they was actually born in Jamaica, right?

12   A    Yes.

13   Q    You said on January 6, on direct, you went over that the

14   defendant had two suitcases that day, correct?

15   A    Yes.

16   Q    And those are the two exhibits that the government showed

17   you earlier?

18   A    Yes.

19   Q    When you first saw Miss Nesbeth, she was standing in a

20   line, right?

21   A    Yes.

22   Q    And you pulled her off of that line for secondary

23   inspection?

24   A    Yes.

25   Q    When you pulled her off of the line for secondary

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

D'Andrea – Cross/David

1    inspection, you took her to that same area that the government

2    showed you on direct in the pictures?

3    A    Yes.

4    Q    At that point you went through both bags, right?

5    A    Yes.

6    Q    Now, in the first bag you go through, you took out all of

7    her belongings, right?

8    A    Yes.

9    Q    And you look through all of the pockets of the suitcase,

10   right?

11   A    Yes.

12   Q    All of the different compartments, right?

13   A    Yes.

14   Q    And you don't find any contraband or any powdered

15   substance in any of the different compartments, right?

16   A    Well, no.

17   Q    And it wasn't until you at some point unzip the lining of

18   her larger suitcase, right?

19   A    Yes.

20   Q    That's when you get access to the handrails?

21   A    Yes.

22   Q    Initially you don't see anything, right, when you open up

23   the lining and see the handrails?

24   A    No.  I don't.

25   Q    At that point you said that you used that instrument, the

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

D'Andrea – Cross/David

1    metal instrument that the government showed you, to tap the

2    handrails, right?

3    A    Yes.

4    Q    It's after you start tapping the handrails that Chevelle

5    asked you is anything wrong, right?

6    A    Yes.

7    Q    Then after that, you start banging on the handrails or

8    putting more pressure with the same instrument?

9    A    As I tapped it, I already knew this.  I don't recall

10   exactly when that was.

11   Q    Sure.

12        I'm going to show you part of what is already in

13   evidence as Government's Exhibit 17 A.

14        (Whereupon, a videotape was played.)

15   Q    So that is part of the video where you are applying more

16   pressure basically on the bag?

17   A    Yes.

18   Q    And that was after you already started tapping on it?

19   A    Correct.

20   Q    In all the time that you've been a customs agent, you said

21   that you probably searched about thousands of suitcases, right?

22   A    Yes.

23   Q    And of those thousands of suitcases, how many bags have

24   you inspected where you found drugs in the suitcase?

25   A    Once prior to this.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

D'Andrea – Cross/David

1    Q    Were you present when the drugs are actually removed from

2    the handrails?

3    A    No.

4    Q    During the course of the same Government's Exhibit 17 A,

5    you mentioned on direct that you were talking with Chevelle,

6    correct?

7    A    Yes.

8    Q    You were asking her questions?

9    A    Yes.

10   Q    She was answering those questions?

11   A    Yes.

12   Q    And some of the questions you were asking her where things

13   like where was it that she visited, correct?

14   A    Correct.

15   Q    You also got into a conversation with her about whether or

16   not she was employed, right?

17   A    Yes.

18   Q    And she told you that she works at a spa, correct?

19   A    Yes.

20   Q    And you also asked her questions about her father, right?

21   A    Yes.

22   Q    And she was trying to explain to you what her father did

23   for a living?

24   A    Yes.

25   Q    Then after you had banged on the inside of the suitcase,

ALLAN R. SHERMAN, CSR, RPR    Official Court Reporter

D'Andrea – Cross/David

1   you asked about the repacked suitcase, right?

2   A    Yes.

3   Q    And she does repack the suitcase, right?

4   A    Yes.

5   Q    Inside of her -- inside of the actual suitcases basically

6   both of the bags were filled with women's clothing, right?

7   A    Yes.

8   Q    There was a lot of clothes, right?

9   A    Yes.

10  Q    And shoes?

11  A    I don't recall how many shoes but there were.

12  Q    There were shoes.

13        And that was in both the carry-on bag, right?

14  A    Yes.

15  Q    As well as the checked bag?

16  A    Yes.

17  Q    And there were also perishables, correct?

18  A    Yes.

19  Q    At some point was Miss Nesbeth searched?

20  A    Yes.

21  Q    And there was never any money recovered from her, correct?

22  A    Not that I recall.

23  Q    But she did have a bank card, right?

24  A    Not that I recall.

25  Q    Were you the one that actually searched Miss Nesbeth?

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

D'Andrea - Cross/David

1    A     No.

2              MS. DAVID:  Can I have one moment, your Honor?

3              THE COURT:  You may.

4              (Pause.)

5              MS. DAVID:  I have no further questions.

6              THE COURT:  Any redirect?

7              MR. SCOTTI:  Just briefly, judge.

8    REDIRECT EXAMINATION

9    BY MR. SCOTTI:

10   Q     Officer D'Andrea, on cross-examination you were asked a

11   lot about all of your experience in searching bags.

12             With respect to this particular bag, what was it that

13   drew your attention to the rails?  What was the first thing

14   that drew your attention to the rails?

15             MS. DAVID:  Objection, your Honor.

16             THE COURT:  I'll allow it.

17   A     That the handle did not extend.

18   Q     What, if anything, did all of your training do to allow

19   you to realize that the handrails didn't extend?

20   A     Any normal person would know that the handrail was not

21   extending and there shouldn't be a reason why.  We don't get

22   trained in handrails.

23             MR. SCOTTI:  Nothing further, your Honor.

24             THE COURT:  Anything else?

25             MS. DAVID:  No, your Honor.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

D'Andrea – Redirect/Scotti

1          THE COURT:  You may step down.

2          Thank you very much.

3          We have another witness available?

4          MR. SCOTTI:  I'm sorry, the next witness is Michael

5    White.  He is a forensic chemist with the drug enforcement

6    agency.

7          THE COURT:  Is he waiting outside?

8          MR. SCOTTI:  He is, your Honor.

9          THE COURT:  Bring him in.

10          (Witness excused.)

11   MICHAEL WHITE, called as a witness, having been

12        first duly sworn/affirmed, was examined and

13        proceeded to testify as follows:

14          THE COURT:  Please state and spell your name for the

15   record.

16          THE WITNESS:  My name is Michael White, M-I-C-H-A-E-L

17   W-H-I-T-E.

18   DIRECT EXAMINATION

19   BY MR. SCOTTI:

20   Q    Good afternoon, Mr. White.

21   A    Good afternoon.

22   Q    Where do you work?

23   A    With the Drug Enforcement Administration.

24   Q    And do you work for a particular unit or a division of the

25   DEA?

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

                          White – Direct/Scotti

1    A    I do, the Northeast Laboratory.

2    Q    What is your title with the Drug Enforcement

3    Administration?

4    A    I'm a forensic chemist.

5    Q    And how long have you been a forensic chemist with the

6    Northeast Lab?

7    A    A little over two and a half years.

8    Q    Could you tell the members of the jury what your duties

9    are as a forensic chemist working with the DEA?

10   A    Sure.

11        I analyze evidence for the presence or the lack

12   thereof of controlled substances.

13        I write reports based upon my findings as well as

14   provide field and training support for state, local and federal

15   law enforcement agencies.

16   Q    How many analyses of controlled substances have you

17   conducted in your career?

18   A    Roughly 400.

19   Q    Just please tell the members of the jury what your

20   educational background is prior to joining the DEA lab?

21   A    I have a bachelors of science degree in forensic and

22   investigative sciences from Purdue University School of Science

23   with a concentration in chemistry.

24   Q    In addition to your formal education, what other training,

25   if any, have you received in the field of forensic chemistry?

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

White – Direct/Scotti

1   A     I have attended the DEA 17 week basic forensic chemist

2   course in Quantico, Virginia.

3   Q     And over your career, how many analyses of controlled

4   substances would you say you have actually performed?

5   A     Roughly 400.

6           MR. SCOTTI:  Your Honor, at this time the government

7   moves to qualify Michael White as an expert witness in forensic

8   drug chemistry.

9           THE COURT:  Ms. David, no exception to that, I take

10  it?

11          MS. DAVID:  No, your Honor.

12          THE COURT:  Go ahead.

13          MR. SCOTTI:  Your Honor, if I may approach the

14  witness.

15          THE COURT:  Go ahead.

16  Q     Mr. White, I'm going to hand you what is in evidence as

17  Government's Exhibit 1.

18          I just want you to take a look at it.

19          Do you recognize this exhibit?

20  A     I do.

21  Q     How do you recognize it?

22  A     I recognize it by my seals on the exterior with my

23  signature as well as on seals on bags in the interior of the

24  packaging.

25  Q     What is inside of Government's Exhibit 1?

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

White – Direct/Scotti

1    A    It is the original packaging of Exhibit 1 as well as a

2    sample from the original packaging.

3    Q    Also, what do you see in there?

4    A    I see my seals on my bags that I produced while performing

5    the analysis on the exhibit.

6    Q    When you are talking about the packaging, you are talking

7    about the cocaine?

8    A    Yes.

9    Q    You also see some metal in there?

10   A    I do.  In the original packaging are the rails in which

11   the cocaine was concealed in when I received it.

12   Q    Is the sample as you are looking at it in the same

13   condition as it was when you last saw it?

14   A    It is.

15   Q    And how do you know that that sample is the same as it was

16   after you analyzed Government's Exhibit 1?

17   A    Once we seal up the evidence, we place our evidence

18   stickers on the envelopes and we seal it to insure that there

19   is nothing that will fall out and the seals are still in tack.

20   Q    When did you first open Government's Exhibit 1?

21   A    It was April 6th of 2015.

22   Q    What condition was the cocaine in when you received it?

23   A    It was, the metal rails contained two, each rail, there

24   were two rails.  Each contained two packages of white powder at

25   the time and it was sealed in this initial evidence envelope.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

White - Direct/Scotti

1    Q    Did you later remove the cocaine from the rails?

2    A    I did.

3    Q    From Government's Exhibit 1?

4    A    I did.

5    Q    Did you perform a series of analyses on the cocaine or on

6    the substance that you removed from the rails in Exhibit 1?

7    A    I did.

8         MR. SCOTTI:  Your Honor, I'd like to show the witness

9    on his computer screen if I can, just the witness for

10   identification what is marked for ID as Government's Exhibit 1

11   A.

12   Q    Do you recognize this document?

13   A    I do.

14   Q    When did you prepare it?

15   A    It was prepared on the 7th of April 2015.

16   Q    What is this document by the way?

17   A    This is my laboratory report that I prepare at the end of

18   the analysis.

19   Q    How do you know that this is the report that you prepared?

20   A    At the bottom of the report, it is approved by and has my

21   electronic signature on it.

22   Q    Can you just tell the members of the jury what type of

23   information is found on this report?

24   A    Sure.  It has my findings.  It also has the net weight of

25   the exhibit, the gross weight of the exhibit, the instrumental

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

White – Direct/Scotti

1   techniques that I used as well as the case number on it.

2             MR. SCOTTI:  And, your Honor, at this time the

3   government moves Government's Exhibit 1 A into evidence.

4             THE COURT:  In evidence at this time.

5             (So marked in evidence as Government's Exhibit 1 A.)

6             MR. SCOTTI:  Can I have it published to the jury?

7             THE COURT:  Yes.

8             MR. SCOTTI:  I'll come back to it.

9             If I can just approach the witness, I'll have him read

10  from the exhibit.

11            THE COURT:  This is his lab report?

12            MR. SCOTTI:  Yes.

13            THE COURT:  In evidence.

14  Q    Looking at your lab report, does it indicate the net

15  weight of the substance that you said was obtained from

16  Government's Exhibit 1?

17  A    It does.

18  Q    What was the net weight?

19  A    It was 360.3 grams.

20  Q    And does it also indicate on there what the findings were

21  with respect to your analysis?

22  A    It does.

23  Q    What were your findings?

24  A    The exhibit contained cocaine hydrochloride.

25  Q    I'm now going do show you what is in evidence as

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

White – Direct/Scotti

1    Government's Exhibit 2.

2            Do you recognize Government's Exhibit 2?

3    A    I do.

4    Q    And how –– what do you recognize it as?

5    A    I recognize it as Exhibit 2 for the case that I analyzed.

6    Q    How do you recognize it?

7    A    I recognize it from the seals both on the exterior

8    packaging as well as the interior packaging as well as the

9    initial packaging material that was received from the evidence

10   vault prior to analysis.

11   Q    And is the sample in the same condition as it was when you

12   last saw it?

13           THE COURT:  This is Exhibit 2.

14           MR. SCOTTI:  Yes.

15           THE COURT:  It's in evidence already.

16           MR. SCOTTI:  Just for chain of custody, I just wanted

17   to make sure.

18           THE COURT:  Next question.

19           It's in evidence.

20   Q    When did you first open that exhibit?

21   A    Also on the 6th of April.

22   Q    Did you perform a series of analyses on Exhibit 2?

23   A    I did.

24           THE COURT:  You can tell us what the results of your

25   analysis are.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

White – Direct/Scotti

1  Q    What were the results of your analysis?

2  A    Exhibit 2 also contained cocaine hydrochloride.

3  Q    And did you prepare a report for Exhibit 2?

4  A    I did.

5        MR. SCOTTI:  I'll mark this for identification.

6        THE COURT:  That will be 2A.

7        MR. SCOTTI:  Yes, your Honor.

8        THE COURT:  It's in evidence.

9        (So marked in evidence as Government's Exhibit 2A.)

10 Q    2A in evidence, does that indicate your findings on there?

11 A    It does.

12       THE COURT:  There is no exception to that.  The

13 government should give me a list of proposed exhibits so that I

14 can follow along.  We can move it along if there are no

15 objections.

16       Counsel is being extra cautious, which is appropriate.

17 Without objection, it's in evidence.

18       (So marked in evidence as Government's Exhibit 2A.)

19 Q    What was the net weight for Exhibit 2?

20 A    It was 241.7 grams.

21 Q    What was the combined net weight between -- the total

22 combined net weight between Exhibit 1 and 2?

23 A    I believe it was 602 grams.

24 Q    What is that when converted into pounds?

25 A    Approximately 1.3 pounds.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

White – Direct/Scotti

1    Q    Based on your analyses of the substances contained in

2    Government's Exhibit 1 and 2, what, if anything, did your

3    analysis reveal about the purity of the cocaine in Government's

4    Exhibit 11?

5    A    I would say based upon my analysis, it is likely to be

6    more than 50 percent pure.

7    Q    When you say 50 percent pure, can you explain to the jury

8    what you mean by that?

9    A    It's likely to contain more than 50 percent cocaine and

10   then the rest of the other alkaloids and things that are

11   contained in the cocaine sample.

12   Q    With respect to Government's Exhibit 2, what, if anything,

13   did your analysis tell you about the purity level of

14   Government's Exhibit, the cocaine found in Government's

15   Exhibit 2?

16   A    It also likely to be more than 50 percent pure.

17   Q    After you completed your testing, what did you do with the

18   materials that you had tested?

19   A    All of the materials that I tested were sealed in two

20   individual bags and then placed in the original evidence

21   container that I received them from and they were then returned

22   to the evidence vault.

23   Q    Did you examine Government's Exhibit 1 and Government's

24   Exhibit 2 separately?

25   A    I did.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

White – Direct/Scotti

1   Q       Did you complete the analysis of one of them before

2   starting the other?

3   A       No.

4   Q       After you completed the testing, what did you do with the

5   drugs?

6   A       After completing the testing, they were sealed and

7   returned to the evidence vault.

8   Q       And the bag that you see here today, is it sealed the same

9   way you left it that day?

10  A       Yes, it is.

11          MR. SCOTTI:  I have no further questions, your Honor.

12          THE COURT:  Any cross-examination?

13          MS. DAVID:  Briefly, your Honor.

14  CROSS-EXAMINATION

15  BY MS. DAVID:

16  Q    Good afternoon, Mr. White.

17  A    Good afternoon.

18  Q    You testified that you've been a forensic chemist for

19  three years?

20  A       Yes.

21  Q    And you've analyzed over 200 exhibits.  Fair to say they

22  were illegal substances?

23  A    To determine if they contained illegal substances or they

24  did not.

25  Q    And you analyzed those substances using some of the

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

White - Cross/David

1  methods of testing you testified to on direct, right?

2  A    I don't believe I testified to them but yes, I used

3  instrumental techniques to identify them.

4  Q    One of them is mass spectrometry, right?

5  A    That is a portion of one of the analyses, yes.

6  Q    And another portion of the analysis is infrared

7  spectroscopy?

8  A    Yes.

9  Q    You've been trained to administer infrared analysis, is

10 that right?

11 A    Absolutely.

12 Q    You said when you received the exhibits in this case, they

13 were still -- the substances were still contained in the metal

14 rails?

15 A    Yes.

16 Q    Inside the metal rails, the substance was wrapped up in

17 vacuum sealed bags, is that right?

18 A    That also contained packing tape, clear packing tape.

19 Q    And that was for both sets of rails, right?

20 A    Correct.

21 Q    So both in Exhibit 1 which came from one set of handrails,

22 they were vacuum sealed in packing tape, right?

23 A    Yes, ma'am.

24 Q    And also from Exhibit 2, correct?

25 A    Correct.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

White – Cross/David

1          MS. DAVID:  I have no further questions.

2          THE COURT:  Anything further, Mr. Scotti?

3          MR. SCOTTI:  No, your Honor.

4          THE COURT:  You may step down.

5          Thank you very much.

6          (Witness excused.)

7          THE COURT:  Do you have someone else you want to take

8   before lunchtime?

9          MR. SCOTTI:  Yes, your Honor.

10          The government calls Jim Modico from JetBlue Airlines.

11   JAMES MODICO, called as a witness, having been first

12        duly sworn/affirmed, was examined and proceeded

13        to testify as follows:

14          THE CLERK:  Please state and spell your name for the

15   record.

16          THE WITNESS:  My name is James Modico, M-O-D-I-C-O.

17          THE COURT:  Your witness.

18          MR. SCOTTI:  Thank you, your Honor.

19   DIRECT EXAMINATION

20   BY MR. SCOTTI:

21   Q    Good afternoon, Mr. Modico.

22   A    Good morning -- good afternoon.  Sorry.

23   Q    What do you work?

24   A    I work for JetBlue Airways here in New York.

25   Q    And how long have you been with JetBlue Airlines?

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

Modico - Direct/Scotti

1    A    Approximately two and a half years.

2    Q    What is your title with the company?

3    A    I'm an investigator with JetBlue.

4    Q    Do you have any prior law enforcement experience?

5    A    Yes, I do.

6    Q    What is that?

7    A    I was a supervisory special agent with the Department of

8    Homeland Security.

9    Q    And getting back to your role as an investigator with

10   JetBlue, does JetBlue Airlines keep records with regard to

11   tickets sold for their flights?

12   A    Yes.

13   Q    Do you have access to JetBlue Airlines electronic database

14   and their records?

15   A    I do.

16   Q    I'm going to show you what has been marked for

17   identification as Government's Exhibit 12.

18          Do you recognize Government's Exhibit 12?

19   A    Yes, I do.

20   Q    And it's a two-page -- I'm going to show you both pages.

21   It's a two-page document.

22          First, the second page and the first page.  What do

23   you recognize Government's Exhibit 12 to be?

24   A    It's typically called a PNR which is a passenger name

25   record maintained in our computer reservation system and it

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

Modico - Direct/Scotti

1    contains a passenger's itinerary.

2    Q    What passenger name is this record for?

3    A    Chevelle Nesbeth.

4    Q    Are you familiar with how that document is generated,

5    specifically this document that relates to the passenger

6    Chevelle Nesbeth?

7    A    Yes.

8    Q    How is it generated?

9    A    It's generated from our computer reservation system.  It's

10   maintained there for approximately 13 months and this is a

11   printout of certain details relating to that PNR which I

12   mentioned.

13   Q    When is -- the information on these documents, when is it

14   generated?

15   A    It's generated at certain events.  It's created when the

16   passenger travels.

17   Q    What sort of information is kept on the document?

18   A    It has the passenger's name, it has the flight they took,

19   it has the amount they paid for the ticket, it has when they

20   checked in, when they boarded and when the plane left.

21   Q    Does it also contain any record with respect to baggage?

22   A    Yes.

23   Q    And form of payment?

24   A    Yes.

25   Q    Is this document a record that is ordinarily maintained by

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

                      Modico - Direct/Scotti

1    JetBlue Airlines during the course of its business?

2    A    It is.

3    Q    Is it the regular practice of JetBlue Airlines to record

4    the travel information contained in that record?

5    A    Yes, it is.

6    Q    Is the information in the record saved by JetBlue Airlines

7    at or near the time of the events that are reflected in the

8    documents that are marked as Government's Exhibit 12?

9    A    Yes.

10           MR. SCOTTI:  Your Honor, the government moves to admit

11   Exhibit 12 into evidence and publish it to the jury.

12           THE COURT:  No objection, in evidence.

13           Go ahead.

14           (So marked in evidence as Government's Exhibit 12.)

15   Q    Mr. Modico, first, what are we looking at right here?

16   A    The top part details the information relating to customer

17   Chevelle Nesbeth.  The top line would be -- where it says

18   number would be her ticket number.

19   Q    I'll zoom in a little bit so we can see here.

20           Are you referring to this number right here?

21   A    Yes, that's correct.

22   Q    That is the ticket number.  Obviously, here is the name.

23   Would you go through it and show us what other information is

24   contained here?

25   A    Sure.  Row one, it will have the line code to the right,

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

Modico - Direct/Scotti

1   B6, which documents JetBlue.  It will have the flight number

2   which is 1679.  Next we have depart, which is 22nd of December.

3   To -- it would be from -- it would be JFK Airport to Montego

4   Bay, MBJ, Montego Bay, Jamaica.

5   Q    So that would indicate a flight on December 22, 2014 from

6   JFK to Montego Bay, Jamaica that the defendant took?

7   A    Correct.

8   Q    Skip down to line two.

9        What does that indicate?

10  A    It says number 7 outbound travel relating to the same

11  customer.  B6 is JetBlue once again.  Flight 780 departing on

12  January 6, 2015 from Montego Bay, Jamaica to JFK Airport,

13  estimated time of departure is 5:18.

14  Q    Move down the document.

15       What, if any, information do you see here with respect

16  to the price of the ticket and other charges?

17  A    So under fare info, it documents different prices for the

18  total ticket.  So the base fare for the ticket would be 558.

19  There are some fees associated which come out to that amount,

20  35, $5.60, 104.71 which represents security fees and taxes.

21  The total price of the ticket is 703.31.

22  Q    And looking below, there is a section; form of payment.

23  How do those records indicate they were paid for?

24  A    This particular travel ticket was paid for in cash which

25  would be 703.31.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

Modico - Direct/Scotti

1       Right below that, it says issued December 22, 2014 at

2   JFK by JFK 6C3 which identifies the employee that took the cash

3   from the passenger at JFK.

4   Q    Looking at the document, what would that mean about how

5   this ticket was paid for?

6   A    This particular ticket was paid for in cash at JFK Airport

7   on December 22, 2014.

8   Q    The information toward the bottom here, what information

9   does this reflect?

10  A    That documents certain events relating to the itinerary.

11  Q    Does the information at the bottom indicate that the

12  defendant boarded the flight on December 22 to Montego Bay?

13  A    If you want to read from the bottom up it shows JFK, the

14  same employee 6C3, December 22, 2014 at 9:29 central time and

15  to the right of that is that six letter passenger name record

16  that I mentioned earlier.

17  Q    All I'm really concerned about, I just want to summarize.

18  Does the record indicate that she left on December 22 from JFK

19  and went to Montego Bay, Jamaica?

20  A    The first portion at the bottom shows that she checked in

21  9:29 central.  The second portion where it says BLIP is where

22  she boarded the plane at 12:32 central time and then the used

23  portion in the middle is when the plane actually took off from

24  Jamaica at 14:02 Central Standard Time.

25  Q    Working up, that also indicates the defendant was on the

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

Modico – Direct/Scotti

1   flight on January 6 from Montego Bay back to JFK, correct?

2   A    That's correct.

3   Q    Do the records here, looking at the second page of

4   Exhibit 2, do the records here also indicate baggage records of

5   checked luggage?

6   A    Yes.

7   Q    What do the records in Government's Exhibit 12 indicate

8   with respect to the checked bags, the number of checked bags

9   the defendant had on her flight down to Montego Bay?

10  A    On December 22, 2014, customer Chevelle Nesbeth had three

11  checked bags according to this record which would be the top

12  three lines indicated by the bag tag numbers ending in 278, 279

13  and 280.

14  Q    So that reflects that she had three checked bags when she

15  went down to Jamaica on the 22nd?

16  A    Correct.

17  Q    How many bags did she check on the way back?

18  A    According to this record, she checked one bag on the way

19  back on January 6, 2015 represented by JFK number ending in

20  954.

21           MR. SCOTTI:  Your Honor, I have no further questions.

22           THE COURT:  Any cross-examination?

23           MS. DAVID:  No, your Honor.

24           THE COURT:  Thank you.

25           You may step down.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

USA v. Nesbeth

1          (Witness excused.)

2          THE COURT:  It's up to you.  If you have somebody now

3    that you want to take before lunch.

4          MR. SCOTTI:  Your Honor, this witness might be a

5    little longer.

6          THE COURT:  We can take our lunch break now.

7          So members of the jury, we'll reconvene, let's make it

8    at 2:00 so you will have about an hour and a half to enjoy

9    lunch.  It's not raining yet.

10          For those who do not know the neighborhood, if you

11   want, you can walk down to the promenade where you get the best

12   views of the lower part of New York City right here from

13   Brooklyn.

14          There is a park area there.  You just take any street

15   Montague or any of the streets that go from the court across

16   the park and continue for a few blocks until you hit the

17   promenade if you want to do that.  Of course, you don't have to

18   but for those of you who don't know the neighborhood, you might

19   enjoy that.

20          Be back at 2:00.

21          (Jury out at 12:35 p.m.)

22          THE COURT:  The jury is out of the courtroom.

23          Give me a heads up as to what I might expect now.  I

24   imagine you might get through your case this afternoon but I

25   might be incorrect in my sense of things.

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

USA v. Nesbeth

1      MR. SCOTTI:  We will definitely finish our case this

2  afternoon.

3      We have one witness, maybe a second witness.  We'll

4  discuss it over lunch.

5      THE COURT:  So there is reason to believe, Ms. David,

6  that the ball may turn to you this afternoon.  You should be

7  prepared for that.

8      I assume you have going to have Miss Nesbeth testify?

9      MS. DAVID:  Your Honor, we haven't made that decision

10  yet but that would be the only witness.

11      THE COURT:  So we may have this case concluded today

12  and I just want to manage it correctly and my sense is probably

13  we'll have summations tomorrow morning I suspect and then the

14  charge.

15      So it's a short trial by the nature of it and you

16  agree that my sense of things is about right?

17      MR. SCOTTI:  Yes.

18      MS. DAVID:  Yes.

19      THE COURT:  See you at 2:00.

20      (Whereupon, there was a luncheon recess.)

21      (Continued on next page.)

22

23

24

25

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

USA v. Nesbeth

1        A F T E R N O O N   S E S S I O N

2            (In open court.)

3            THE COURT:  All right.  Everybody here?

4            THE CLERK:  I think so.

5            THE COURT:  You can bring your next witness in, in the

6    meantime, while we bring the jurors in, so we can have them

7    here.

8            MR. SCOTTI:  Judge, before we call the next witness,

9    we do want to address an issue that's come up.

10           THE COURT:  What's the issue?

11           MR. SCOTTI:  There are -- there is -- the defendant's

12   cell phone was confiscated at the time of her arrest, and there

13   was a search warrant executed on the phone.  The phone was

14   dumped of all of its information.  It was generated into a

15   large report.  It was turned over to defense counsel as part of

16   discovery, and we are seeking to put in some of these messages

17   in through our case agent.

18           THE COURT:  Is the case agent your next witness?

19           MR. SCOTTI:  Well maybe not the next witness, but the

20   witness after.  Well, she might be the next witness, depending

21   on the way the court resolves this.

22           THE COURT:  The only reason I'm saying this is because

23   I don't like to keep the jurors waiting.  If we don't have to,

24   we can talk about this after your next witness, if that's not

25   relevant here.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1           MR. SCOTTI:  That's fine, your Honor.

2           THE COURT:  So you are objecting to allowing these in

3    evidence?

4           MS. DAVID:  Yes, your Honor.

5           THE COURT:  Was there any suppression motion that was

6    made here?

7           MS. DAVID:  No, your Honor.  The issue is -- well

8    there are two issues, if the court wants to address them now or

9    wants to wait.

10          THE COURT:  Let's wait until we take our break, and

11   let's have the next witness in the meantime.  So we can bring

12   the jurors in.

13          MR. SCOTTI:  Okay.

14          (Pause.)

15          (Daniel Suden took the witness stand.)

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1          THE CLERK:  All rise.

2          (Jury enters.)

3          THE CLERK:  You can all be seated.

4          THE COURT:  All right.  Folks, we are ready to

5    continue with the trial.  We have somebody now who is going to

6    be our next witness.

7          Let's see who this gentleman is, Mr. Scotti.

8          MR. SCOTTI:  Your Honor, the government calls Special

9    Agent Dan Suden.

10         THE CLERK:  Good afternoon, Agent Suden.  I ask you to

11   remain standing and raise your right hand.

12   DANIEL SUDEN, called as a witness, having been first

13        duly sworn/affirmed, was examined and proceeded

14        to testify as follows:

15         THE CLERK:  Please state and spell your name.

16         THE WITNESS:  My name is Daniel Patrick Suden.  My

17   last name is spelled S-U-D-E-N.

18         THE CLERK:  Thank you.

19         THE COURT:  Your witness.

20         MR. SCOTTI:  Thank you, your Honor.

21   DIRECT EXAMINATION

22   BY MR. SCOTTI:

23   Q    Agent Suden, who do you work with?

24   A    I'm a special agent with U.S. Immigration and Customs

25   Enforcement, Homeland Security Investigations.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden – Direct/Scotti

1   Q     Your title is special agent; is that correct?

2   A     That's correct.

3   Q     How long have you been a special agent with HSI?

4   A     It will be six years in October.

5         THE COURT:  So I have to interrupt you interrupt you

6   now.  I just can't help myself.  I just do this all the time.

7   It's just something I can't resist.

8         Do you know why you are called special agent and not

9   just plain agent?

10        THE WITNESS:  Special is a limiting word that

11  indicates that our authority is for a special purpose of

12  federal law.  When federal agents began, they didn't want to

13  create a federal police force with universal authority.  They

14  wanted to have agents that enforce one specific set of rules.

15        THE COURT:  Interesting.  I heard -- and that may be

16  so -- that it goes back as far as J. Edgar Hoover.  That's a

17  charming story.  Whether it's true or not, I don't know.

18  That's why I asked you these questions.  That he thought all of

19  his agents were special.  Maybe it was sort of related because

20  he was carving out a certain law enforcement apparatus, and I

21  think probably it goes back to those days.

22        THE WITNESS:  I'm not positive of that history, but I

23  know agents have been around before the early 1900s.

24        THE COURT:  So, you know, the jurors should know that

25  you are all called special agents, right, DEA agents, FBI

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden - Direct/Scotti

1    agents?

2         THE WITNESS:  It's used interchangeably with our

3    title, which is 1811.  It's a job series within the federal

4    government for criminal investigators.  It's similar to what a

5    detective in a local police force would do.

6         THE COURT:  So I like the jurors to understand that

7    you are a special agent, and they are probably wondering why

8    Judge Block is not called special judge.

9         THE WITNESS:  There is a joke amongst us, that, oh,

10   I'm just a regular agent because I work and do all the humdrum

11   things that we have to do.

12        THE COURT:  So, members of the jury, so once in a

13   while I will ask some questions for clarification purposes.

14   Sometimes there's a touch of humor to it, but it's not meant to

15   suggest that this is anything other than serious; but I'm a

16   great believer that sometimes you can lighten up the courtroom.

17   And I think that jurors are sometimes entitled to know a little

18   about things.

19        If I do that, I'm not suggesting that I'm for the

20   government or against the government.  I'm totally neutral, but

21   it's just being for those special and limited purposes.  So

22   understand that.  Go ahead.

23        MR. SCOTTI:  Thank you, your Honor.

24   BY MR. SCOTTI:

25   Q    Agent Suden, where are currently assigned?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden - Direct/Scotti

1    A    To the JFK smuggling unit team four.

2    Q    And what are your duties and responsibilities there?

3    A    There has just been a restructuring about a week ago.

4          Prior to a week ago, our sole function was narcotics

5    investigations, dealing with narcotics coming through JFK

6    International Airport.  As of a week ago, we are now going to

7    be doing all sorts of smugglings, including things other than

8    narcotics.

9    Q    Still working in narcotics?

10   A    Yeah.  That's still our main focus and still the bulk of

11   our case work.

12   Q    How long have you been in that assignment for?

13   A    I have only been in New York for about a year this June.

14   So this month is a year.

15   Q    Your entire time in New York you are working on narcotics

16   investigations?

17   A    Correct.

18   Q    Where were you working prior to being assigned to

19   New York?

20   A    My first assignment out of the academy was in southern

21   Arizona, out of the Tucson office, working on the organized

22   crime drug enforcement task force.

23   Q    What, for that particular assignment, including -- with

24   that assignment, including your assignment here in New York,

25   how many narcotics investigations would you say you have

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden – Direct/Scotti

1    investigated?

2    A    Where I have been the primary case agent, it hasn't been a

3    large volume, maybe 25 to 30; but in Arizona my focus was on

4    large-scale, long-term investigations.  Some of the cases would

5    last several years.  You try to identify multiple targets and

6    take your time building a complex case.

7    Q    Did you work in law enforcement before going to HSI?

8    A    Yeah.  I was probably the third-oldest person in my class.

9    I was a police officer for nine years in Arizona before I went

10   to become a federal agent.

11   Q    What different job or titles or ranks did have you as a

12   police officer in Arizona?

13   A    I worked for a sheriff's department.  So my initial rank

14   was as a deputy sheriff.  It's what you see with a typical

15   police officer:  Answering calls for help, answering 911 calls.

16   I was assigned to a patrol district for the first three and a

17   half years as a deputy.

18         After three and a half years I was promoted to

19   detective; and for two and a half years I worked as a

20   detective, investigating a variety of crimes, all felonious in

21   nature.

22         After three -- after two and a half years as a

23   detective, I was promoted to sergeant; and I spent the last

24   three years of my career with the sheriff's department as a

25   patrol sergeant, supervising upwards of 20 deputy sheriffs.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden - Direct/Scotti

1   Q    In your time as law enforcement in Arizona, what type of

2   work did you do on narcotics-related cases?

3   A    Pima County is in southern Arizona.  It shares over a

4   hundred miles of water with Mexico.  There is large expanses of

5   desert in Pima County.  So it's a prime location for narcotics

6   trafficking.

7        A typical patrol deputy would encounter a lot of

8   crimes incidental to drug trafficking.  Sometimes you will make

9   a traffic stop and you think you are pulling over somebody for

10  speeding, and the vehicle turns out to be loaded with drugs.

11       During my course as a deputy I made approximately 300

12  arrests.  Somewhere in the vicinity of 50 to 100 of them were

13  for street-level narcotics, personal-use quantities of cocaine,

14  crack cocaine, methamphetamine, heroin, marijuana; and I made

15  several arrests of street-level dealers, people dealing larger

16  quantities of narcotics, but not at the level that I

17  investigated as a special agent.

18  Q    So now, getting back to your experience as a special

19  agent, I believe you testified that you have worked on

20  approximately 20 to 30 investigations.  Is that correct?

21  A    That was with me as the primary case agent.  As a member

22  of a team, you assist in all of the investigations that your

23  team participates in.  So I was on a ten-man team in Tucson.

24  We were also located with four other agencies.

25       The task force that I was on had, I think, 60 or so

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden – Direct/Scotti

1    federal agents; and I participated in over a hundred

2    investigations in various capacities.

3    Q    How many of those investigations involved importation of

4    cocaine into the United States?

5    A    Almost all of them began at that point.  Very few of our

6    cases in southern Arizona dealt with domestic narcotics

7    trafficking.  Our push was to interrupt international drug

8    smuggling from Mexico.

9    Q    Now, when you got assigned here to the New York office,

10   how many of your investigations involved the importation of

11   cocaine?

12   A    Almost all of them.  Our authority is international in

13   nature.  We deal with things that are smuggled from out

14   received the U.S. into the U.S. or that impact us in that way.

15   Q    Could you tell the jury what format cocaine is generally

16   sold in?

17   A    Cocaine is generally sold in a powder form.  It's turned

18   into a what's known as a salt so that it's ingestible.  It's

19   water soluble.  So it can be consumed through inhalation or

20   through ingestion or injection.

21   Q    What type of investigative techniques have you employed in

22   investigating narcotics cases?

23   A    A wide variety of things, from things such as physical

24   surveillance, where we will attempt to follow suspects around

25   for days at a time trying to see their routines, who they meet

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden - Direct/Scotti

1    with.

2              THE COURT:  Let me interrupt.

3              Mr. Scotti, get to the heart of it.  You have all this

4    background information.  I think he can get right to what you

5    are calling him for.

6              MR. SCOTTI:  Okay.

7    Q    As part of your training did you learn about the pricing

8    of cocaine?

9    A    Yes.

10   Q    And what, if anything, do you do to remain current on the

11   topics that we are discussing with respect to pricing and also

12   distribution of cocaine?

13   A    As a member of the narcotics team, we receive periodic

14   updates, intelligence briefs.  In particular, the Drug

15   Enforcement Administration puts out a biannual report, with a

16   first half and a second half of a given year, and they will

17   compile all the information from a variety of intelligence

18   sources to indicate what the going price is.  That information

19   is taken from interviews with defendants, from listening to

20   wiretaps, from evidence collected during the course of cases,

21   money recovered at the scene of drug investigations, and then

22   also undercover operations.

23             We often have people who are working directly for us,

24   and we know, because we are actually controlling a drug

25   transaction, whether we are doing an undercover sale or an

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden – Direct/Scotti

1   undercover buy.

2           THE COURT:  I'm going to intrude now.  When I do this

3   I'm just trying to move this long and get clarification.

4           Obviously, you are here to testify about the value of

5   the cocaine that was found in this case.

6           THE WITNESS:  Yes.

7           THE COURT:  You can tell the jury.  It's perfectly

8   okay.  Nobody will bite you.

9           THE WITNESS:  Okay.

10          MR. SCOTTI:  Judge, at this time the government --

11  BY MR. SCOTTI:

12  Q    First of all, were you involved in this case at all?

13  A    No, I was not.

14  Q    Did you conduct any interviews of participants in this

15  case?

16  A    No, I did not.

17  Q    Have you had any contact with the defendant?

18  A    I'm not even sure who the defendant is.

19          THE COURT:  So you are here just to testify as an

20  expert, so to speak, about the price of the cocaine, correct?

21          THE WITNESS:  Correct.

22          THE COURT:  Let's get right to it.

23          MR. SCOTTI:  Your Honor, the government, moves

24  pursuant to rule 702, to qualify Special Agent Suden as an

25  expert in the areas of narcotics pricing and distribution.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden – Direct/Scotti

1        THE COURT:  Is there any exception to that?

2        MS. DAVID:  No objection, your Honor.

3        THE COURT:  So he can testify about that.  Let's find

4   out how much this thing is worth.

5   BY MR. SCOTTI:

6   Q    In the context of cocaine smuggling and pricing, are you

7   aware of the concepts of wholesale value and street value?

8   A    Correct.

9   Q    What is the distinction, if any, between wholesale and

10  street value?

11  A    Wholesale in the drug trade is very similar to what you

12  hear in typical retail.  When you buy wholesale, you are buying

13  in bulk.  You are buying a large quantity, more than a typical

14  Street user could afford to invest in.

15        Because you are buying in bulk you are going to get a

16  higher purity level.

17        THE COURT:  So you looked at the cocaine here.  You

18  know what was involved in here, right?

19        THE WITNESS:  Yes.

20        THE COURT:  Nobody is questioning whether you know

21  about it or not.  You can tell us what you assessed the value

22  to be.  There is a wholesale value.  There is a retail value, I

23  guess.  Those are the two values, right?

24        THE WITNESS:  Yes.

25        THE COURT:  Tell the jurors.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden – Direct/Scotti

1    THE WITNESS:  I was made aware that the price or that

2    the quantity was 602 grams.  A kilogram is 1,000 grams.  A

3    kilogram in the second half of 2014 was between a price window

4    of $27,700 and $47,000.  If you take into account that it's

5    only 600 grams, that price is between 16,000 and I think about

6    $600 upwards to I think it was about $28,000.  In that range,

7    approximately.  I don't have the numbers in front of me.

8         THE COURT:  Is that the retail or wholesale?

9         THE WITNESS:  That's the wholesale value, if it's sold

10   at that same purity level, if it isn't cut down, if there isn't

11   any cutting agents added to it and the quantity increased.

12        THE COURT:  So there is a question of purity?

13        THE WITNESS:  Fifty percent purity is much higher than

14   you would expect to find on the street.  At 50 percent purity

15   you could expect to cut that, basically add a cutting agent and

16   increase the volume by twofold, turning 602 grams into

17   approximately 1204 grams.

18        THE COURT:  You are very knowledgeable obviously.  So

19   what was the street level itself worth?

20        THE WITNESS:  Grams of cocaine are sold in New York

21   anywhere between $40 and $100.  Forty dollars is a very low

22   outlier, and $100 is a high outlier.  Typically you will see

23   between $50 and $80.  Those are the typical prices for a gram

24   of cocaines.

25        THE COURT:  So tell us what the number would be if you

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden – Cross/David

1  used the lowest number.

2          THE WITNESS:  If you used the lowest number or the

3  lowest typical number of $50 and you multiplied 602 times 50,

4  you are looking at a little over $30,000, I think $30,200, and

5  if you take --

6  BY MR. SCOTTI:

7  Q     Is that for how many grams, 600 grams?

8  A     That's for 600 grams, if it wasn't cut.

9  Q     How much if it was cut?

10 A     If you cut it and you turn it into 1200 grams, times 50,

11 you are looking at a little over $60,000.

12         THE COURT:  So we have a range.

13 A     (Continuing) On the low end.

14         THE COURT:  We have a range for what its value is.

15 Anything else you wish to ask him?

16         MR. SCOTTI:  No, your Honor.  No further questions.

17         THE COURT:  All right.  Do you have questions,

18 Ms. David?

19         MS. DAVID:  Yes, your Honor.

20         THE COURT:  All right.

21 CROSS-EXAMINATION

22 BY MS. DAVID:

23 Q     Good afternoon, Agent Suden.

24 A     Good afternoon, counselor.

25 Q     So you testified on direct what exactly would be street

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Suden – Cross/David

1    value of the cocaine found in this case?

2    A    It's a window of value, depending on the purity, depending

3    on your clientele, but generally the numbers that I just

4    stated.

5    Q    And in your experience interacting with cases where people

6    are bringing drugs into the country, usually when a person

7    arrives with drugs is there someone there that's picking them

8    up from the airport?

9    A    Generally.

10   Q    That's in part because the idea that whoever was sending

11   the drugs doesn't want those drugs to be lost, correct?

12   A    That's one of the many risks that they are trying to

13   curtail.

14   Q    Or that they would be stolen in some way?

15   A    Theft, detection, interdiction, those are all fears.

16           MS. DAVID:  I have no further questions.

17           THE COURT:  I take it you have no other questions,

18   Mr. Scotti?

19           MR. SCOTTI:  No questions, judge.

20           THE COURT:  Thank you very much.  You may step down.

21           THE WITNESS:  Thank you, your Honor.

22           THE COURT:  Your next witness, please.  Is this the

23   one you wanted to chat with me about?

24           MR. SCOTTI:  Yes, your Honor.

25           THE COURT:  All right.  So, folks, I'm going to

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1   whisper a little bit at sidebar because counsel said there is a

2   legal matter they want to discuss with me before the next

3   witness testifies.

4        I can do one of two things.  I can have you sent back

5   in the jury room or I can have you sit here and guess about

6   what we are talking about.  We are going to try -- I will see

7   how long it's going to take.  It may not be too long.  We will

8   see how it goes.

9        Once again, we are not being snobs, we are not being

10  rude.  We do it intentionally so we can keep the lines clear.

11  I'm not going to have anything to do when you deliberate about

12  the facts of this case.  You have nothing to do when we talk

13  about the law, because it can be confusing.  It may be, you

14  know, prejudiced by things we say which you don't really

15  understand.  So we try to do it that way.

16       So let's whisper a little bit here, see how it goes.

17  If it's going to take a substantial amount of time, then I will

18  let you leave the courtroom so you can be comfortable.  I don't

19  think it's going to take too long.  All right.

20       (Continued on the next page.)

21

22

23

24

25

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Sidebar

1            (Sidebar conference.)

2            THE COURT:  So let's hear what the concerns are that

3    we have now.

4            MR. SCOTTI:  Your Honor, as I was saying before, there

5    were messages, there were text messages that were obtained from

6    the defendant's phone after a search warrant.

7            THE COURT:  You want to use those text messages?  They

8    are from her phone.  So what's the problem, Ms. David, that you

9    think is not permissible?

10           MS. DAVID:  Yes, your Honor.  There are two issues.

11   One, I think, is more significant than the other; but the first

12   issue is that the messages that were extracted from the

13   phone -- it sounds as if the government is seeking or they have

14   indicated they are seeking to introduce the messages through

15   the case agent, Agent McFadden, and we have had some

16   preliminary discussions, myself and Mr. Scotti.

17           THE COURT:  What's your objection?

18           MS. DAVID:  The authenticity.

19           THE COURT:  The authenticity.  So how do you expect to

20   establish a foundation as to the question whether these are

21   authentic?

22           MR. SCOTTI:  As Ms. David was telling the court, we

23   had some preliminary discussions about agreeing to the

24   authenticity of the statements here.  There were text messages

25   that were arguably favorable to the defense, and there are

Sidebar

1   messages that were arguably favorable to us.  Our discussion

2   was how we were going to put those in and how we would agree to

3   the authenticity of them.

4         We did talk last Friday, I believe.

5         THE COURT:  I'm trying to get to the heart of it.  The

6   jurors are waiting.  I don't care whether you talked Friday,

7   Thursday, Wednesday, last year.

8         What is it you want to do?

9         MR. SCOTTI:  We did agree to stipulate to the

10  authenticity.

11        THE COURT:  You did not agree?

12        MR. SCOTTI:  We did agree.

13        THE COURT:  You did agree.

14        MR. SCOTTI:  That stipulation has not been drafted at

15  this point.

16        THE COURT:  Are you changing your mind?

17        MS. DAVID:  It's not that I'm changing my mind.  My

18  understanding from our discussion was we were going to enter

19  into a stipulation.  In fact, we both sought to introduce these

20  messages, but because neither of us has really finished

21  discussing the intention on both parts --

22        THE COURT:  So the only thing the judge can do is call

23  a witness to deal with it the good, old-fashioned way.

24        MS. DAVID:  The other issue -- I'm sorry -- I can be

25  brief.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Sidebar

1          THE COURT:  You can't agree, you can't agree.  Let's

2    call the witness, and I will listen to his testimony.

3          What else?

4          MS. GEDDES:  Your Honor, relying upon our

5    understanding that the defendant was going to stipulate, we

6    don't have the witness here today.

7          THE COURT:  Oh, you don't have a witness today.  So

8    why are we doing this?  Do you have somebody else to testify

9    today?

10          MR. SCOTTI:  We have an agent who can testify to the

11    messages but not to getting the information out of the phone.

12          MR. WEIL:  He can read the document aloud.  Being that

13    she didn't create --

14          MR. SCOTTI:  She compared it.

15          THE COURT:  We have a trial here.  What is it you want

16    me to do?

17          MS. DAVID:  The bigger issue that I have with the

18    messages is that they are all in Patois, your Honor.

19          THE COURT:  They are in what?

20          MS. DAVID:  They are in Patois, and the issue is based

21    on the government's representations it seems that they would

22    also need to call an interpreter to translate.

23          THE COURT:  What do you want me to do?  You are making

24    an application.  What's your application?

25          MS. DAVID:  I would ask that the government not be

Sidebar

1    allowed to interpret the messages.

2              THE COURT:  Why don't you take the person into court.

3    I will listen to it, I will make my ruling as to whether it's

4    admissible.  How does that sound?

5              MR. SCOTTI:  That's fine.

6              THE COURT:  We can do that outside of the earshot of

7    the jurors.  All right.

8              Let's bring him in right now, and let's take care of

9    it.  Okay.

10              (End of sidebar conference.)

11              (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

123

USA v. Nesbeth

1          (In open court.)

2          THE COURT:  Members of the jury, what's going to

3    happen now is I have to listen to some folks talk about some

4    legal matters, which I don't want you to listen to.

5          So I'm going to have you just cool your heels.  I

6    assume you are wearing heels.  Ms. Avila, you are wearing

7    heels.  I saw that outside.

8          Maybe take 10 or 15 minutes or so.  These things

9    happen in the course of the real world.  It's not like TV,

10   right?  So we will do that in your absence so we don't have to

11   whisper to each other while I flush this thing out.

12         After the case is over, if you are curious about

13   anything that has happened or has not happened, my policy is to

14   make myself available to you after you render your verdict so

15   you can say what happened, what was this all about, or any

16   other questions or anything else you want to say to the judge.

17   I think it's a good thing to do, so the jurors have an

18   opportunity to, you know, satisfy whatever curiosities or ask

19   questions about whatever it is that they want.

20         So you don't want to speculate about things you are

21   not allowed to do.  Then you can talk to me afterwards.  Then

22   you may want to talk about this and you will find out what

23   happened while I made you wait two minutes, but don't

24   speculate.  All right.

25         THE CLERK:  All rise.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1          (Jury exits.)

2          THE COURT:  The jurors are not here.

3          Now, Mr. Scotti, is this your last witness that we are

4    talking about now, or is there anybody else?

5          MR. SCOTTI:  Your Honor, there is also -- we were able

6    to get a Patois interpreter to resolve any issues of

7    translation of the messages we seek to admit.

8          THE COURT:  So I will ask you the question again:  Is

9    this your last witness?

10          MR. SCOTTI:  It's two more witnesses, judge:  This

11    witness, and then an interpreter, if the interpreter is

12    required -- or, no, there are two witnesses, this witness and

13    the interpreter.

14          THE COURT:  This witness and the interpreter?

15          MR. SCOTTI:  Yes.

16          THE COURT:  That means these will be your last

17    witnesses?

18          MR. SCOTTI:  Yes.

19          THE COURT:  I just want to know.

20          MR. SCOTTI:  That's it.

21          THE COURT:  So now when you folks talked to me at

22    sidebar back and forth and tell me about last Friday and last

23    Thursday, it doesn't move the ball along at all.  It's hard to

24    get a handle on what you are fussing about.

25          The best I can glean from your mumbling is that you

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1    have an insipient agreement on the admissibility of these, I

2    guess, phone messages and somehow you don't have an agreement.

3    I'm a little confused as to what went on.

4         The jurors are not here.  Why don't you tell me in 25

5    seconds or less what your problem is.

6         MR. SCOTTI:  I will try, judge.  We had spoke last

7    Friday.

8         THE COURT:  You mentioned that.  I know that.

9         MR. SCOTTI:  I'm sorry?

10        THE COURT:  You mentioned that.  I know that.

11        What's the problem today?

12        MR. SCOTTI:  Well, the issue is today that we are now

13   seeking to put these messages in.

14        THE COURT:  I understand.

15        MR. SCOTTI:  And we want to put them in through the

16   agent who did not dump -- didn't actually do the phone dump and

17   didn't actually extract the information, but that was the issue

18   that we had agreed the week before would be stipulated to.

19   Ms. David can speak to obviously her understanding of that

20   agreement.

21        THE COURT:  The stipulation was that this person would

22   be able to be qualified to lay the foundation that these were

23   the actual phone messages obtained on the phone?

24        MR. SCOTTI:  Exactly.

25        THE COURT:  So you play the messages and you have an

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    interpreter who will then translate them for the jurors.

2         MR. SCOTTI:  These were text messages.  So we were

3    stipulating to the authenticity of all of the information that

4    was taken off the phone, and then it would be case agent

5    testifying to messages.

6         THE COURT:  Why don't you stand by your oral

7    agreement?  You are taking up our time, and I don't quite get

8    it.

9         MS. DAVID:  Sure, your Honor.  When we discussed this

10   information last week, there was no discussion about -- first

11   of all, there was no discussion about a translator, which is

12   the biggest problem that I have with the messages because they

13   are in fact in Patois; and left, I think, for the jury just to

14   read them, they are not something that the jury can just take

15   on face value.

16        THE COURT:  You knew that before.  You knew that these

17   were not going to be in English, right?

18        MS. DAVID:  Yes, your Honor.  I think the issue was if

19   either of us were seeking to actually put these messages before

20   the jury that either one of us would need to call some type of

21   translator.

22        THE COURT:  We have that person now.  So why is it you

23   are fussing about this?

24        MS. DAVID:  I don't know what the translation that the

25   translator is going to purport that these messages mean.  I

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1  don't know if we are going to need more context based on the

2  messages that were selected by the government.

3      These messages and none of the text messages were

4  apparent on the exhibit list.  This wasn't something that --

5  obviously, I had the extractions.

6      THE COURT:  You are going on and on and on and on.

7  You told me you had an agreement.  Now you tell me you do not

8  have an agreement.

9      MS. DAVID:  I'm not saying I'm telling you now that

10  I'm changing my mind, your Honor.  The issue for me is the

11  translation --

12      THE COURT:  It's hard for me to try to understand

13  what's in your mind at this time.  Maybe you would like to

14  enlighten me a little more effectively.

15      MS. DAVID:  Sure, your Honor.  The fact that the

16  messages are in Patois is a problem for the defense because the

17  government is seeking to introduce them and call a translator

18  to interpret them.

19      THE COURT:  Wasn't that a problem before you agreed to

20  the authenticity of these messages?

21      MS. DAVID:  Agreeing to the authenticity as in

22  agreeing to the fact they came from the phone is different than

23  agreeing to the admissibility.

24      THE COURT:  Now you don't want the jurors to hear

25  them, even though you are agreeing they are authentic.  Is that

USA v. Nesbeth

1    what you are telling me?

2          MS. DAVID:  No, your Honor.  If the jury reads the

3    messages just as they are written, I don't believe they will be

4    able to interpret the messages, which is why an interpreter is

5    required.  However, I don't know what that interpreter's

6    interpretation of those messages is going to be, and that was

7    never discussed.

8          THE COURT:  Stop it.  You are telling me you don't

9    want these messages to be in evidence because they are in a

10   foreign language and you are not so sure you know what they

11   say.  Is that what you are trying to tell me?  I'm trying to

12   decipher what you are trying to say.

13         MS. DAVID:  My or -- whatever interpretation that the

14   government interpreter is going to give, I don't know what that

15   is, that's correct.

16         THE COURT:  You had ample opportunity.  You knew this

17   was going to happen.  You said you agreed to the authenticity,

18   but now you are playing ignorant that you don't want to have

19   them in evidence when you agreed to the authenticity.  I don't

20   understand what you are saying.

21         MS. DAVID:  What I'm saying --

22         THE COURT:  So you are not going to say anything any

23   more now.  I gave you the opportunity.  It sounds like

24   gobbledygook to me.

25         You have somebody you want to put on who is going to

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1  be an interpreter, and that person is here.  I will let you

2  question that person as to that person's qualifications.  You

3  can do it here in the absence of the jury or in front of the

4  jury.

5          What's your preference, Ms. David?

6          MS. DAVID:  Absence of the jury, your Honor.

7          MR. SCOTTI:  Your Honor, I do want to point out to the

8  court one thing.  Ms. David is -- we did have a discussion

9  about whether we would be using any of the messages, each of

10 us.  Neither of us gave final answers on it, and Ms. David is

11 correct in that this exhibit is not part of the exhibit list

12 that I gave them.

13         This was -- this is an exhibit that they had the

14 information.  They had it as part of discovery.  The defendant

15 herself, these are her own words.  It could have been

16 interpreted by her.

17         But I do want to be clear that this was not part of

18 the exhibit list.  But nevertheless, this was information that

19 the defendant had, information the defendant could interpret

20 herself; and this was just now because we were able to secure

21 an interpreter at this time, at the last minute, that these are

22 now needs an interpreter.

23         THE COURT:  This is my ruling.  I'm not going to let

24 you do it.  Your case is over.  It just sounds, all this

25 mumbling back and forth and this and that, it's not on the

USA v. Nesbeth

1    exhibit list, it's something that happened lately, she knew

2    about it, she didn't know about it.  It just doesn't sound like

3    something I can allow in evidence.  It just doesn't sound like

4    it to me.

5              What else do you have?

6              MR. SCOTTI:  Your Honor, if I could just have one

7    moment, please.

8              THE COURT:  Yes.

9              (Pause.)

10             MR. SCOTTI:  Nothing else, your Honor.

11             THE COURT:  All right.  So, you know, you have all

12   your evidence in.  You have your drugs.  You have everything

13   else.  And I don't know if you need any more.  I was willing to

14   try to accommodate you, but it's just too fuzzy for me to

15   really get a handle on it.  So we are not allowing it.  All

16   right.

17             Now, I think at this particular time we can go forward

18   with your case.  So are you going to have her testify or not?

19             MS. DAVID:  I would like to make my rule 29 motion.

20             THE COURT:  You can make your rule 29 motion, but why

21   don't you answer my question.

22             MS. DAVID:  The court can inquire directly from

23   Ms. Nesbeth, but we will not be putting on a case, your Honor.

24             THE COURT:  So you understand, Ms. Nesbeth, you

25   discussed this fully with your counsel and you agree with that?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1    You are making an informed decision after consulting with your

2    counsel that you prefer not to testify; am I correct?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  Okay.  Would you have anybody else that

5    you would call?

6              MS. DAVID:  No, your Honor.

7              THE COURT:  Okay.  So what I want to do is I have a

8    draft of the charge, and the only question -- I will give it to

9    you, but I just have one question here.

10             The way my excellent law clerk drafted it, it would be

11   to have a separate determination as to whether there was an

12   importation of drugs and then to the possession with intent to

13   distribute the drugs, and a separate question as to the drug

14   type, whether it was cocaine or not.  There can't be anything

15   else.  I don't see why you have a separate question here.

16   There is no separate quantity that we are dealing with here.

17             So my thinking is just to present it as to whether she

18   knowingly and intentionally imported cocaine, period.  Is there

19   any problem with that?  That's what the case is all about.

20   Okay.  So we will do it that way.  All right.

21             MR. SCOTTI:  Judge, also, in our request to charge, we

22   also included in that that the defendant intentionally or

23   consciously avoided knowing.

24             THE COURT:  Conscious avoidance?

25             MR. SCOTTI:  A conscious avoidance charge, I think, is

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1    appropriate here, judge.  The evidence here is that the

2    defendant didn't know.  So the lack of knowledge and all the

3    surrounding circumstances here would argue that she did know.

4            So if the defense itself is lack of knowledge, then

5    there is the argument here that she made herself willfully

6    blind so it would have been obvious.

7            THE COURT:  I see your point.  I'm not going to give

8    it.  All right.

9            So let's have your summations now.  Do you need a

10   little bit of time to gather your thoughts?

11           MR. SCOTTI:  Yes, your Honor.

12           THE COURT:  So, Mike, tell the jurors that we will be

13   with them in about -- what, about ten minutes you will need?

14           MR. SCOTTI:  Could we get 15 minutes, judge?

15           THE COURT:  Okay.  Let's tell the jurors they will be

16   coming back here at three o'clock promptly to continue with the

17   trial.

18           Now, do you want to, in the meantime, put anything on

19   the record on your rule 29 motion, Ms. David?

20           MS. DAVID:  Yes, your Honor.  We would ask the court

21   that the court grant our rule 29 motion, even in the light most

22   favorable to the government.  We would argue that the

23   government has not shown that Ms. Nesbeth knowingly imported

24   the drugs and possessed them with intent to distribute.

25           THE COURT:  All right.  So I'm going to deny that.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1          See you then at three o'clock for summations, and we

2     will give the case to the jury today.  If not, tomorrow

3     morning.  We will see how it goes.

4          MR. WEIL:  Your Honor, would we be able to review the

5     charge in 20 minutes?

6          THE COURT:  You have seen it 3,000 times.

7          MR. WEIL:  I have never been here before, your Honor.

8          THE COURT:  It's going to be count one, whether or not

9     the defendant knowingly and intentionally imported -- I'm going

10    to say cocaine.  Okay.  I'm going to just wrap it together

11    because there is no other deal in this case.

12         And the first element that the defendant imported

13    cocaine into the U.S. from a place outside; and the second,

14    that the defendant is knowingly and intentionally, and then we

15    can explain what knowledge is.  You know all of that, right;

16    and so count two deals with the same dime mick in terms of

17    distribution what else do you think.

18         MR. WEIL:  I didn't know if -- I don't know the

19    court's standard charge on reasonable doubt, evidence, lack of

20    evidence.

21         THE COURT:  We will get a copy to you.

22         MR. WEIL:  Okay.

23         THE COURT:  We are not going to hold up progress.

24    There is no need to do that.

25         MR. WEIL:  All right.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1        THE COURT:  Okay.  Three o'clock.

2        (Recess.)

3                        o O o

4   Certified to be a true and accurate transcript.
    /s/ Michele Nardone
5   MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Nesbeth

1        (In open court.)

2        THE COURT:  So Mr. Scotti, I thought about conscious

3   avoidance but I don't see it as enough of a foundation that you

4   laid here.

5        I don't recall anything about the circumstances by

6   which she got the suitcase; was it given to her boyfriend, I

7   know I have papers in limine but I'm listening to what came out

8   and all I hear is that the suitcase was opened up, he probed

9   it, found the cocaine, she was there.

10       I think you need more than that for conscious

11  avoidance.  Suspicious circumstance as to how she got it, who

12  gave it to her, where she was going with it and everything like

13  that.

14       So that is my thinking.  I just want you to know.

15  When I make my ruling, it's just not an arbitrary ruling.

16       MR. SCOTTI:  Can I be heard briefly on that, judge,

17  because I do believe that there is evidence that does prove

18  that this defendant did willfully turn a blind eye to what

19  would be obvious.

20       THE COURT:  You show me.

21       MR. SCOTTI:  Judge, you saw video.  I'm not going to

22  play the video now but it's depicted in Government's

23  Exhibit 20.  It's a picture that clearly shows the obvious

24  difference in the length of the extendable pull handle.  And as

25  the evidence says, the officer testified that the pull handle

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

1    came out only four, five inches.  That is not a normal bag to

2    anyone.  And that is not just a coincidence that that is where

3    the cocaine was found.  That clearly reflects, and the

4    defendant in the video as well, judge, from the baggage

5    carousel, when the jury can reflect on it, they will be able to

6    see that when she pulled the bag off of the baggage carousel

7    and she pulled the handle up, it came up about four or

8    5 inches, there was not a reaction from her.  She didn't pull

9    on it, look confused by it.  She just kicked it out with her

10   foot so she could use it comfortably.  That bag would not be

11   normal to anybody except someone that knew that there was

12   cocaine in there, someone who was ignoring.

13           THE COURT:  Maybe you are right.  It's a bit of a

14   stretch but it's not exactly a black and white conscious

15   avoidance dynamic, but maybe I'll give it to you.

16           MS. DAVID:  Your Honor, if I may be heard.

17           In response to the government's argument, the

18   government is essentially saying that the fact that the one bag

19   only extended partially --

20           THE COURT:  Right.

21           MS. DAVID:  The evidence shows that there is drugs in

22   both bags.  I guess I'm left with this --

23           THE COURT:  One bag was okay, the other was not,

24   right?

25           MS. DAVID:  Right.  And the truth of the matter is

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

USA v. Nesbeth

1    that there is the issue that drugs were contained in both bags'

2    handrails.  So I don't think the fact that one of the bags

3    partially extends really shows anything more than that there

4    might have been a problem with the bag.

5           THE COURT:  This is the real world.  My interns are

6    fascinated by this.

7           So if it's a close call, I'm going to sort of tip the

8    hat towards the defendant and not give it but it's close.

9           MR. SCOTTI:  Judge, if I can respond to that because I

10   don't think it's a close call.

11          THE COURT:  You can certainly argue it.  I'm not going

12   to prevent you from arguing that she had knowledge.  You can do

13   all of that.  We are just talking about the charge as such.

14   And certainly you can argue all of that to the jury.

15          I'm going to stick to my guns.  It's a close call but

16   I adopt concepts of levity when I'm dealing with people's

17   liberty quite candidly.  Some other judges might do it the

18   other way but that's the way I do it so I'm not going to allow

19   it.

20          You could have done more things, you could have asked

21   the agent did you have a conversation about what you thought

22   she would be doing with the suitcase.  The agent could have

23   said no.  You could have asked the agent did she say anything

24   about where she was bringing the suitcase.

25          I'm not going to be critical.  It is what it is.

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

USA v. Nesbeth

1          Let's just bring the jurors in.  And the charge has

2     been revised according what I explained to you.  Let's hear the

3     summations today.  I don't know how long we are going to go.

4     My sense is that I'll charge the jury first thing tomorrow

5     morning.  You'll have a chance to look at it if you really have

6     concerns about what the charge says.

7          How long are you going to be, about 20 minutes, half

8     an hour?

9          MR. SCOTTI:  My summation, judge?

10         THE COURT:  Yes.

11         MR. SCOTTI:  Your Honor --

12         THE COURT:  I'm not pinning you down.

13         MR. SCOTTI:  It will be about a half hour probably.

14         THE COURT:  You will be about how long?

15         MS. DAVID:  About 25 minutes.

16         THE COURT:  I think the way it breaks out, we'll

17    charge the jury tomorrow morning.

18         So take all the time you need to get your summations

19    in this afternoon.

20         MR. SCOTTI:  Thank you, your Honor.

21         THE COURT:  And you'll have a brief rebuttal.

22         MR. SCOTTI:  I can't promise it's brief but there will

23    be a rebuttal.

24         THE COURT:  All rebuttals by definition are brief.

25         MR. SCOTTI:  I'll try my best, your Honor.

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

USA v. Nesbeth

1          THE COURT:  So let's bring the jurors in.

2          (Jury in at 3:25 p.m.)

3          THE COURT:  Members of the jury, you are probably

4    wondering what was going on over the last half hour, 45

5    minutes.  You can speculate but I suspect you speculations may

6    be incorrect.  You might say maybe the judge went out to play

7    golf for the last half an hour or something like that but that

8    is not what happened.

9          What happened over the last half hour is that the

10   government has rested, has no additional evidence to submit to

11   you.

12         And I guess you did that officially in front of the

13   jury, right?

14         MR. SCOTTI:  I don't think I did, your Honor.

15         THE COURT:  You have done it now.

16         MR. SCOTTI:  I'm doing it now.  The government rests.

17         THE COURT:  Then we had some legal matters to discuss

18   because of that and then I turned the courtroom over to Ms.

19   David and the defense and she has told me that the defendant is

20   not going to produce any evidence and the defendant has chosen

21   to exercise her constitutional right not to testify.

22         So all that took a little bit of time to sort out and

23   that means that we can spend the rest of the afternoon

24   listening to summations.

25         It's a short trial but as I cautioned you to begin

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

USA v. Nesbeth

1  with, some trials by their very nature, like O.J. Simpson with

2  lots of witnesses took months, others take days.  It depends on

3  the circumstances of each case.  They are all equally

4  important.

5       The fact that a case may be a short case or a long

6  case is not a factor in terms of your determination based upon

7  the evidence that you heard as to whether the government has

8  proven its case.

9       So I just want to caution you not to infer anything

10  one way or the other because of the length of the trial or the

11  lack of length you might say, but we are now prepared to go

12  forward with concluding remarks or sometimes we call them

13  summations.

14       And the same as the opening comments, the government

15  goes first followed by defense and then the government has the

16  right to have the last word.  We call it a brief rebuttal.

17  It's not a repeat of the government's summation but somebody

18  has to get the last word in.

19       Since the government has the burden of proof in all

20  cases, we give the government the opportunity to get the last

21  word in.

22       So that's how it shakes out.  I think we can do that

23  all this afternoon speaking to counsel in terms of the

24  anticipated length of their summations.  We'll see how it goes.

25  And if that materializes, we will then start tomorrow morning

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

1    at 10:00 and I'll explain to you the law and you'll commence

2    your deliberations.

3           I want to caution you once more that what counsel says

4    in their opening statements or here now in summations is not

5    evidence.

6           I don't like to have counsel interrupted during their

7    closing remarks but sometimes it happens when something is said

8    by a lawyer and the other lawyer says that's just not true.

9    That is not what I recall.

10          So by talking to them briefly in advance, perhaps it

11   might be prophylactic to prevent any interruptions, saying I

12   object, that's not true, because I'm telling you now, it

13   doesn't matter what the lawyers say.  You may agree, you may

14   disagree.  It's your recollection as the fact finders that

15   counts.  The same thing about comments they may make about the

16   law.  It's what I say about the law that counts.

17          And if somebody says something that the other lawyer

18   doesn't agree with, it's not going to be necessary for them to

19   stand up and say I object necessarily because I'm telling you

20   right now that you don't believe anything that is said because

21   a lawyer said it, whether it's the government lawyer or the

22   defendant's lawyer.  It's your recollection of the facts.  And

23   once again, if you don't have a clear recollection, we can get

24   the original.  Allan, our wonderful court reporter is writing

25   down everything that we say now and you'll be able to have that

USA v. Nesbeth

1    again if you have any question as to what actually was said by

2    any of the witnesses in the case.

3         So I think with those instructions, we can now call

4    upon Mr. Scotti to deliver the government's summation.

5         MR. SCOTTI:  Thank you, your Honor.

6         Ladies and gentlemen, as I told you when this case

7    started, the government would prove beyond a reasonable doubt

8    that the defendant Chevelle Nesbeth brought cocaine into the

9    United States and that that cocaine was of such an amount that

10   was not intended for personal use but for distribution and also

11   that she knew what she was doing when she came into the

12   country.

13        That is exactly what we have proven to you at this

14   point.  They were her bags.  There was cocaine found in those

15   bags that were valued between either 16,000 at the low end

16   wholesale to $60,000 for resale value and she brought those

17   bags into this country and she was caught.

18        Ladies and gentlemen, most of the evidence you've

19   heard in this case is not in dispute.  It's not in dispute that

20   the bags where the cocaine was found were the defendant's.

21   It's not in dispute how she got to this country.

22        You saw in Government's Exhibit 13 her boarding pass

23   from the flight from Montego Bay, Jamaica into John F. Kennedy

24   Airport.  You know she was admitted into the U.S. because of

25   the customs declaration, Government's Exhibit 9.  It has a

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

 1    stamp that says that she was admitted.

 2            There is no issue that these bags were hers.  This was

 3    the large suitcase.  This is the one where there was 371 grams,

 4    I believe it was 371 grams from what I remember, of cocaine

 5    found inside this bag.

 6            This bag doesn't just have a baggage sticker with the

 7    defendant's name on it.  It has a personal tag that she wrote

 8    that is in handwriting, her name, her address, her phone number

 9    and her E-mail address.

10            These are all things that any of us do to our bags

11    when we own them, when we want to make sure when we fly that we

12    get them back.  The defendant treated these bags, as the

13    evidence proved to you, just as if they were her bags because

14    the evidence showed to you that they were.  It's not in

15    dispute.

16            What else is not in dispute?

17            The rails of both of those bags, both of the

18    defendant's bags were filled with cocaine.  1.3 pounds of

19    cocaine is a very significant amount.  And they were put into

20    the rails of the two suitcases that the defendant brought into

21    this country.

22            There is no dispute that the white powdery substance

23    found in those rails was cocaine.  You heard the testimony from

24    the forensic chemist and he told you exactly what it was.  And

25    also, you heard testimony from an expert on the value, on the

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

1   distribution of cocaine.  And there has been no real dispute as

2   to what that evidence is either.  And that evidence is that as

3   is, wholesale, the cocaine the defendant brought that was a

4   combined 600 grams or 602 grams was worth between 16,000 and

5   $28,000.  Agent Suden said that that could be cut up because

6   the purity level was approximately 50 percent, that that

7   600 grams could be turned into 1200 grams to be sold out on the

8   street.  And once it was, the value goes from between 30 to

9   upwards of $60,000.  That's how much those bags were worth when

10  the defendant came into the country on January 6, 2015, the

11  bags with her names on them, the bags that you saw her on those

12  videos come in with.

13       So what are we left with, ladies and gentlemen?  We're

14  only left with one issue here for you to decide.  Did she know?

15       Ladies and gentlemen, the evidence here proves to you

16  that she knew in several important ways.  Again, what is the

17  first and most logical and important reason that you know that

18  the defendant knew?

19       They are her bags.  Her name was on those bags.  Her

20  clothes, all of her belongings were in those bags.  In her own

21  words.  One of the first things she did when the CBP officer

22  brought her to the secondary checking area, he asked her are

23  these your bags?  She said yes.  Is everything inside of them

24  yours?  Yes.  Did you pack them yourself?  Yes.

25       She accepted ownership of those bags because the

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

Summation - Scotti

1    evidence proves that they were?

2          Ladies and gentlemen, the next point that shows after

3    the evidence proves that they were her bags, the next and most

4    important part of the evidence you heard that shows her

5    knowledge was the condition of the bag.

6          Can I have the Elmo?

7          THE CLERK:  Yes.

8          MR. SCOTTI:  You remember Government's Exhibit 20.

9    This was from the still video taken from the baggage area.  You

10   heard the testimony about the extendable pull handle that

11   barely came out.

12         Ladies and gentlemen, this case is about common sense.

13   You have to figure out what someone knew.  You have to get

14   inside their minds.  So you want to put yourself in that

15   situation.

16         These were your bags.  Does that handle look normal to

17   you on the larger suitcase?

18         Does that look like the way it was supposed to?  You

19   can see the smaller bag and the smaller bag fully extends.  The

20   larger bag doesn't.

21         Why does the larger bag not fully extend?  Because it

22   was altered.  It was specially altered to fit more cocaine in

23   there.

24         And how do you know that?  You know that because when

25   the bags were taken apart, you saw the rails.  The larger

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

1    suitcase had only these two rails.  The smaller suitcase had

2    almost twice as many rails.  That's why the smaller suitcase

3    extended all the way and the larger suitcase didn't.  It was

4    because the larger suitcase was altered.

5            So the question is why wasn't the small suitcase

6    altered?  The larger one was to fit more cocaine.  Why was the

7    smaller one not altered?

8            Ladies and gentlemen, again if you look at this

9    picture, you'll see the larger suitcase is tall.  And it's

10   already awkward to carry the larger suitcase when the handrail

11   barely comes up.  The smaller suitcase, if the handrail only

12   came up 4 inches, it would be awkward to carry.  It would be

13   obvious.  So the cocaine was put in the top of the rail.

14           But for someone who didn't know, who was arguing that

15   they didn't know, there is no way that that larger suitcase is

16   okay, that it's normal.  It was normal to the defendant because

17   she knew what was in it.  She knew she was carrying cocaine.

18           (Continued on next page.)

19

20

21

22

23

24

25

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

Summation - Scotti

1          (In open court.)

2          MR. SCOTTI:  Also, ladies and gentlemen, you know that

3     the defendant had knowledge because of how it was hidden.

4          This wasn't just slipped into the pocket of the bag.

5     These were in the handrails.  That is a labor-intensive

6     process, right?

7          You heard evidence that she went home and she stayed

8     with her family for two weeks.  These were her suitcases.

9          How did that happen?  How could somebody get to her

10    bags and fill them with cocaine in the rails?  You know that

11    that couldn't happen.  It's just the defendant would have to be

12    the most unlucky person in the world, if someone could get to

13    her bags, take the rails apart, fill them up with cocaine, put

14    them back together, without her knowing, and then the handrail

15    of this one, barely extends?  That's not -- we already talked

16    about how that's not normal.

17         After they doctored her bags and altered them,

18    wouldn't she have realized?  Wouldn't she have seen that was a

19    problem?  No reaction from her in that airport.  No problem

20    with extending the rail or pulling on them or doing any of the

21    things that someone who identified fact that their own bag was

22    not working properly would do, would pull on it, would question

23    it.  There was no question from her.

24         Also, ladies and gentlemen, getting back to the value,

25    you have heard $16,000 or $60,000.  Either way, that is a lot

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    of money.  If she didn't know those drugs were in her bag, how

2    was whoever snuck it in there going to get it back from her?

3    Nobody is just giving that to someone who doesn't know and then

4    crossing their fingers and saying, I hope this gets over there.

5    Then what?  Then what do you do?  Were they going to steal them

6    from her?  Were they going to mug her?  How were they going to

7    get the bags back?  That's a lot of money.

8         They would not do that.  They wouldn't just give bags

9    to someone who didn't know.  That's too much money.  There was

10   just too much on the line.

11        Ladies and gentlemen, the evidence here establishes

12   without dispute that the bags you are looking at here were the

13   defendant's.  It establishes the fact that there was 1.3 pounds

14   of cocaine in those bags when she came back.  And the evidence

15   finally establishes without any reasonable doubt that she knew

16   it.

17        Those bags could not have been taken from her, taken

18   apart, have cocaine put inside, put back together, with the

19   larger suitcase and the extendible rail clearly, clearly

20   altered, and the defendant just think it was fine and come in

21   here, coming here and be none the wiser.

22        Ladies and gentlemen, the defendant brought $60,000 of

23   cocaine into this country.  She knew it.  The evidence proves

24   it.  I ask that you find her guilty.

25        THE COURT:  All right.  Thank you, Mr. Scotti.

Summation - David

1          Ms. David, summation.

2          MS. DAVID:  I agree with Mr. Scotti about one thing.

3     Knowledge is absolutely the key issue in this case.  It's what

4     I said to you in the beginning when I first spoke with you.  It

5     is the only thing that's really in dispute.

6          From the government's perspective they tell you, well,

7     of course, Ms. Nesbeth, Chevelle, knew because she had the bags

8     that day, because she said she packed the bags that day.  Oh,

9     by the way, there is this issue with the handrails on one of

10    the bags not fully extending.  Of course we know that there

11    were drugs found in both of the bags and one handrail had no

12    problem whatsoever.

13         But, I think that these statements, ladies and

14    gentlemen, create more questions than answers.  Let's talk

15    about a few of those questions, because as I told you in the

16    beginning, having the bag in and of itself, having these

17    suitcases, is not where the story ends.  The question is, of

18    course, that of knowledge.

19         Where is the evidence?  Where is the evidence that

20    Chevelle saw the drugs being placed into the handrails of her

21    bags; that she was told about it; that she was cued in about

22    it; that it was even hinted to her?  Where is the evidence of

23    how long she even had these bags before she got to JFK that

24    day?

25         You heard the testimony from the JetBlue agent, who

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - David

1   told you that on the way to Montego Bay Chevelle checked in

2   three bags; on the way back she checked in one.  She was gone

3   for approximately two, two and a half weeks.  We have no idea

4   how long she had those bags.

5        Then the malfunctioning handrails.  You might have

6   seen us with these carts in the back of the courtroom that we

7   use to kind of push around the materials that we bring back and

8   forth.  I remember having a cart once where the wheel was

9   stuck.  Did I think to myself somebody altered this?  Somebody

10  must have put something in there to get it to stick?  Or was it

11  just that it was malfunctioning?

12       Why does the fact that her handrails don't pull out

13  all the way show flashing signs that there must be drugs in

14  here and that she must have known that there were drugs in

15  there?  It doesn't.

16       Ladies and gentlemen, you have to ask yourselves

17  whether or not the government has actually proven that Chevelle

18  knew that there were drugs in the handrails of those suitcases

19  beyond a reasonable doubt.  I submit to you they have not.

20       I want to talk to you briefly, before I go into the

21  number of reasons to doubt that are present in this case, about

22  three principles of law that the judge has talked to you about

23  and will talk to you about again.  The first is the presumption

24  of innocence.  What the presumption of innocence means is that

25  when Chevelle walked into the courtroom yesterday and today she

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    was innocent, and she remains that way up until the time that

2    you decide otherwise.

3         And the presumption of innocence goes hand in hand

4    with another very important principle of law, and that is the

5    burden of proof.  It is the government's burden to prove that

6    Chevelle is guilty.  So if you have any questions, any reasons

7    to doubt her guilt, you look to the government.  If you have

8    questions about why there is no evidence of any link showing

9    that she, Chevelle Nesbeth, would have had any contact with

10   cocaine, you look to the government.  If you have any questions

11   about why in this gotcha moment, supposedly, when the agent

12   looks into the bag and looks at the handrails Chevelle does not

13   at all appear nervous and nothing really more than confused,

14   you look to the government.

15        How much proof does the government need?  Proof beyond

16   a reasonable doubt.  Proof beyond a reasonable doubt is the

17   kind of doubt that might cause one to hesitate in the graver

18   and more serious decisions in life.  Ladies and gentlemen,

19   there are many reasons to doubt in this case.

20        The government doesn't have to give you every piece of

21   evidence.  But you should not have to speculate and guess at

22   and estimate what's happening.  You shouldn't have to speculate

23   about all of these questions that remain outstanding.

24        On the back of that customs card or the customs

25   receipt, Government's Exhibit 9 -- you will have it in evidence

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1  with you -- the CBP officer, the customs officer, said that he

2  had his own notes back here with names of different officers

3  and times.  This shows you a little bit about how after

4  Chevelle was arrested the timeline and a little bit about what

5  was going on.

6       During none of this time, during none of this time at

7  all, when Chevelle is with these agents, with these law

8  enforcement folks, is she making any more statements that the

9  government has shown you that show that she has some direct

10  link to this cocaine.  The only link that they are saying that

11  she has was the fact that that day she came to the airport with

12  two bags and that she said that the things that she had

13  touched, seen, and packed were in fact hers.  But you know that

14  the drugs were not found in places where she would have

15  touched, seen, or packed.  They are found in the handrails,

16  secreted away from her view, as well as anyone else's.

17       Now, think about all the things that are missing here.

18  Special Agent Suden testified about some of the types of

19  investigation he has done in his experience as a drug expert in

20  doing narcotics investigations, how sometimes law enforcement

21  does wiretaps, they do work with informants.  So they tap

22  people's phones.  They do all of this investigation, they kind

23  of figure out where the drugs came from, where they are going.

24  He talked about the fact when people usually come into the

25  country with drugs there is somebody at the airport waiting for

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1   them to pick up the bag, for various different reasons,

2   including the fact that thousands of dollars worth of drugs,

3   that's something that somebody else would want to pick up.

4           But there is no evidence of any bigger picture here

5   because Chevelle is not linked to some bigger picture because

6   she doesn't know.  She absolutely doesn't know.  This

7   19-year-old girl comes into the country with these bags after

8   going to visit her family.  Where is the bigger conspiracy?

9   Where is the evidence that she was part of some plan to bring

10  drugs into the country?  There isn't one.

11          Now, there is a lot of different reasons why the

12  handrails themselves are not the starting and stopping point in

13  this case.  Because what about the handrails apart from the

14  fact that they don't -- one of the bags doesn't extend all the

15  way is an indicator of anything?

16          You heard the testimony that the drugs were in

17  vacuum-sealed bags.  There was no smell coming out of the

18  handrails.  The handrails didn't look to be altered in any way.

19  There was no hole in the handrails.  That in order to get to

20  the drugs, the customs agent, who testified that of the

21  thousands of suitcases he searched this is the second time he

22  has ever found drugs in handrails, that he had to use a probing

23  agent, this metal instrument, to bang and tap until he could

24  break open and puncture holes to see any white powder

25  whatsoever.

Summation - David

1      Now, unlike some of the other types of ways that

2   people bring drugs into the country, as Special Agent Suden

3   told you, here is an instance where the person who has the

4   drugs in their bag has zero contact with them.  Zero access to

5   those drugs.

6      It's not an -- it's not a situation where a person has

7   swallowed them, where they would have been able to access them

8   into some type of hidden compartment or false bottom.  The only

9   way for the customs agent to have accessed them was to have

10  broken open the handrails.  That's not something that Chevelle

11  or you or I or anyone would think to do.  She did not know.

12     What's the other indication that shows you that the

13  government can't prove and has not proven that she knew?  Think

14  about Chevelle's reaction when the drugs are discovered or even

15  during the secondary inspection.  Now, the government wants you

16  to believe that Chevelle has full well knowledge that there is

17  cocaine in the handrails of these bags.  Yet, she talks to the

18  customs agent.  They have a chat, a friendly conversation.

19     You will hear in Government's Exhibit 17A, when he

20  asks her questions about where she lives, about where she is

21  going, about if she works, what her dad does, and she is trying

22  to explain to the customs agent what her father does for a

23  living.  And then he suddenly starts tapping the bag; and

24  that's when she says, well, is something wrong?  But before

25  that he has already unzipped the lining of the bag, gotten to

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation – David

1    the handrails.  This should be the moment where the panic sets

2    in.  The panic should be setting into Chevelle's face, if she

3    knows there are drugs in there, because it's clear.  It would

4    be clear in the mind of someone who knew that they were about

5    to be discovered.

6           But none of that, none of that is on her face.  None

7    of that governs any of her body at all.  She stands there,

8    calm, not looking nervous, and only starts to become confused.

9    Then, even after, even after he bangs on the bag, he tells her

10   to repack the bag, which she does, even after all of that, when

11   the bags are taken down and she is waiting to see what's going

12   on, at this point you would think she must know that she has

13   been discovered.  Because why else is she still standing there

14   after this man has looked at the handrails so carefully, after

15   he has pounded the place where the drugs are?  If she even, if

16   she knew they were there.

17          Let's look at the clip of her after all of this is

18   happening.  One moment.

19          (Recording played.)

20          MS. DAVID:  So here Chevelle is.  She is -- he has

21   already gone through her bags.  If you go back a little bit

22   further, to about 6:16, she starts reaching into her purse for

23   something.  At this point if she knew that there were drugs in

24   the handrails, she knew that obviously the customs agent had

25   been that close to these thousands of dollars worth of drugs

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    that she, according to the government, is knowingly trying to

2    bring into the country, and she reaches into her bag, wouldn't

3    you expect her to be pulling out, say, her phone to text

4    message someone, to frantically send a message saying, hey, I

5    have been discovered; hey, I need help, whoever is supposed to

6    be coming to pick up the drugs, alerting them.

7           But Chevelle doesn't do any of that.  Again, she is

8    just standing there.  She pulls out some lip gloss because she

9    has no clue.  She has no clue what's going on.  At this point

10   she still has no idea.  Because she never knew that the drugs

11   were in the handrails.  It isn't until she is placed under

12   arrest that that becomes clear.

13          Now, at the beginning of this case I told you that

14   Chevelle had gone on a vacation.  She arrived back at JFK and

15   that ever since she has been in an ongoing nightmare.  Because

16   here she sits, being accused of a crime that she did not

17   commit.

18          Ladies and gentlemen, I have talked to you about a

19   number of questions, a number of reasons to doubt that the

20   government has proven their case beyond a reasonable doubt.

21   They haven't.

22          I now ask that you come back with the only verdict

23   that matches up with all of those reasons to doubt in this

24   case, and that is a verdict of not guilty of all counts on

25   behalf of Ms. Chevelle Nesbeth.

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

1        THE COURT:  Thank you, Ms. David.

2        Mr. Scotti, do you wish to have a brief rebuttal?

3        MR. SCOTTI:  I do, your Honor.

4        Your Honor, if I could just have a moment, I would

5    like to set up the video.

6        THE COURT:  Go ahead.

7        (Pause.)

8        MR. SCOTTI:  Thank you, your Honor.

9        Ladies and gentlemen, this case is about common sense.

10   It's not about speculation.  There is no jury school.  None of

11   you had to take a course before you came here to sit on a jury.

12   The reason is, the only thing you need to be good jurors, you

13   walked in here and it was with you today.  It's your common

14   sense and your life experience.

15       Ladies and gentlemen, remember about Officer

16   D'Andrea's answer on redirect examination.  We were talking

17   about his training and all these things, but he told you that

18   had nothing do with how he noticed that this handle was odd,

19   that there was something strange about it.  It was obvious to

20   him.  The handle was altered.

21       Let's talk about the defendant's reaction.  Someone

22   who knew they were importing cocaine into the United States

23   knows that there is a good chance that they are going to be

24   checked, that they are going to be searched.  They will be

25   prepared for that.  They will be ready to be able to mask it,

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    to hide whatever emotions there are, that they have to look

2    normal and appear normal to get away with it.  So is there any

3    surprise that for the large part of that video defendant was

4    just having normal conversation and everything was fine?  No.

5    Because someone who was trying to sneak cocaine into the

6    country is going to try to act normal.  They are going to try

7    to deflect any suspicion.

8            But, if you look at the video, you will see that there

9    is a lot of back and forth, normal conversation between Officer

10   D'Andrea and the defendant.  But when does that conversation

11   stop?  It stops the moment he pounds into that rail.  There is

12   not another word said between them until later on, when he is

13   searching the second bag, but she doesn't say anything.

14           Ladies and gentlemen, look at these bags.  They are in

15   good condition.  They pretty much look new.  Right?  We have

16   all -- I can't say all of us, but if you travel you have had

17   your bags searched.  For those of us who have been there --

18   and, again, it's about putting yourself in a situation, you

19   have had your bags searched, just imagine that that's you.  You

20   are sitting there.  You watch the officer going through it.

21   They empty all out your belongings, they unzip it.  That seems

22   normal.  She asks him, Is everything okay?  That's her starting

23   to get nervous.  She was talking casually to him.  They were

24   having conversations about her father, about all these other

25   things.  She is trying to deflect his attention, but now he is

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Rebuttal - Scotti

1   getting close.

2          When he hits into that rail, silence.  I want you to

3   take a look at what I'm referring to.  You can see they are

4   talking back and forth.  He is working on the rail.  Her hands

5   are at her side.  Now he is looking closer.  She is looking as

6   well.  She asks if something is wrong.  He says no.  She is

7   just looking.

8          (Recording played.)

9          MR. SCOTTI:  Ladies and gentlemen, if this was your

10  bag, if this was you, if you had these nice, new, perfect bags,

11  pristine bags, what would you say when an officer just took a

12  metal tool and punched a hole into it?  You would say, What are

13  you doing?  Why did you just do that?  He was clearly damaging

14  the bag.  He wasn't tapping it anymore.  He punched a hole in

15  it.  Is that reaction normal to you?

16         I mean, the defense wants to say that just because she

17  didn't crumble into a ball and start sobbing at that moment

18  because it was discovered, that that shows that she had no

19  idea.  That's absolutely not the case.  Why?  Because Officer

20  D'Andrea didn't want to alert her to the fact he found

21  something.  You see his reaction.  It was hardly any reaction.

22  He just looked up.

23         But watch what's happening right now.  Her hands were

24  never in her pocket the whole time.  It's subtle things, ladies

25  and gentlemen, but when you add them all up they mean that she

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    knew.  Not saying anything, talking to him casually, trying to

2    distract him, as soon as he punches a hole, all of a sudden she

3    is quiet, doesn't even question him.  Just punched a hole in

4    the bag, doesn't question it, nice new bag.  Then, for the

5    first time, he looks around, he sees it.

6              (Recording played.)

7              MR. SCOTTI:  Hands go in the pocket.  Not a word.

8              Also, ladies and gentlemen, I want to jump ahead to

9    the -- Ms. David mentioned the lip gloss.  I want to play the

10   whole clip because I want you to see how much lip gloss the

11   defendant put on her lips, and this is the point where now the

12   bags have been searched and she is still there and there are

13   more officers coming her way.  If Ms. David wants to argue this

14   shows she doesn't know, she was casually putting lip gloss on,

15   reaches into her bag.

16             (Recording played.)

17             MR. SCOTTI:  Still going, still going, and now still

18   rubbing on the area.  Ladies and gentlemen, that doesn't look

19   casual.  This is someone who is in a very stressful environment

20   and was trying to act casual.  She put lip gloss on for -- you

21   have the video in evidence -- it looked like ten seconds

22   almost.  How chapped were her lips?  And then afterwards she

23   rubs it on.

24             For someone who knew that cocaine was in the bag that

25   she was carrying and it was just searched like that, that's

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Rebuttal — Scotti

1    consistent with someone -- it's a nervous tick.  They are not

2    going to crumble into a ball.  They are not going to start

3    crying, but it's little things that show.  When you combine

4    that are the big things that we have here, that it's her bags,

5    that's not in dispute, these reactions are significant.  They

6    are very significant.

7         Ladies and gentlemen, common sense.  Drug traffickers

8    do not give $16,000 to $60,000 worth of drugs to someone who

9    does not know they are carrying it.  They just don't.  They are

10   not going to risk it, especially when the large suitcase was

11   altered like that.  Think about that.

12        Are they going to do something and put the drugs in a

13   place where that bag is altered and then give it to someone who

14   doesn't know so that their attention would be directed exactly

15   to that spot?  A person who doesn't know is going to think that

16   bag is broken.  A person that doesn't know is going to pull on

17   it.  They are going to try to open it.

18        How is this drug trafficker, how does he not know or

19   she not know that they don't try poking in there to shake it

20   loose?  That's thousands of dollars of product, and they are

21   just sending it off.  They are taking that risk, not a chance?

22   There is -- ladies and gentlemen, there are many risks that are

23   beyond the control of someone who is trying to get drugs in the

24   country.  If the bag is searched, they can't control that.  If

25   the hiding place holds up itself, if there is drug sniffing

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Rebuttal - Scotti

1    dogs when they get to the airport, those are things they can't

2    control.

3              But what can they control?  They can control how it's

4    hidden and who brings it in.  This is a good hiding spot and

5    it's got a built-in defense with it.  No question about it.  It

6    allows whoever brought it in to say, I don't know, the bag was

7    empty, how am I supposed to check the rails?  Because it's your

8    suitcase because, you extend it and close your suitcase all the

9    time before they put drugs in there, before it was shrunk down

10   to that size.  That's how you know.

11             That built-in defense aside, talk about the drug

12   traffickers themselves, those are the variables they have some

13   control over, right, and when they have that much on the line,

14   they have that much at stake, these people whoever it was, who

15   sent these bags over, and had the defendant send them, whether

16   it was the defendant herself or whoever, we don't have to prove

17   that.  That's not what this case is about.

18             But these bags were very specially designed.  The

19   hiding place was made to avoid detection.  They were reducing

20   the risk.  Why would someone take all the effort to recreate

21   these bags to carry cocaine and give them to someone who didn't

22   know?  They wouldn't.  They wouldn't.  It doesn't matter how

23   well hidden the drugs are, if the person you send doesn't get

24   them to where they are supposed to go, ladies and gentlemen.

25             Even the small bag.  You heard the evidence that the

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1    small bag the extendible handrail, was filled all the way to

2    the top.  I explained to you that difference.  It doesn't have

3    to be that, well, since the small bag extends all the way and

4    then that whole theory that the altered handrail on the larger

5    bag doesn't hold water.  Of course it does.  The smaller bag

6    couldn't be altered that way.  It would be a child's bag.  She

7    would be walking around the airport leaning over.  It would be

8    obvious, and it was still obvious and it's obvious with the

9    larger bag, as you have seen.

10            Can I have the ELMO.

11            THE COURT:  Mr. Scotti, you are going for ten minutes.

12   It's getting a little repetitious.  The purpose of rebuttal is

13   not to repeat what you said on summation.

14            MR. SCOTTI:  Understood, your Honor.  I will wrap up.

15            Ladies and gentlemen, just to conclude, look at the

16   difference in those bags.  There was cocaine in the smaller

17   bag, but the small bag had a normal handrail.  That handrail on

18   the larger bag is one-third the length.  This is not something

19   that the defendant can just ignore, that she could say I don't

20   know, I thought maybe the handrail they made for my larger bag

21   just didn't extend all the way.

22            What does your common sense tell you about that?  It

23   tells you that that can't be true.

24            This is not a coincidence.  Defendant is not just the

25   most unlucky person in the world.  Someone got to her bags,

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Rebuttal - Scotti

1    they took them apart, they filled them with cocaine, they put

2    them back together, they sent her over here, and then who knows

3    how they were going to get it back from her, but they were

4    going to.  Hopefully they get it back.  That's not what

5    happened, ladies and gentlemen; and you know that from common

6    sense, not from speculation.  This case is about your common

7    sense.  They were the defendant's bags.  The drugs were inside,

8    she is was caught.  She tried to get it through, and she was

9    caught.

10          Ladies and gentlemen, at this point in the case, the

11   government has proved to you beyond a reasonable doubt that the

12   defendant knowingly imported cocaine into the United States and

13   knowingly possessed it with the intent to distribute.  Thank

14   you.

15          THE COURT:  Thank you, Mr. Scotti.

16          So rather than to really give you the charge late this

17   afternoon -- it will take about a half hour or so -- I think

18   it's best if we just get a good night's sleep and come back

19   tomorrow morning fresh at ten o'clock.  And you will hear me

20   explain the law to you at that time, and then you will commence

21   your deliberation.  All right.

22          So don't talk to anybody.  You have been fine.  Just

23   resist the temptation.  You have heard all the arguments.

24   Don't go home and check it out with anybody back home.  It

25   would be the wrong thing to do.  That would be a violation of

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1    your oath.

2           So I expect you all to be like as pure as Caesar's

3    husband -- and you can get away with it because I'm not going

4    to be there to supervise you -- but I don't think you want to

5    do that.  You want to base your decision tomorrow or whenever

6    on the evidence.

7           You heard all the arguments.  You know the case now.

8    You will have a chance to discuss it amongst yourselves during

9    deliberations, and we will see you tomorrow at ten o'clock.

10          THE CLERK:  All rise.

11          (Jury exits.)

12          THE CLERK:  You can all be seated.

13          THE COURT:  All right, folks.  Mr. Johnson, my law

14   clerk, is going to hand out to you the charge.

15          I will make a couple of little small nonsubstantive

16   changes.  You may pick up other things.  I'm not going to give

17   it to the jurors.  It's short.  I don't have to give it to

18   them, and you will notice on page 16 I'm going to put in -- the

19   document is not in evidence -- after I talk about the

20   defendant's right not to testify on page 17 and then I'm just

21   changing the next to last line on 17 to refer to her rather to

22   either of them in the plural.  So you may find other little

23   things after you look at it, but it's basically, I think, in

24   good shape.

25          The exhibit, the verdict sheet, has just the two

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

USA v. Nesbeth

1   counts and, you know, I will see you.  Why don't you take a

2   look at it now.  We have a little bit of time.  It's very

3   short, and if you have any real requests or anything that

4   concerns you, I have to be here for a five o'clock.  I have a

5   conference on a civil matter.  So take a look at it now, and if

6   you have anything further you can tell me before you leave.

7   Okay.  And I will be back here about a quarter to 5:00 or

8   thereabouts.

9           Mike, the civil people, are they here yet?

10          THE CLERK:  Actually, it's by telephone.  So we can do

11  it in chambers at your leisure.

12          THE COURT:  Let's it now.  Off the record.

13          (Recess.)

14                         o O o

15

16  Certified to be a true and accurate transcript.
    /s/ Michele Nardone
17  MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

167

USA v. Nesbeth

1                        I N D E X

2                        WITNESSES

3           D'Andrea – Direct/Scotti          32
            D'Andrea – Cross/David            75
4           D'Andrea – Redirect/Scotti        83
            White – Direct/Scotti             84
5           White – Cross/David               93
            Modico – Direct/Scotti            95
6           Suden – Direct/Scotti            106
            Suden – Cross/Suden              116
7           Summation – Scotti               143
            Summation – David                149
8           Rebuttal – Scotti                157

9

10                       EXHIBITS

11          Government's Exhibit 9            39
            Government Exhibits 5A through 5F  41
12          Government Exhibit 5G             46
            Government Exhibit 7             51
13          Government Exhibits 17A through C  55
            Government Exhibit 17C           62
14          Government's Exhibit 19A         66
            Government Exhibit 19B           67
15          Government Exhibit 1            69
            Government Exhibit 2            70
16          Government Exhibit 4            71
            Government Exhibit 3            71
17          Government Exhibit 13           73
            GX 1A                          89
18          GX 2A                          91
            GX 2A                          91
19          GX 12                          98

20

21                       o O o

22

23

24

25

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter